**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**RALPH LYNCH,**

        **Petitioner,**

  **v.**                              **Case No.  2:07-cv-948**
                                            **JUDGE GREGORY L. FROST**
**STUART HUDSON, Warden,**          **Magistrate Judge E.A. Preston Deavers**

        **Respondent.**

<u>**OPINION AND ORDER**</u>

     Petitioner, a prisoner sentenced to death by the State of Ohio, has pending before this Court a habeas corpus action pursuant to 28 U.S.C. § 2254.  This matter is before the Court for final judgment and disposition.

**I.  Overview**

     In a February 25, 2009 Opinion and Order, the Court dismissed as procedurally defaulted the following grounds for relief: four, nine (paragraph 89), eleven (paragraphs 110-111), fourteen (sub-part B), fifteen, and sixteen.  (ECF No. 25.)

     The Court permitted some factual development in this case.  On October 29, 2009, the Court issued an Opinion and Order granting Petitioner's request for funds to employ a neuropsychologist and denying Petitioner's request for funds to employ a clinical psychologist. (ECF No. 31.)  On May 24, 2010, the Court issued an Opinion and Order granting Petitioner's motion to expand the record with the affidavit, report, and curriculum vitae of Dr. Michael M. Gelbort, the doctor who conducted the neuropsychological evaluation of Petitioner as permitted by this Court's October 29, 2009 Opinion and Order.  (ECF No. 49.)  The matter of factual development remains open, however, because also before the Court are Petitioner's motion for an evidentiary hearing (ECF No. 59) and Respondent's motion for reconsideration of the Court's order granting Rule 7 expansion of the record (ECF No. 65).  The Court addresses those motions in Section II below.

     Pursuant to the Court's September 21, 2010 Scheduling Order, Petitioner filed his merit

brief on November 24, 2010 (ECF No. 56), Respondent filed his response in opposition on December 22, 2010 (ECF No. 57), and Petitioner filed his reply memorandum on January 13, 2011 (ECF No. 58).  This case is now ripe for review.

## II.  Expansion of the Record and Evidentiary Hearing

### A.    Expansion of the Record

Before addressing the merits of Petitioner's claims, the Court must resolve two matters concerning factual development in this case.  The first concerns the Court's May 24, 2010 Opinion and Order granting Petitioner's Rule 7 motion to expand the record with Dr. Gelbort's materials.  Respondent seeks reconsideration of that Opinion and Order, relying on the recent Supreme Court decision of *Cullen v. Pinholster*, 131 S.Ct. 1388 (2011).  (ECF No. 65.)  Also before the Court are Petitioner's response in opposition (ECF No. 66) and Respondent's reply (ECF No. 67).

Respondent argues that *Pinholster* confirms his original argument opposing expansion of the record that new evidence developed during federal habeas corpus proceedings is not relevant to the federal court's determination of whether a state court's decision contravened or unreasonably applied clearly established federal law.  (ECF No. 65, at 1.)[1]  According to Respondent, *Pinholster* recognized that 28 U.S.C. § 2254(d) limits a federal court's review to the record as it existed when the state court reached its adjudication.  "Therefore," Respondent reasons, "a habeas petitioner cannot support a claim under the applicable 28 U.S.C. §2254(d) standard of review with evidence that was not presented to the state court."  (*Id*. at 2.)  To that point, Respondent asserts that the Ohio courts rendered adjudications on the merits of the claims that Petitioner now seeks to bolster with the new evidence of Dr. Gelbort's report.

Petitioner argues that Respondent is urging this Court to adopt an overly broad

---

[1]      For ease of reference, all pinpoint references to documents filed on the electronic docket shall be to the page number assigned by the electronic docket, located in the upper right-hand corner of the document–not the "PAGEID #" or the original page number on the document itself.

interpretation of *Pinholster*.  Observing that "*Pinholster* did not overrule, amend, remove or delete Rule 7," Petitioner asserts that Rule 7's "continued existence means that the district court is still permitted to grant such expansions."  (ECF No. 66, at 1.)  Thus, Petitioner's first argument is that Respondent misconstrues *Pinholster*'s reach.  Petitioner asserts that *Pinholster* is consistent with previous Supreme Court decisions forbidding petitioners who failed to exhibit diligent factual development in the state courts to engage in and benefit from factual development in federal habeas corpus proceedings.  Petitioner emphasizes that *Pinholster* expressly "rejected the notion that its holding would forever bar habeas petitioners from presenting new evidence in the federal habeas proceedings."  (*Id*. at 2 (citing *Pinholster*, 131 S.Ct. at 1401).)  Petitioner next argues that *Pinholster* is distinguishable from the instant case because Pinholster, unlike Petitioner, never claimed an inability to discover, develop, or present evidence to the state courts.  Insisting that "*Pinholster* does not preclude fact development for a section (d) analysis, when the state court's fact-finding process is shown to be unfair or inadequate," Petitioner argues that he could not have offered the evidence that he now asks this Court to consider–Dr. Gelbort's materials–due to the state trial court's denial of Petitioner's request for funds to employ Dr. Gelbort.  (*Id*. at 4.)  Petitioner explains that unlike Pinholster, he does not seek to introduce new witnesses.  Rather, Petitioner seeks only to present the witness that the state court thwarted him from presenting.  Petitioner also argues that Respondent's "reading of *Pinholster* would render 28 U.S.C. §2254(e) moot."  (*Id*. at 5.)  Specifically, according to Petitioner, "a petitioner cannot rebut the presumption [of correctness] in (e)(1) by clear and convincing evidence without discovery and Rule 7 record expansion, especially when the factual predicate could not previously be discovered due to the denial of testing by the state court, after specifically requested by the defense."  (*Id*.)  Petitioner's final argument is that the state courts did <u>not</u> adjudicate the claims at issue on the merits, either because they addressed only part of certain claims or because they did not have all necessary facts.  (*Id*. at 6-7.)

In his reply, Respondent reiterates his position as follows:

> Pursuant to *Pinholster*, a federal court adjudicating a habeas claim, which was adjudicated on the merits in state court, is barred from considering evidence that was not presented to the state court.  Before the Court are claims adjudicated on the merits in state court.  Lynch has developed new materials that were not presented in state court, *i.e.*, the Gelbort materials.  Therefore, the Court is barred from considering these materials.  Under the *Pinholster* rationale, the Gelbort materials are "irrelevant."

(ECF No. 67, at 1.)  Respondent also takes Petitioner to task for advancing a position now that is inconsistent with the position he previously had taken concerning the applicability of § 2254(d).  Although "Lynch had maintained throughout these proceedings that he is entitled to relief under §2254(d)," Respondent asserts, Petitioner now takes the position that the state courts did <u>not</u> adjudicate on the merits his first, sixth, seventh, or eleventh grounds for relief.  (*Id*. at 2.)  Respondent proceeds to explain that whereas this Court originally granted Petitioner's motion to expand the record on the basis that the materials that Petitioner sought to add were relevant, *Pinholster* now makes clear that the materials are <u>not</u> relevant to the threshold determination the Court must make in reviewing the merits of every claim, the § 2254(d) inquiry.  Respondent also argues that, under *Pinholster*, whether or to what extent a petitioner exercises due diligence is not relevant to the question of whether a federal court, while considering a claim on the merits, may consider new evidence that the state courts did not consider when addressing that claim on the merits.

In *Pinholster*, the Supreme Court granted certiorari to resolve two questions, the first of which was: "whether review under § 2254(d)(1) permits consideration of evidence introduced in an evidentiary hearing before the federal habeas court."  131 S.Ct. at 1398.  The Supreme Court had before it a case in which first the district court and then the United States Court of Appeals for the Ninth Circuit, sitting *en banc*, had held on the basis of evidence developed during a federal evidentiary hearing that the California state courts' decision rejecting Pinholster's ineffective assistance claim was contrary to or involved an unreasonable application of clearly established federal law and warranted habeas corpus relief.  The Supreme Court reversed, holding "that review under § 2254(d)(1) is limited to the record that was before the state court

4

that adjudicated the claim on the merits." *Id.* Noting that "[o]ur cases emphasize that review under § 2254(d)(1) focuses on what a state court knew and did," the Supreme Court remarked that "[i]t would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court." *Id.* at 1399. "[H]old[ing] that evidence introduced in federal court has no bearing on § 2254(d)(1) review," the Supreme Court made clear that, "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." *Id.* at 1400.

The Sixth Circuit has yet to address *Pinholster* in detail. In *Bray v. Andrews*, however, the Sixth Circuit stated without further elaboration that, "[o]ur review is, as the Supreme Court recently made clear, 'limited to the record that was before the state court.' " *Bray*, No. 09-4151, 2011 WL 1544740, at *4 (6th Cir. Apr. 26, 2011) (quoting *Pinholster*, 131 S.Ct. at 1398). The Sixth Circuit went on to note that, "[i]f Bray is to 'overcome the limitation of § 2254(d)(1),' she must do so 'on the record that was before the state court.' " *Id.* (quoting *Pinholster*, 131 S.Ct. at 400). Recently, in *Trimble v. Bobby*, a sister court within the Sixth Circuit addressed the reach of *Pinholster* in the context of a petitioner's motion for conveyance in order to obtain various medical tests to support his claim of mitigation-phase ineffective assistance of counsel. The district court concluded that "*Pinholster* indicates that the Court cannot now consider the contents of outside discovery in determining if the decision of the state court was an 'unreasonable application of [] clearly established federal law,' so long as the state court ruling was made on the merits." *Trimble*, No. 5:10-cv-149, 2011 WL 1527323, at *2 (N.D. Ohio Apr. 19, 2011). The district court reached that conclusion against a backdrop in which the petitioner had requested and was denied during state postconviction proceedings the same medical tests for which he requested conveyance in his federal habeas corpus proceedings.

Many courts have broadly and strictly applied *Pinholster* to preclude consideration of new evidence for the purpose of ruling on claims that were adjudicated on the merits by a state

court. *See Atkins v. Clarke*, No. 10-1870, 2011 WL 1419127, at *1 (1st Cir. Apr. 13, 2011) ("The Supreme Court's new decision in *Cullen v. Pinholster*, No. 09-1088, 2011 WL 1225705 (Apr. 4, 2011), requires that we reject this appeal from a denial of a request for an evidentiary hearing in relation to a petition for habeas corpus."); *see also Jackson v. Kelly*, Nos. 10-1 & 10-3, 2011 WL 1534571, at *6 (4th Cir. Apr. 25, 2011) (holding, on appeal from district court's decision granting writ as to penalty-phase claims following an evidentiary hearing, that "[i]n light of *Cullen*'s admonition that our review is limited 'to the record that was before the state court that adjudicated the claim on the merits,' we avoid discussion of the evidence taken in the federal evidentiary hearing (citation omitted)"); *Carter v. Secretary, Dept. of Corrections*, No. 6:09-cv-468-Orl-31KRS, 2011 WL 1842885, at *1 (M.D. Fla. May 16, 2011) (holding, upon the state's motion to dispense with an evidentiary hearing, that, "[b]ecause claim nine was denied on the merits, this Court concludes, pursuant to *Pinholster*, that an evidentiary hearing is not appropriate."); *U.S. ex rel. Brady v. Hardy*, No. 10 C 2098, 2011 WL 1575662, at *2 (N.D. Ill. Apr. 25, 2011) (holding, upon the state's motion to reconsider the court's decision to hold an evidentiary hearing, that "*Pinholster* requires this Court to vacate its decision to hold an evidentiary hearing on the merits of Brady's ineffective assistance claim involving trial counsel's failure to investigate and call certain exculpatory witnesses . . . .").

This Court is in agreement with those courts insofar as they conclude that *Pinholster*, by the plain meaning of its language, permits only one conclusion: that a federal court, when determining under 28 U.S.C. § 2254(d) whether a state court decision adjudicating a claim on the merits was contrary to or involved an unreasonable determination of clearly established federal law as determined by the United States Supreme Court or involved an unreasonable determination of the facts based on the evidence presented, must limit its review to the record that the state court considered when it rendered its adjudication. *Pinholster* states in unmistakable language: "We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 131 S.Ct. at

6

1398.  Neither Petitioner's arguments nor this Court's own reading of *Pinholster* and review of the record persuade the Court that the instant case is distinguishable from *Pinholster* in the manner asserted by Petitioner or that the habeas claims at issue were not adjudicated on the merits, except as the Court identifies below in its discussion of Petitioner's claims.  Should the Court determine that the state courts failed to adjudicate any of Petitioner's claims on the merits, the Court is free under the express language of *Pinholster* to consider Dr. Gelbort's materials in determining whether that claim is meritorious.  *Pinholster*, 131 S.Ct. at 1401 (explaining that provisions governing factual development set forth in 28 U.S.C. § 2254(e)(2) continue to have force when court addresses a claim that the state courts did not adjudicate on the merits).

Further, if this were a case in which the Court determined, without resort to Dr. Gelbort's materials and based solely on the evidence that the state court had before it, that the state courts' decisions contravened or unreasonably applied clearly established federal law or involved an unreasonable determination of the facts based on the state court record, the Court allows for the possibility that it could then consider Dr. Gelbort's materials in making the determination whether to grant habeas corpus relief.  Several courts have concluded that, under such a scenario, a federal court may consider additional evidence to determine whether habeas corpus relief should issue.  *Skipwith v. McNeil*, No. 09-60361, 2011 WL 1598829, at * 5 (S.D. Fla. Apr. 28, 2011) (concluding on basis of state court record that state court's decision involved unreasonable factual determination based on record and that with the § 2254(d) hurdle cleared, district court could conduct evidentiary hearing and consider new evidence in determining whether claim was meritorious); *Hearn v. Ryan*, No. CV 08-448-PHX-MHM, 2011 WL 1526912, at *2 (D. Ariz. Apr. 21, 2011) (holding that where federal court finds, based solely on state court record, that state court's decision was unreasonable, then federal court could hold evidentiary hearing to determine whether claim warrants habeas relief)  That is not the case here because, as the Court explains below, the Court has determined as to each of Petitioner's claims properly before it that the state court's decision rejecting the claims did not contravene or unreasonably apply clearly

7

established Supreme Court law and did not involve an unreasonable determination of the facts based on the evidence presented.

For the foregoing reasons, the Court conditionally **GRANTS** Respondent's motion for reconsideration (ECF No. 65) of the Court's May 24, 2010 Opinion and Order expanding the record with Dr. Gelbort's materials.  The Court will not consider Dr. Gelbort's materials for the purpose of determining whether any state court adjudication on the merits ran afoul of 28 U.S.C. § 2254(d).  The Court does not read *Pinholster* to restrain it from considering Dr. Gelbort's materials either as to a claim that the state courts did not adjudicate on the merits or for the purposes of determining, independent of the § 2254(d) inquiry, whether habeas corpus relief should issue.

### B.  Evidentiary Hearing

A separate but related matter that the Court must resolve is Petitioner's motion for an evidentiary hearing.  (ECF No. 59.)  Specifically, Petitioner asserts that although the state court record and the report by Dr. Gelbort support sufficiently his claims of mental retardation and ineffective counsel, "an evidentiary hearing on these claims will allow this Court to fully weigh the evidence and aid the disposition of these factually disputed matters."  (*Id*. at 2.)  Also before the Court are Respondent's response in opposition (ECF No. 60) and Petitioner's reply memorandum (ECF No. 62).

Extended discussion of the parties' arguments is not necessary.  The same reasons that compelled the Court to revisit the issue of Rule 7 expansion of the record mandate that the Court deny Petitioner's motion for an evidentiary hearing.  To the extent that Petitioner seeks a hearing to develop new evidence for the Court to consider in assessing the reasonableness of state court adjudications rejecting certain claims, *Pinholster* forbids this.  To the extent that Petitioner seeks a hearing to develop new evidence for the Court to consider either on a claim that the state courts did not adjudicate on the merits or to assist the Court in deciding, independent of the threshold § 2254(d) inquiry, whether any claims warrant habeas corpus relief, the Court concludes in its

8

discretion that a hearing is not necessary.

Accordingly, the Court **DENIES** Petitioner's motion for an evidentiary hearing.  (ECF

No. 62.)  The Court turns now to a discussion of Petitioner's claims.

### III.  Factual and Procedural History

The Ohio Supreme Court set forth the facts detailing this capital murder, rape,

kidnapping, and gross abuse of a corpse as follows:

> Lynch lived alone in an apartment in Cincinnati.  Mary Jennifer Love, a
> six-year-old girl, lived with her family in a neighboring apartment building and
> often played in the common area of the apartment complex.

> On June 24, 1998, Lynch invited Love into his apartment, and they
> watched TV and ate popcorn.  Lynch asked to see Love's genitals, and he took off
> her clothes.  Lynch kissed and touched Love's genitals, and she started to scream.
> He then strangled Love, placed her body in his bathtub, and put his finger into her
> vagina.  Lynch put Love's body into a cardboard box, put the box into his van,
> and dumped Love's body in a nearby wooded area.

> Lynch was convicted of the aggravated murder of Love and sentenced to
> death.

#### *State's case*

> In June 1998, Lynch and Love lived in adjoining buildings at apartments
> on Arborwood Drive.  Lynch met Love about one year earlier when she "handed
> him flowers in the parking lot" of the apartment complex.  Love and other
> neighborhood girls would sometimes play in Lynch's apartment building in bad
> weather.  Love was described as a "very sweet little girl" who made friends easily
> and did not consider anybody a stranger.

> On June 23, 1998, Lynch spent 40 to 45 minutes talking to Love on the
> inside stairway in front of his apartment.  Lynch was seated on the steps, and
> Love was standing in front of him.  According to Lynch's confession, "at one
> point * * * he lifted her up, and when he lifted her up, he leaned back and [while]
> holding her on an angle * * * her vaginal area was right in his face.  And * * *
> when that happened, he became very excited and he obtained an erection."

> Shortly after 3:00 p.m. on June 24, 1998, Love left her apartment and went
> outside to play.  Love was wearing a one-piece swimming suit, shorts, and brown
> sandals.

> According to Lynch's confession, around 4:00 p.m., Love entered Lynch's
> apartment building and Lynch invited her into his apartment.  Lynch and Love sat
> on the floor, watched TV, and ate popcorn.  Lynch told Love that he loved her,
> she gave Lynch a kiss on the cheek, and "that's when the feelings all started,"
> meaning that he got an erection.

Lynch rubbed Love on the back, kissed her on the neck, and touched her belly button.  They moved to his bedroom, and Love sat on the bed.  Lynch asked Love if he could "see it," and she pulled her swimming suit to the side to show her genitals.  Lynch started "licking * * * and kissing" her genitals, and his tongue went inside her vagina "a little."

Love started screaming after Lynch touched and kissed her.  Lynch told Love not to be afraid and asked her whether he "could see her out of the bathing suit."  Lynch then "took the swim suit off of her," and she was completely naked except for her shoes and socks.  When Love started screaming again, Lynch strangled her by putting his hands around her neck and squeezing for "approximately * * * three minutes."

After strangling her, Lynch carried Love into the bathroom and put her in the bathtub.  Lynch poured some water into her mouth, and "she gasped and * * * the water went down in her lungs."  Lynch concluded that Love was dead.  He placed his finger into her vagina and then "started feeling bad about what * * * [he had] just done."

Lynch went into the kitchen, found a garbage bag, and placed it over Love's head so that he "couldn't see her face."  Lynch then took Love's body out of the bathtub and placed her inside a cardboard vacuum cleaner box.  Around 5:00 p.m., Lynch left his apartment carrying the cardboard box with Love's body inside.  Lynch put the box inside his van and started "riding around looking for some place to dump her body."

Lynch dumped Love's body in an isolated and wooded area off Breezy Acres Drive, located one and one-half to two miles from Lynch's apartment.  Lynch carried the box with Love's body into an area 60 to 70 feet from the road, removed her body from the box, and placed it under a rug that "just happened to be * * * laying [sic] back there."  Then, Lynch dumped the cardboard box and Love's shoes and socks in a nearby dumpster.  Lynch disposed of Love's swimming suit and shorts at another dumpster in Hamilton, Ohio.  Shortly after 8:15 p.m., Lynch returned to his apartment.

Around 7:30 p.m. on June 24, Carol Williams, the victim's mother, went looking for Love after she failed to show up for dinner.  After Williams and other family members could not find Love, Williams notified the police around 9:00 p.m. that her daughter was missing.

Around 10:00 p.m. on June 24, police began their search for Love.  Additionally, many apartment residents searched for Love around the apartment complex and in a nearby wooded area.

Lynch joined the search after noticing that people were looking for Love around the apartment complex.  During the search, Lynch mentioned to his neighbor, James Doyle, "It's a shame this has happened," and "I wonder where she could have roamed off to."

On June 26, as the search for Love continued, FBI Special Agent Tracey Heinlein interviewed Lynch as part of a neighborhood canvass.  Lynch stated that his last contact with Love was on June 23 when he said hello to her in the parking

10

lot.  However, a neighbor told police that on June 23, he saw Lynch talking to Love on a stairway near Lynch's apartment.

On June 27, Detective Thomas Corbett interviewed Lynch about discrepancies in his statement to Heinlein.  At Corbett's request, the interview was conducted at the police station, where Lynch completed a timeline detailing his whereabouts on June 24.

After Corbett learned about Lynch's criminal history, Lynch was advised of his *Miranda* rights and waived those rights.  During questioning, Lynch admitted having "a conversation with Mary Love" on the steps inside his apartment building.  He admitted grabbing Love while he was seated on the steps, picking her up, becoming very excited, and getting an erection.  After police completed their interview, Lynch, who was not under arrest, drove back to his apartment.

On July 3, police reinterviewed Lynch.  After police again advised Lynch of his *Miranda* rights, and he again waived those rights, Lynch denied that he knew anything about Love's disappearance.  As Lynch's interview proceeded, the police mentioned the need to find Love, the need for the family to grieve properly, and the need for Love to have a proper burial.  Lynch then told the police, "She's on Breezy Acres."

Police drove Lynch to Breezy Acres Drive.  On the way there, Lynch told police, "I choked her. * * * She came up to my apartment, and that's where it happened."

Lynch provided police with detailed directions on where to find Love's body.  He told them, "I put a bag over her head and she'll be wrapped and rolled in a carpet in a wooded area off the highway."  Lynch told police, "Stop right here," when they came to the location of Love's body.  He pointed through the car window and said, "It's right inside the trees, you'll find carpet."

Following Lynch's directions, police went into the woods and found Love's skeletal remains underneath a carpet.  A maggot-filled plastic garbage bag was covering the skull.  While Lynch was in the police car at the scene, he told police, "I strangled her.  I didn't mean to do it.  I'm sorry.  I need help.  I'm sorry I lied to you."

Police returned with Lynch to police headquarters after discovering Love's remains.  Lynch provided a taped, detailed account of the murder and signed the transcript of his taped confession that reflects the facts already described.

Police searched Lynch's apartment and found "an assortment of children's toys, stuffed animals * * * in the bedroom closet on the shelf."  A box of popcorn and a roll of plastic garbage bags were found in the cupboard.

After examining Love's remains, Dr. Robert Phalzgraf, Chief Deputy Coroner for Hamilton County, determined that Love was a homicide victim.  Because Love's skeletal remains were "perfectly intact" and because of her age, Phalzgraf was able to rule out a "gunshot sound, stab wound, blunt trauma, [or]

being struck by a hard object" as the cause of death.  Phalzgraf concluded that Love's "cause of death was * * * asphyxia."

The defense presented no evidence during the guilt phase.

### *Trial result*

The grand jury indicted Lynch on three counts of aggravated murder. Count 2 charged Lynch with aggravated murder while committing rape, Count 4 charged Lynch with aggravated murder while committing kidnapping, and Count 5 charged Lynch with aggravated murder by purposely causing the death of a child under 13.  Additionally, Lynch was indicted for rape in Count 1, kidnapping in Count 3, and gross abuse of a corpse in Count 6.

The three counts of aggravated murder each contained four identical death-penalty specifications: murder for the purpose of escaping detection or apprehension for another offense, R.C. 2929.04(A)(3); principal offender in a murder while committing or attempting to commit rape, R.C. 2929.04(A)(7); principal offender in a murder while committing or attempting to commit kidnapping, R.C. 2929.04(A)(7); and principal offender in a murder of a child under 13 years of age, R.C. 2929.04(A)(9).

The jury convicted Lynch as charged and recommended the death penalty. Thereafter, the trial court sentenced Lynch to death, life imprisonment for rape, ten years' imprisonment for kidnapping, and 12 months' imprisonment for gross abuse of a corpse, with the sentences to run consecutively.

*State v. Lynch*, 98 Ohio St. 3d 514, 515-19, 787 N.E.2d 1185, 1194-96 (2003); (App. Vol. 3, at

262-65.)  The Ohio Supreme Court subsequently described the mitigation evidence that

Petitioner had offered as follows:

*Mitigating evidence.*  Lynch called five mitigation witnesses, made an unsworn statement, and introduced documentary evidence for the jury's consideration.

Elizabeth Iverson, Lynch's cousin, grew up with Doris Hayes, Lynch's mother, in Cincinnati.  Doris attended school through only the third grade and was functionally illiterate.

Doris met and married Ralph Lynch, Sr. while she was working in Indiana.  Ralph and Doris's children were Lynch and Darlene.  After Lynch's parents divorced, Doris had another child, Debbie, who was sent to live with other family members.

In June 1953, Doris, Lynch, and Darlene moved to Albuquerque, New Mexico, with Iverson and her two children.  Lynch was described as a "quiet child" who did not interact well with other children and "smiled [only] once in a while."

12

Doris later moved to Vallejo, California, and Lynch and Darlene were sent to live with their maternal grandparents in Ohio. Doris married Milford Hayes, and they lived together in California.

Lynch and Darlene later rejoined the family when Doris and Hayes moved to Ohio. The family later moved to Oregon, where Hayes worked at a sawmill. Because of the family's financial problems, Lynch, Darlene, and some of their half-siblings were sent to live with neighbors, Clyde MacWhorter and his friend Don Fletcher. Iverson later learned that the children were molested while living with these men.

Doris died in 1988. However, Lynch did not attend his mother's funeral because he "had gotten really angry with his mother and he said he would never go back into the state of Oregon until she had died."

During cross-examination, Iverson mentioned hearing rumors that Lynch had molested his cousin with they were both children.

Milford Hayes, Lynch's stepfather, testified that he married Doris in 1956 while living in California. Hayes and Doris had five children together, in addition to Doris's children from prior relationships.

Hayes and Doris later lived in Ohio for four years and then moved to Sweet Home, Oregon. While living in Oregon, Lynch was sent to live with neighbors, MacWhorter and Fletcher, for about one year. Hayes later learned that Fletcher had molested Lynch, and state welfare officials placed Lynch in a foster home.

Peggy Gomez, Lynch's younger half-sister, testified about the sexual abuse of her brothers and sisters in Oregon. Gomez was sent to live with Fletcher when she was eight years old. Fletcher molested Gomez while she was living at his home. Gomez recalled that Lynch lived with MacWhorter and Fletcher and that Lynch was "not happy" being with these men and "begged [our] mom to [let him] come home."

In later years, Gomez and her family visited Lynch in Ohio. Since 1993, Lynch made periodic trips to Oregon and visited Gomez and other relatives. Gomez testified that Lynch is "a very kind person. He would * * * give his shirt off his back to anyone that needed help. In the years he's come out, this is what I've seen in my brother. A very kind, gentle guy."

In closing remarks, Gomez told the jury, "I'm truly sorry. * * * I can't know what the family is going through. But I feel that God should make the decision of whether my brother should die."

Dr. Robert Tureen, a clinical psychologist, reviewed Lynch's records, conducted psychological testing of Lynch, and talked with two of his relatives.

Lynch was "in special education * * * from the 6th grade on, and he did very poorly in school." Results of intelligence tests show that Lynch's mental functioning is on the borderline between the normal range of intelligence and the mentally retarded range, with a full-scale IQ of 72.

Test results showed that Lynch does not have a major mental disorder such as schizophrenia or bipolar disorder. However, Lynch suffers from a mild cognitive dysfunction that indicates that "there's some brain disturbance which might interfere with academic learning over time."

Lynch dropped out of school around the ninth grade and went to work. He worked in a shingle factory in Oregon, loaded trucks at a dog food factory in South Carolina, and then returned to Ohio. Lynch was employed at Rumpke for 19 years, changing tires and taking care of cars and trucks.

Lynch was married for eight or nine months in 1991, but that marriage was never consummated. Lynch reports that he has been sexually impotent since the age of 20. He once sought medical treatment for his impotence but could not afford the treatment.

Tureen diagnosed Lynch as suffering from chronic depression and pedophilia. Lynch's own victimization as a child and his molestation of Love are consistent with this diagnosis. However, Tureen cannot explain why Lynch killed Love. According to Tureen, "pedophiles, as a rule, are not physically aggressive to the children that they molest."

Tureen also concluded that Lynch is not psychotic but has some limitation in his intellectual functioning. However, Tureen stated, "I'm not trying to say that because he's got a low IQ, this happened or anything like that."

During cross-examination, Tureen reviewed Lynch's history of child molesting. These incidents included accusations that he molested young children at a church nursery, that he exposed himself to two young girls at a Toys R Us store in 1988, and that he committed sexual improprieties with a couple of his young cousins. Lynch was placed on probation for one year for exposing himself at the Toys R Us store. However, Lynch terminated his treatment and counseling two weeks after his probation ended.

Tureen also testified on cross-examination that Lynch stated that he "deserved to die" for what he did to Love. Lynch stated, "What I did runs against God's law and man's law."

Dr. Jill Bley, a clinical psychologist, administered tests and interviewed Lynch in conducting a psychological evaluation of him. In completing an Evaluation of Lifetime Stressors form, Lynch reported being abused by a female teacher when he was 14. Lynch also related that he and his sister were sexually abused by Fletcher and that Fletcher made him abuse his sister. On another occasion, Lynch was picked up by a man as he was coming home from the theater and was forced to have sex with him.

The Multiphasic Sex Inventory showed that Lynch scored "high on the child molest scale with much fantasy material about children." Lynch's responses showed that he used "cruising and grooming" to find his victims. Cruising means looking for a child that might easily be victimized, and grooming means being friendly and building a relationship with the potential victim. The test results also showed that Lynch was interested in young girls and had no interest in young boys.

14

Other tests confirmed that Lynch suffers from a post-traumatic stress disorder. According to Bley, Lynch suffers moderate to severe levels of impairment when he remembers his experiences with the female teacher who abused him and when he recalls being abused by Fletcher.

Bley testified that Lynch's history fits the pattern of a pedophile. Lynch's family was extremely dysfunctional. Lynch suffered from "roles and boundary confusion" because almost every important adult in his life betrayed him in some way. His father abandoned him, and his mother "gave him away twice into * * * prostitution." Moreover, Lynch was horribly ashamed and humiliated because he had been raped by a man. He views himself as flawed and definitely thinks of himself as bad.

Bley testified that in her opinion, Lynch was totally preoccupied with his thoughts about young children but was "episodic rather than constant in his behavior." Lynch definitely understands the wrongfulness of his behavior. However, Bley cannot explain why Lynch killed Love, because pedophiles are usually "very withdrawn, almost milk toast." Moreover, Bley does not believe that Lynch understands why he killed Love, and Lynch "didn't offer an understanding of it."

In an unsworn statement, Lynch told the jury, "I didn't mean to kill her, but I killed her. I did it and I don't know why I did it. I don't know what happened. I'm sorry it happened, and I'm sorry for the folks that I hurt." Lynch also said, "I tried to stop, you know, doing these things and I didn't succeed. * * * I'm just so sorry about it."

*Lynch*, 98 Ohio St. 3d at 540-43, 787 N.E.2d at 1214-16; (App. Vol. 4, at 279-81.)

Represented by new counsel on appeal, Elizabeth Agar and Herbert Freeman, Petitioner pursued a direct appeal of right to the Ohio Supreme Court. He filed a merit brief on June 1, 2000 raising twenty-three propositions of law. On May 14, 2003, the Ohio Supreme Court issued a decision rejecting Petitioner's claimed errors and affirming the judgment against him. *State v. Lynch*, 98 Ohio St. 3d 514, 787 N.E.2d 1195 (2003); (App. Vol. 3, at 258.)

Represented by the Ohio Public Defender, Petitioner on August 15, 2000 filed a petition for postconviction relief pursuant to Ohio Revised Code § 2953.21, alleging twenty-four grounds for relief. The state trial court denied Petitioner's action on December 22, 2000, the intermediate state appellate court affirmed the trial court's decision on December 21, 2001, and the Ohio Supreme Court issued a summary order declining to review the case on July 30, 2003.

Pursuant to the United States Supreme Court's decision in *Atkins v. Virginia*, 536 U.S. 304 (2002), and the Ohio Supreme Court's decision in *State v. Lott*, 97 Ohio St. 3d 303, 779

N.E.2d 1011 (2002), Petitioner filed a separate postconviction petition in the state trial court alleging that he was mentally retarded and therefore ineligible for the death penalty.  The trial court conducted an evidentiary hearing on June 17, 2005, and issued a decision on October 24, 2005, rejecting Petitioner's *Atkins* claim.  Petitioner appealed that decision to the Ohio Court of Appeals for the First Appellate District, which court affirmed the decision of the trial court on September 29, 2006.  Petitioner appealed that decision to the Ohio Supreme Court, filing a memorandum in support of jurisdiction on November 9, 2006.  The Ohio Supreme Court declined to accept jurisdiction.

Petitioner initiated the instant habeas corpus proceedings on June 26, 2007, and filed his petition on February 15, 2008 raising twenty grounds for relief.  (ECF No. 11.)

## IV. Standards for Habeas Corpus Review

The provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA") that became effective prior to the filing of the instant petition apply to this case.  *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997).  Under the AEDPA, a federal court shall not issue a writ of habeas corpus on a claim that the state courts adjudicated on the merits unless the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).  Section 2254(d)(1) circumscribes a federal court's review of claimed legal errors, while § 2254(d)(2) places restrictions on a federal court's review of claimed factual errors.

Under § 2254(d)(1), a state court decision is "contrary to" Supreme Court precedent "when the state court confronts facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from its precedent[]" or "when the state court 'applies a rule that contradicts the governing law set forth in' Supreme Court cases." *Williams v. Coyle*, 260 F.3d 684, 699 (6th Cir. 2001) (quoting *Williams v. Taylor*, 529 U.S. 362,

16

406-07 (2000)).  A state court decision involves an unreasonable application of Supreme Court precedent if the state court identifies the correct legal principle from the decisions of the Supreme Court but unreasonably applies that principle to the facts of a petitioner's case.  *Coyle*, 260 F.3d at 699.  A federal habeas court may not find a state adjudication to be "unreasonable" simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly.  *Id.*  Rather, a state court's application of federal law is unreasonable "only if reasonable jurists would find it so arbitrary, unsupported or offensive to existing precedent as to fall outside the realm of plausible credible outcomes."  *Barker v. Yukins*, 199 F.3d 867, 872 (6th Cir. 1999).

Further, § 2254(d)(2) prohibits a federal court from granting an application for habeas relief on a claim that the state courts adjudicated on the merits unless the state court adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  In this regard, § 2254(e)(1) provides that the findings of fact of a state court are presumed to be correct and that a petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence.

## V.  Petitioner's Claims

**A.**     <u>**First Ground for Relief**</u>**: Petitioner is mentally retarded and thus, ineligible for the death penalty, violating Petitioner's right to be free from cruel and unusual punishment as guaranteed by the Eighth Amendment to the United States Constitution.**

(Petition, ECF No. 11-5, at ¶¶ 28-35.)  The gravamen of Petitioner's first ground for relief is that because he is mentally retarded and therefore ineligible for the death penalty, the state courts' decision finding otherwise not only contravened and unreasonably applied federal law but also was based on an unreasonable determination of the facts based on the evidence that Petitioner presented.  (ECF No. 56, at 18-39.)  Averring that Petitioner is "feigning to be a developmentally disabled individual" in order to escape execution for the murder of Mary Jennifer Love,

17

Respondent disagrees that the evidence establishes that the state courts unreasonably determined that Petitioner was not mentally retarded.  (ECF No. 57, at 20.)

In *Atkins v. Virginia*, 536 U.S. 304 (2002), the United States Supreme Court held that the Eighth Amendment prohibits states from executing mentally retarded individuals.  In so holding, however, the Supreme Court left to the states the tasks of not only establishing the standard for finding that a person is mentally retarded but also fashioning procedures for pursuing an "*Atkins*" claim.

The Ohio Supreme Court in *State v. Lott*, 97 Ohio St. 3d 303, 779 N.E.2d 1011 (2002), set forth the substantive standards and procedural guidelines for pursuing an *Atkins* claim in Ohio.  According to *Lott*, an individual is mentally retarded for *Atkins*' purposes if he or she demonstrates all three of the following: (1) significantly subaverage intellectual functioning; (2) significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction; and (3) onset before the age of 18.  *Id.* at 305, 779 N.E.2d at 1014.  The Ohio Supreme Court relied on the fact that the United States Supreme Court in *Atkins* cited the same standard with approval and that both the American Association of Mental Retardation and the American Pyschiatric Association define the standard as such.  The Ohio Supreme Court also held "that there is a rebuttable presumption that a defendant is not mentally retarded if his or her IQ is above 70."  *Id.*

With respect to procedural guidelines, the Ohio Supreme Court held that the procedures set forth in Ohio Revised Code. § 2953.21 *et seq*. were suitable for pursuing at *Atkins* claim and that such claims are to be adjudicated by a judge and not by a jury.  *Id*. at 305-06, 779 N.E.2d at 1014-15.  The Ohio Supreme Court also held that the accused bears the burden of proving an *Atkins* claim by a preponderance of the evidence, that the trial court shall conduct a *de novo* review of the evidence presented, and that the trial court must issue written findings and set forth the rationale for its decision.  *Id*. at 306-07, 779 N.E.2d at 1015-16.

Petitioner filed an *Atkins* petition in the state trial court on June 5, 2003.  (App. Vol. 10,

18

at 40.)  He attached in support ten exhibits consisting of a page or two of school records; the affidavit of maternal cousin Ronald Kidwell; the affidavit of maternal cousin Carol Gay; records and performance reviews from his employment at Rumpke; the affidavit of co-worker Charlie Bevens; 1987 bankruptcy records; credit counseling records; defense counsel's trial motion to allow a question-and-answer format for Petitioner's unsworn statement in mitigation; the trial court's written sentencing opinion imposing the death penalty; and the affidavit of Dr. William W. Friday.  (App. Vol. 10, at 47-102.)  Petitioner also filed motions requesting the trial court to reject the Ohio Supreme Court's above-seventy IQ presumption (*Id*. at 25), for a jury determination on the issue of mental retardation (*Id*. at 35), and to retain a mental retardation expert (*Id*. at 137).  In a March 8, 2004 entry, the trial court granted funds for Petitioner to retain Dr. Timothy Rheinscheld and appointed Dr. Michael Nelson to serve as an expert for the state. (*Id*. at 208.)  It does not appear from the record that the trial court granted either of Petitioner's motions to reject the above-70 IQ presumption or for a jury determination on the issue of mental retardation.

The one-day hearing, for which Petitioner waived his presence, commenced on June 17, 2005.  After both sides waived opening statements, Petitioner presented the testimony of clinical psychologist Dr. Timothy L. Rheinscheld.  (Tr. Vol. 11, at 9-94.)  Following Dr. Rheinscheld's recitation of his education, training, and experience, the trial court granted Petitioner's motion to qualify Dr. Rheinscheld as an expert without objection from the state.  (*Id*. at 14.)

Dr. Rheinscheld then recited the definition of mental retardation as endorsed by the American Psychiatric Association and the American Association of Mental Retardation, which is significant deficit in intellectual performance; significant deficit in adaptive behavior; and onset before the age of 18.  (*Id*. at 14-15.)  Dr. Rheinscheld explained that the component of significant deficit in intellectual performance is usually measured through the administration of an IQ test. (*Id*. at 16.)  Dr. Rheinscheld testified that the score for someone with significant intellectual deficit is generally two standard deviations below the mean; Dr. Rheinscheld clarified that

19

because the mean for the Wechsler Adult Intelligence Scale is 100 points and one standard deviation is 15 points, two standard deviations below the mean would amount to 30 points yielding a score of 70.  (*Id*. at 17-18.)  Dr. Rheinscheld also explained that the standard error of measurement is approximately 9 points, meaning that a score of 72 would actually be anywhere in a value between 77 and 67.  (*Id*. at 19.)  Dr. Rheinscheld then explained briefly the "Flynn Effect":  the established or widely accepted principle that over time, an individual's IQ test scores tend to rise.  (*Id*. at 21-22.)

Dr. Rheinscheld proceeded to describe his evaluation of Petitioner to assess whether Petitioner was mentally retarded.  (*Id*. at 22.)  Dr. Rheinscheld had reviewed numerous records concerning Petitioner's background and the trial, the mitigation testimony that Dr. Tureen had administered, the IQ test (Wechsler Adult Intelligence Scale) that Dr. Tureen had administered to Petitioner in 1999 in preparation for the mitigation hearing, an alternate IQ test that Dr. William Friday had administered shortly after Dr. Tureen's test, and the mitigation testimony that Dr. Jill Bley had administered.  Although Dr. Rheinscheld did not administer an IQ test to Petitioner, Dr. Rheinscheld reviewed the Wechsler Adult ("WAIS") test that Dr. Tureen had administered in 1999, as well as Dr. Tureen's raw data, and was satisfied that Dr. Tureen's assessment of Petitioner's IQ was valid.  (*Id*. at 23-24.)  Dr. Rheinscheld confirmed that he saw no need to administer his own IQ test to Petitioner.  (*Id*. at 24-25.)

Dr. Rheinscheld then explained that the WAIS test consists of two broad categories: verbal and performance.  (*Id*. at 25.)  The verbal component measures largely academic attributes, while the performance component measures skills such as problem-solving and the ability to handle other hands-on tasks that an individual encounters in daily life.  (*Id*.)  Dr. Rheinscheld remarked that Petitioner's score of 6 on the arithmetic sub-test was significant because it was significantly below average and was consistent with anecdotal evidence indicating that Petitioner had had difficulties managing money.  (*Id*. at 25-26.)  Dr. Rheinscheld then explained that obtaining a full scale score from the WAIS test involves converting the raw

20

scores from the verbal and performance components into standard scores and then combining them to yield a full scale score.  (*Id.* at 26-27.)  According to Dr. Rheinscheld, Petitioner's full scale score of 72 was significantly below average and placed Petitioner in the borderline range of intelligence.  (*Id.* at 27.)  Dr. Rheinscheld opined that, taking into consideration the standard error of measurement, Petitioner functioned in the mental retardation range of intelligence.  (*Id.*)  Dr. Rheinscheld reiterated his confidence in the validity of the test that Dr. Tureen had administered.  (*Id.* at 27-28.)  Dr. Rheinscheld proceeded to testify that in his opinion, to a reasonable degree of psychological certainty, Petitioner had significant subaverage intellectual functioning, thereby meeting the first component of the standard mental retardation definition.  (*Id.* at 28.)

On cross-examination, Dr. Rheinscheld agreed that Petitioner seemed to have a good memory, although Dr. Rheinscheld disagreed that a good memory alone is an indicator of intelligence.  (*Id.* at 68.)  Dr. Rheinscheld also noted during cross-examination that Petitioner had lived alone in the same place for 18 years and had been employed at the same place for 19 years, receiving generally satisfactory work performance reviews.  (*Id.* at 70-73.)  Dr. Rheinscheld qualified the latter point by noting that Petitioner functioned well when told exactly what to do but that Petitioner had difficulty thinking for himself.  (*Id.*)  Dr. Rheinscheld denied on cross-examination that Petitioner's having driven to and from Oregon just prior to the offense required skill, noting that Petitioner had reported getting lost several times and that Petitioner had received considerable assistance planning the trip from credit counselor Jerry Fugle.  (*Id.*)  Dr. Rheinscheld did agree on cross-examination that it required a certain amount of intelligence for Petitioner to remove the victim's body from his apartment to his van without being detected.  (*Id.* at 80-81.)

Returning to his direct examination, Dr. Rheinscheld next testified concerning the second component of the mental retardation definition: significant deficits in adaptive behavior.  (*Id.*)  Adaptive skill, Dr. Rheinscheld explained, consists of an individual's ability to adapt to the

demands of everyday life. (*Id*. at 29.) Much of Dr. Rheinscheld's assessment of Petitioner's adaptive skill involved a three-hour, face-to-face clinical interview with Petitioner. (*Id*. at 30.) Dr. Rheinscheld noted that even from idle "chit chat," it was clear to him that Petitioner was possessed of a limited amount of information, much like the patients that Dr. Rheinscheld evaluated and treated in his practice. (*Id*. at 31.) Dr. Rheinscheld proceeded to describe several hands-on, practical tests that he had conducted with Petitioner, such as giving Petitioner a white pages directory, a yellow pages directory, and a dictionary, and asking Petitioner to find a doctor. Dr. Rheinscheld testified that they gave up after twenty-five minutes because Petitioner could not find a doctor. (*Id*. at 31.) Dr. Rheinscheld also asked Petitioner to look up a word in the dictionary, only to have Petitioner respond that he could not do so unless Dr. Rheinscheld wrote down the word instead of just saying the word. (*Id*.)

Dr. Rheinscheld then identified some of the more formal tests used in a clinical setting to evaluate adaptive skill, specifically the Scale of Independent Behavior Revised ("SIB-R") consisting of 50 to 70 questions posed by the administrator to the subject. (*Id*. at 32-34.) At this point, Dr. Rheinscheld noted that typically, an evaluator will use "informants" to gather anecdotal information about the subject but that Dr. Rheinscheld found an "opacity" of people capable of providing an idea about Petitioner's adaptive skills. (*Id*. at 34.) Dr. Rheinscheld measured Petitioner in the following areas: motor skills, social interaction, communication skills, personal living skills, community living skills, and finally a broad independent score. Dr. Rheinscheld testified that Petitioner, when taking the test, did not appear to be malingering or to have an agenda (to appear less capable than he actually was), but rather appeared very forthcoming and willing. (*Id*. at 35-36.) In fact, Dr. Rheinscheld added, Petitioner would not have been able, in Dr. Rheinscheld's opinion, to try to answer questions in a certain way to obtain a certain score. (*Id*. at 36.) Explaining that the mean for the test is 100 and that a standard deviation is 15 points, Dr. Rheinscheld testified that Petitioner had a broad independence score of 74, plus or minus a few points. (*Id*. at 39.) Dr. Rheinscheld proceeded to

explain that Petitioner's strength was motor skills, where his score fell in the average range, that Petitioner's scores for social interaction and communication fell in the borderline range, and that his scores for personal living skills and community living skills were significantly below average. (*Id.*) Dr. Rheinscheld explained that an individual demonstrating significant weakness in two or more of the identified skill-sets qualified as having significant limitations in adaptive skills–the second of the three components for a clinical diagnosis of mental retardation. (*Id.* at 39-40.) Dr. Rheinscheld testified that two areas of practical weaknesses that Petitioner had demonstrated were deficits in the adaptive skills of (1) obeying laws and (2) managing money. (*Id.* at 40.)

   With respect to the validity of Dr. Rheinscheld's conclusions, Dr. Rheinscheld conceded that although he endeavors to be as neutral as possible, he tends to give an individual that he is testing the benefit of the doubt, scoring the individual slightly higher. (*Id.*) Dr. Rheinscheld denied the possibility that Petitioner's having been in prison for 4 to 5 years at the time he took the test affected the results. (*Id.* at 41.) In regard to the two areas of significant weakness that Dr. Rheinscheld had identified in administering the SIB-R test, Dr. Rheinscheld proceeded to describe various factors and anecdotes from Petitioner's life that were consistent with weaknesses in those areas, such as the fact that Dr. Tureen reported that Petitioner had taken three to four hours to complete the MMPI test and had required verbal explanations for many of the questions; the fact that Dr. Bley had testified similarly concerning Petitioner's taking the tests that she had administered; that Petitioner's mother likely was mentally retarded; that employment records and remarks from Petitioner's co-workers characterized him as "slow; " that Petitioner had declared bankruptcy; and that Petitioner's credit counselor, Jerry Fugle, had performed additional tasks on Petitioner's behalf such as scheduling oil changes, negotiating a new rental property lease, and setting up medical appointments. (*Id.* at 42-44.) Dr. Rheinscheld agreed that it was certainly possible, or not unusual, for mentally retarded people to have drivers' licenses, to own and drive cars, and to have jobs. (*Id.* at 45.) To that point, Dr. Rheinscheld

23

explained that the largest category of mental retardation was "mild" mental retardation and that the jobs that Petitioner had had were consistent with those with which mildly mentally retarded individuals could cope. (*Id*. at 45-46.) Dr. Rheinscheld agreed that Petitioner functions well in a structured environment and that prison constitutes a very structured environment. (*Id*. at 47-48.) Dr. Rheinscheld confirmed that Petitioner's lack of any disciplinary write-ups, save for once having an extra cable wire in his cell, was indicative of his working well in a structured environment. (*Id*. at 48-49.) Based on the results of his testing of Petitioner, a clinical interview, and a review of documents and other materials, Dr. Rheinscheld testified that in his opinion, to a reasonable degree of psychological certainty, Petitioner met the criteria of having significant limitations in adaptive behavior. (*Id*. at 52-53.)

Regarding his conclusion, Dr. Rheinscheld agreed generally on cross-examination that many factors can impinge an individuals adaptive skills, such as poor resources, mental illness, physical limitations, medical conditions, and a lack of education. (*Id*. at 64.) With respect to the testing that Drs. Tureen and Bley had conducted in 1999, as well as the adaptive skills testing that Dr. Rheinscheld had conducted, Dr. Rheinscheld downplayed any suggestion that Petitioner's having been incarcerated and/or that Petitioner was experiencing anxiety and remorse, had had any impact on the results of the tests. (*Id*. at 68, 75-77.)

During his direct examination, Dr. Rheinscheld testified that in addition to mild mental retardation, he had also diagnosed Petitioner with pedophilia and post traumatic stress disorder ("PTSD"). (*Id*. at 54.) Dr. Rheinscheld remarked that Petitioner likely suffered from some general depression. Dr. Rheinscheld explained that psychological trauma such as that Petitioner had suffered–consisting of the abuse and deprivation to which Petitioner was subjected during his developmental years–could operate to suppress an individual from developing cognitive skills. (*Id*. at 55.) Dr. Rheinscheld voiced his opinion that there was a good probability, had Petitioner not been subjected to sexual and emotional abuse, had Petitioner grown up in a suitable environment, and had Petitioner more access to schooling, that Petitioner probably

24

would not have qualified for a mental retardation diagnosis and probably would not have committed the crime for which he received the death penalty. (*Id*. at 55-56.)

Next, Dr. Rheinscheld testified concerning the third component of the mental retardation definition: onset before the age of 18. (*Id*. at 56.) Dr. Rheinscheld affirmed that he had found no evidence that Petitioner ever suffered a brain injury before or after the age of 18. (*Id*. at 57-58.) Explaining that IQ scores tend to solidify at age 9 or 10 and that an individual's score at age 12 would be roughly the same in adulthood, Dr. Rheinscheld testified that he had found nothing in Petitioner's records indicating that there would be a difference in Petitioner's IQ score from before the age of 18 to after the age of 18. (*Id*. at 58.) Dr. Rheinscheld also testified that the poor academic performance that Petitioner's school records reflected, as well as a statement from a school superintendent when Petitioner was 15-years-old certifying that Petitioner was mentally retarded and eligible for placement in special education, provide evidence that the onset of Petitioner's mental retardation took place before he was 18. (*Id*. at 58-60.)

Dr. Rheinscheld agreed that he had found nothing in Petitioner's background records reflecting that Petitioner, before the age of 18, had ever undergone any testing to measure IQ or adaptive skills. (*Id*. at 60.) Dr. Rheinscheld stressed, however, that a pre-18 administration of an IQ test was not a prerequisite to finding that the onset of an individual's mental retardation was before the age of 18. The fact that Petitioner at age 15 had been certified as mentally retarded by the superintendent of the Oregon school system in which Petitioner was a student, according to Dr. Rheinscheld, was sufficiently credible to support a finding that the onset of his mental retardation was before the age of 18. (*Id*. at 61.) On cross-examination, Dr. Rheinscheld insisted that despite the paucity of records or other information about Petitioner prior to the age of 18, Dr. Rheinscheld was confident from what information he did have that the onset of Petitioner's mental limitations was before the age of 18. (*Id*. at 63-64.) Dr. Rheinscheld testified that nothing in Petitioner's records explained Petitioner's scores on the WAIS and the SIB-R tests other than that Petitioner had significant limitations in intellectual functioning. (*Id*. at 61-

25

62.) Dr. Rheinscheld concluded by offering his opinion, to a reasonable degree of psychological certainty: Petitioner had a subaverage IQ and significantly subaverage adaptive skills, the onset of both of which was prior to the age of 18. (*Id*. at 62.) Dr. Rheinscheld found, accordingly–also to a reasonable degree of psychological certainty–that Petitioner satisfied the criteria set forth by the American Association of Mental Retardation and the American Psychiatric Association for a diagnosis of mental retardation. (*Id*.) Petitioner called no other witnesses.

The state called Dr. W. Michael Nelson, a clinical psychologist and professor of psychology. (Tr. Vol. 11, at 97.) Following Dr. Nelson's recitation of his education, training, and experience, the trial court granted the state's motion to qualify Dr. Nelson as an expert, over no objection from Petitioner. (*Id*. at 101.) Dr. Nelson defined mental retardation as Dr. Rheinscheld had and in accordance with the Diagnostic and Statistical Manual issued by the American Psychiatric Association: (1) subaverage intellectual ability; (2) subaverage deficit in adaptive behavior; and (3) onset before the age of 18. (*Id*. at 103.) Dr. Nelson also testified, as Dr. Rheinscheld had, that an IQ test is generally accepted as the method by which to measure intellectual functioning. (*Id*.) Dr. Nelson proceeded to explain that the adaptive behavior component of the mental retardation definition measures an individual's capacity for personal and social sufficiency. (*Id*. at 105.) Dr. Nelson testified that there are eleven categories of skills or capacities and that a diagnosis of mental retardation requires an individual to demonstrate significant limitations in at least two of those skills/capacities. (*Id*. at 105-106.)

Dr. Nelson confirmed that he had reviewed the test results and raw data from Dr. Tureen's administration of the WAIS test to Petitioner in 1999 and testified that according to that test, Petitioner achieved a 79 on the verbal component, a 68 on the performance component, and full scale score of 72. (*Id*. at 107.) Those scores, according to Dr. Nelson, placed Petitioner in the borderline range of intellectual functioning. (*Id*.) Dr. Nelson explained the presumption that typically, an IQ score below 70 falls in the mental retardation range while an IQ score above 70

does not.[2]  (*Id*.)  On cross-examination, Dr. Nelson conceded that he had never met with or spoken to Petitioner.  (*Id*. at 116-17.)

Regarding adaptive behavior, Dr. Nelson concluded based on his review of all of the materials that Petitioner functioned above the mental retardation range.  (*Id*. at 111-12.)  Dr. Nelson further opined that the conditions under which an individual takes a test can affect the results and that if Petitioner had been under considerable anxiety when he underwent testing, he might have scored slightly lower in certain areas.  (*Id*. at 113.)  Dr. Nelson agreed that at the time that Petitioner took the IQ test that Dr. Tureen administered, Petitioner had been incarcerated for a year and facing a capital trial, and that even Dr. Tureen noted some anxiety on Petitioner's part.  (*Id*. at 113-14.)  Dr. Nelson testified that he found of Petitioner no significant deficiencies in areas of adaptive functioning to the degree that Dr. Nelson would characterize Petitioner as functioning in the mental retardation range.  (*Id*. at 114.)  Dr. Nelson concluded that, to a reasonable degree of psychological certainty, Petitioner was not an individual with mental retardation, which conclusion Dr. Nelson memorialized in a report.  (*Id*. at 114-15.)

The record reflects that Dr. William Friday had administered to Petitioner in 1999 an IQ test called the Cognitive Assessments System ("CAS").  Because both Dr. Rheinscheld and Dr. Nelson largely agreed that the CAS has been called into question and was not widely used in the field, those test results had no bearing on the outcome of Petitioner's *Atkins* hearing and require little more discussion herein.  (Tr. Vol. 11, at 78-79; 108-110; App. Vol. 13, at 10.)  The Court notes, however, that Dr. Nelson in particular testified that Dr. Friday's conclusion that Petitioner's cognitive functioning on several sub-sets was the equivalent of that of a child between the ages of 6 and 8 was, in Dr. Nelson's opinion, inconsistent with what the record

---

[2]	Dr. Nelson elaborated earlier in his testimony that an IQ score of 70-80 is considered the borderline range of intellectual functioning, that an IQ score of 80-90 is considered the low average range, and that an IQ score above 90 is considered the average range.  (*Id*. at 104.)  Dr. Nelson testified as Dr. Rheinscheld had that the standard error of measure for the WAIS is plus or minus 5 points, meaning that an IQ score of 72 can confidently be regarded as between 67 and 77.  (*Id*. at 104-05.)

reflected about how Petitioner had lived, worked, functioned, and managed. (*Id*. at 109-11.)

Neither Petitioner nor the state called any additional witnesses or made closing arguments, opting instead to file post-hearing briefs. The state trial court issued a decision on October 24, 2005, concluding that Petitioner had failed to meet his burden of establishing by a preponderance of the evidence that he was mentally retarded, that Petitioner's IQ score over 70 created a presumption that he was not mentally retarded, and that Petitioner had not rebutted that presumption. (App. Vol. 13, at 7-12.) The trial court began its analysis by noting the standards and definitions of mental retardation set forth in *Atkins* and *Lott*. The trial court proceeded to note that Petitioner's IQ had been assessed at 72, that this fact was not in dispute–save for Petitioner's insistence that the court consider the standard error of measurement–and that a rebuttable presumption existed that Petitioner was not mentally retarded.

Regarding the intellectual functioning component of the three-part mental retardation definition, the trial court found as follows:

> Both experts agree that the WAIS-III test administered to Petitioner for the mitigating phase of his capital trial by Dr. Tureen was reliable, and both experts utilized this IQ test for their opinions. Both agreed that retesting was not necessary. This test was administered in 1999. Petitioner scored a 72.
>
> Dr. Rheinscheld testified that the standard error of measurement (SEM) was plus or minus 5. Thus, Petitioner's IQ is between 67 and 77. He further testified regarding the "Flynn effect" – if a person takes the test more than once, his score tends to rise. The Court finds that there is no evidence that the Flynn effect affected Petitioner's test results. In fact, there is no evidence that Petitioner has been administered any other IQ test.
>
> Dr. Rheinscheld testified about Petitioner's scores on the verbal IQ and the performance IQ. He also noted that the Petitioner exhibited an inability to manage money. He pointed to Petitioner's previous bankruptcy. The Court finds that filing for bankruptcy does not indicate mental retardation; it is a fact, however, that the Court has considered.
>
> Dr. Rheinscheld testified that in his opinion, Petitioner has a significantly sub-average intellectual functioning.
>
> Dr. Nelson agreed that the SEM is plus or minus 5, and that the range for Petitioner is therefore 66-77. In his opinion, Petitioner was not functioning in the mentally retarded range.
>
> The evidence also established that Petitioner had lived alone for 18 years

28

in the same place, that he had held the same job for 19 years, and that he was a dependable worker. He received adequate reviews at work and had excellent attendance. He also has a good memory. Further, he was able to go on a cross-country trip to Oregon and was able to plan and budget for the trip. There was also evidence that Petitioner was a slow learner in school and that he had difficulty reading. The Court has considered all of these factors.

There was some testimony regarding a CAS test. Both experts agreed that this test is not widely used. The Court puts little reliance on the result of this testing.

Because Petitioner's IQ is above 70, he is presumed to be not mentally retarded. Based on all of the evidence, the Court finds that Petitioner has failed to establish that he has significantly sub-average intellectual functioning.

(App. Vol. 12, at 293-95.)

Although noting that Petitioner's failure to meet the first criteria was sufficient to defeat

Petitioner's claim, the trial court proceeded to consider the second and third criteria. Concerning

the adaptive skills component, the trial court found as follows:

In order to meet this criteria, Petitioner must establish that he has significant limitations in adaptive behavior. Under Lott, he must show significant deficits in two of the eleven recognized adaptive skills. Dr. Nelson found no deficiencies in any area of adaptive behavior. His opinion was that Petitioner is not functioning in the range of mental retardation.

Dr. Rheinscheld explained that adaptive skills equate to the ability to adapt to the requirements of everyday life. In order to assess this factor, Dr. Rheinscheld conducted a clinical interview of Petitioner which lasted 3 hours. He administered various tests – for example, he asked Petitioner to find a doctor in a telephone directory. Petitioner was unable to do so. He was also unable to find a word in a dictionary unless it was written down for him.

Dr. Rheinscheld also administered the Scales of Independent Behavior Test ("SIB-R") to test Petitioner's adaptive behavior. He was asked about 50 - 70 questions. Under Lott and the 1992 AAMR definition of mental retardation in effect at the time of Lott, an individual must demonstrate significant limitations in at least two adaptive skills. (There are eleven total adaptive skills.) Dr. Rheinscheld concluded that Petitioner had significant limitations in two: social skills (ability to follow the law) and functional academics (money management). Dr. Rheinscheld pointed to Petitioner's bankruptcy filings, inability to manage money, and his use of a credit counselor to help manage his credit card, money and wage advances. Dr. Rheinscheld's opinion was that Petitioner had significant limitations in adaptive behavior.

The Court finds that with respect to social skills (following the law and rules) the evidence does not support Dr. Rheinscheld's conclusion. Prior to the present case, Petitioner had very little criminal record. He has had only one incident while in the Ohio Department of Corrections. Petitioner concedes he has

29

gotten along well in prison.  Moreover, he had few disciplinary problems at work, excellent attendance and satisfactory reviews.  Thus, as to the first adaptive skill identified by Petitioner's expert as having a significant limitation, the Court finds the evidence does not support it.

The Court similarly does not find that Petitioner has significant limitations in the second adaptive skill (money management).  While Petitioner did apparently have financial difficulties, and while he did seek the services of a credit counselor, this is simply not sufficient to establish a significant limitation.  Based upon all of the evidence, the Court finds that Petitioner has not met his burden with respect to this adaptive skill.  The evidence establishes that Petitioner had worked steadily at the same job for 19 years.  He had excellent attendance and good job reviews.  He lived alone in the same apartment for 18 years, functioning on a daily basis.

Petitioner also addresses a more recent AAMR definition of adaptive skills.  Under this definition, Petitioner must exhibit limitations in one of 3 groups of adaptive behavior – conceptual, social and practical – or on the total score.  For the reasons discussed above, the Court finds that Petitioner has failed to establish that he exhibits significant limitations in any of these.

(App. Vol. 12, at 295-97.)

The trial court declined to make a finding on the third and final criteria of whether the onset of mental retardation was before the age of 18.  The trial court explained:

The last criteria is onset before the age of 18.  The record is sparse with regard to this factor.  A November 1964 school record classifies Petitioner as mentally retarded.  Dr. Rheinscheld opined that Petitioner's mental retardation had onset prior to 18.  Because the Court finds that Petitioner is not mentally retarded, this criteria is irrelevant.

(App. Vol. 12, at 297.)

Petitioner appealed the trial court's decision to the Ohio Court of Appeals for the First Appellate District.  The appellate court issued a decision on September 29, 2006, affirming the judgment of the trial court.  (App. Vol. 13, at 151-56.)  After summarizing the evidence presented during the *Atkins* hearing and the trial court's findings as to each of the three criteria, the appellate court concluded as follows:

An appellate court will not reverse a trial court's determination of the issue of mental retardation if the determination was supported by reliable, credible evidence.  We conclude that reliable, credible evidence supported the trial court's determination that Lynch had not proved by a preponderance of the evidence that he was mentally retarded.  We, therefore, overrule the assignment of error and affirm the trial court's judgment.

30

(App. Vol. 13, at 156.)

Petitioner filed a discretionary appeal to the Ohio Supreme Court.  The Ohio Supreme Court issued a summary entry on February 28, 2007, declining to accept jurisdiction and dismissing the appeal.  (App. Vol. 14, at 2.)

As noted above, Petitioner argues that he is mentally retarded and that the Ohio courts' decisions finding otherwise are objectively unreasonable in light of clearly established federal law and an unreasonable determination of the facts in light of the evidence presented.  (ECF No. 56, at 18.)  Specifically, with respect to the trial court's decision finding that he met none of the three criteria for a diagnosis of mental retardation, Petitioner faults the trial court for "fail[ing] to give proper salience to the standard error of measurement with the IQ test." (ECF No. 56, at 21-22.)  Petitioner argues that the trial "court also failed to give proper credit to the adaptive skills test and hands-on testing administered to Lynch which rebutted the Lott presumption." (*Id*. at 21.)  Finally, according to Petitioner, "[t]he trial court also failed to recognize that enough evidence had been presented to establish that Lynch's mental retardation originated prior to the age of 18." (*Id*.)  With respect to the appellate court's decision affirming the trial court's judgment, Petitioner notes simply that "[t]he court of appeals did not render any analysis of the claims but merely restated the findings of the trial court and held that [the trial court's decision] was not an abuse of discretion." (*Id*.)

Petitioner recounts in detail the evidence he presented to the state courts that, according to Petitioner, established by a preponderance of the evidence that he was mentally retarded. Noting that both his own expert and the state's expert adopted the full-scale score of 72 that Petitioner achieved on the WAIS-III that Dr. Tureen administered in 1999, Petitioner argues that "[a]ccording to the AAMR and the APA, a person with an IQ score of approximately 2 standard deviations below the mean, or 30 points, *factoring in the standard error of measurement of plus or minus 5 points*, meets the definition of significantly subaverage intellectual functioning." (ECF No. 56, at 22 (emphasis added).)  Petitioner therefore asserts not that his full scale IQ score

31

of 72 *could*, factoring in the standard error of measurement, place him as below 70 and within the range of mild mental retardation, but that his score of 72, factoring in the standard error of measurement, *does* satisfy the criteria for finding of mild mental retardation.  (*Id*. at 23.) Petitioner's score must also be considered in the context of the "Flynn effect," Petitioner argues, meaning that a person's IQ tends to rise over time.  According to Petitioner, data establishes that "the Flynn effect accounts for an artificial gain of 2 years of .622 points for Lynch, thus his IQ score would be 71.378 without factoring the SEM of plus or minus 5 points."  (*Id*.)  Based on the foregoing, Petitioner argues that *Lott*'s rebuttable presumption that a person with an IQ above 70 is not mentally retarded does not apply.[3]

Petitioner proceeds to argue that he presented sufficient evidence demonstrating that he has significant limitations in adaptive skills and that the state trial court erred in failing to so find.  (*Id*. at 24.)  Petitioner emphasizes that any determination of an individual's adaptive skills must take into account "that all people, mentally retarded and non-mentally retarded, have strengths and weaknesses."  (*Id*.)  To that point, Petitioner asserts that mildly mentally retarded individuals often function well in society, outside an academic setting, and that the ability of a mildly mentally retarded individual to so function does not equate with not having significant limitations in adaptive functioning.  Petitioner points to the results of the three-hour clinical interview and Scales of Independent Behavior–Revised ("SIB-R") test that Dr. Rheinscheld conducted in 1999.  (*Id*. at 25-27.)  During the interview and "hands-on" testing, Petitioner was unable after twenty-five minutes to find the listings for physicians in a telephone directory or to look up a word in a dictionary without having the word written down for him.  With respect to

---

[3]     Another argument that Petitioner advances supporting his position that the state courts erred in finding that Petitioner did not establish significantly subaverage intellectual functioning is that a psychological examination conducted by Dr. Michael Gelbort in connection with these habeas corpus proceedings confirms Petitioner's subaverage intellectual functioning. (*Id*. at 24.)  Petitioner asserts that he scored a 70 on the WAIS-IV test that Dr. Gelbort administered.  For the reasons that the Court discussed more fully in Section II above, this Court will not consider Dr. Gelbort's materials when assessing whether the state courts' adjudication on the merits contravened or unreasonably applied clearly established federal law or involved an unreasonable determination of the facts in light of the evidence presented.

the SIB-R, Petitioner notes that Dr. Rheinscheld found no signs of malingering on Petitioner's part and no indication that the fact that Petitioner had been incarcerated since 1998 had any effect on the test results. According to Petitioner, Dr. Rheinscheld concluded that Petitioner had significant deficits in the personal living and community living skills, having scored 69 (two standard deviations below the mean of 100).

Noting that the state presented no evidence to dispute Dr. Rheinscheld's conclusions, Petitioner faults the trial court not only for failing to address the low scores but also for relying instead on the fact that Petitioner lived alone for 18 years, worked for the same company for 19 years, and took a trip to Oregon as evidence that Petitioner did not demonstrate significant deficits in adaptive skills. To the latter point, Petitioner asserts that the trial court failed to account properly for Petitioner's limitations in the very areas that the trial court counted as strengths, such as the fact that Petitioner had received considerable assistance from his credit counselor Jerry Fuqua in managing money, negotiating Petitioner's rental property, arranging oil changes, and scheduling medical appointments. (*Id*. at 27.) Similarly, Petitioner faults the trial court for equating Petitioner's functioning well in the rigidly structured prison culture with Petitioner's possessing the social skills and ability to follow the law. (*Id*. at 27-28.) The weight that the trial court placed on Petitioner's job history is equally flawed, Petitioner asserts, because the trial court failed to take into account some of the poor evaluations that Petitioner received for such behavior as failing to follow company policies or failing to be productive when working independently. (*Id*. at 28.) Petitioner also downplays the significance of his having taken a trip to Oregon by himself, noting Dr. Rheinscheld's observations that Petitioner had spent considerable time going over maps and other logistics with Jerry Fuqua and that Petitioner nonetheless got lost several times. (*Id*.)

Petitioner emphasizes again that mentally retarded individuals have strengths as well as weaknesses and that it is not uncommon for mentally retarded individuals to obtain a driver's license, own a car, hold a job, and live on their own. (*Id*. at 28-29.) Petitioner relies on *State v.*

*White*, in which the Ohio Supreme Court found that the trial court had abused its discretion in failing to find that the petitioner was mentally retarded.  118 Ohio St. 3d 12, 885 N.E.2d 905 (2008).  According to Petitioner, the Ohio Supreme Court faulted the trial court for relying too heavily on the fact that the petitioner had his own apartment, bought and drove a truck, helped his girlfriend buy a car, cooked, played video games, taught his girlfriend a card game, and attended activities with his girlfriend.

Petitioner states that Dr. Rheinscheld was of the opinion that Petitioner was significantly limited in his ability to follow the laws of society.  Dr. Rheinscheld based that opinion, according to Petitioner, on Petitioner's convictions in the instant case, a police report documenting an incident during which Petitioner exposed himself to two young girls, the same report documenting that another young girl had accused Petitioner of improper sexual conduct, other additional accusations of inappropriate sexual contact between Petitioner and children, and Petitioner's own admission that he had had sexual contact with several cousins who were under the age of 11.  (*Id*. at 29-30.)

Petitioner states that Dr. Rheinscheld also found that Petitioner was significantly limited in the adaptive skill of money management.  (*Id*. at 30.)  Dr. Rheinscheld noted that Petitioner had filed for bankruptcy, required constant help from a credit counselor, and sought wage advancements.  All of these incidents, Dr. Rheinscheld concluded, were reflective of Petitioner's inability to use arithmetic to budget and manage his money.  To that point, Petitioner notes that he scored significantly below average on the arithmetic subset of the WAIS-III test that Dr. Tureen administered.  Petitioner asserts that by concluding that not everyone who files for bankruptcy is mentally retarded, the trial court improperly discounted that evidence instead of regarding it as just one of many anecdotal factors reflecting Petitioner's limitations in the ability to manage money.[4]

---

[4]    Petitioner points to additional evidence that, according to Petitioner, corroborates Dr. Rheinscheld's conclusions that Petitioner is significantly limited in the adaptive skill of money management.  Dr. Gelbort administered the Wide Range Achievement Test–3rd edition

With respect to the 2002 AAMR definition of adaptive skills, requiring an individual to exhibit significant limitations in one of three groups of adaptive behavior (conceptual, social, and practical), Petitioner asserts that the evidence satisfies that criteria because he exhibits significant deficits in adaptive behavior in conceptual skills (money concepts and writing), social skills (following rules and obeying laws), and practical skills (money management, meal preparation, and telephone use). (*Id*.)

Petitioner next points to other anecdotal evidence of his being cognitively "slow." Petitioner notes that Dr. Tureen testified at the mitigation phase that Petitioner took approximately three hours to complete a MMPI-2 test that usually takes a person an hour or hour-and-a-half to finish. Petitioner states that Dr. Tureen testified that taking the MMPI requires a reading ability level between the 6th and 8th grades and that Petitioner needed Dr. Tureen to explain many of the questions and define many words. Dr. Bley testified similarly, according to Petitioner, about Petitioner's needing her to read to him the tests that she administered. Petitioner states that his intellectual deficits even impeded his ability to work with his trial attorneys. (*Id*. at 32.) Finally, Petitioner points to reports by several of his own cousins and his work supervisor, as well as Department of Rehabilitation and Corrections records, characterizing Petitioner as "slow."

Petitioner proceeds to argue that the significant limitations that he exhibits in intellectual functioning and adaptive functioning must be assessed in the context of his "masking the impairments" and exhibiting "a cloak of competence" throughout his adult life. (*Id*.) Dr. Rheinscheld reported incidents of Petitioner coming across in communication as "normal" or higher functioning than he actually was. In sum, Petitioner argues that he established that he has significant limitations in adaptive skills and that the state courts erred in finding otherwise. To

_____

("WRAT–III")–a test to measure functional academic achievement–and concluded that on the arithmetic component of the test, Petitioner scored in the fourth grade level. (*Id*. at 31.) For the reasons that the Court discussed in Section II above, the Court will not consider Dr. Gelbort's materials in conducting its § 2254(d) analysis.

that point, Petitioner proceeds to argue that he presented sufficient evidence to rebut the *Lott* presumption–the presumption that an individual with an IQ score above 70 is not mentally retarded.  Petitioner relies on *State v. Gumm*, 169 Ohio App. 3d 650, 657-58, 864 N.E.2d 133, 139 (Ohio App. 1 Dist. 2006), and *State v. Greer*, No. 24608, 2010 WL 2623860 (Ohio App. 9 Dist. June 30, 2010), cases in which the trial court found that petitioners had rebutted the presumption that they were not mentally retarded, despite having IQ scores above 70.  (ECF No. 56, at 33.)

    With respect to the last of the three criteria for demonstrating mental retardation, Petitioner asserts that he presented sufficient evidence that the onset of his mental retardation was before the age of 18.  (*Id*. at 33-36.)  He asserts that the trial court erred not only in failing to find that Petitioner met this criteria but also in finding that criteria irrelevant in Petitioner's case.  (*Id*. at 33.)  To the extent that the trial court relied on the fact that the record was sparse with regard to the issue of whether onset occurred prior to the age of 18, Petitioner emphasizes that a psychologist can make a professional determination about onset even in the absence of pre-18 IQ tests, adaptive skills testing, or other documentation.  (*Id*. at 34.)  Petitioner proceeds to assert, however, that he did collect and present sufficient documentation that the onset of his mental retardation was prior to the age of 18.  He points to 1964 Oregon school records, when Petitioner was 15, documenting that the superintendent had certified Petitioner as mentally retarded and in need of special education, as well as to an Oregon statute in effect at that time stating that a mental retardation determination made by the superintendent of schools was to be done with the advice of competent medical and educational authorities.  Petitioner also points to Loveland, Ohio school records reflecting Petitioner's poor academic performance.

    Petitioner proceeds to assert that the record contained no evidence that he had suffered a traumatic brain injury after the age of 18 to which his mental deficits could be attributed instead.  (*Id*.)  In so noting, Petitioner again relies on *State v. White*, in which the Ohio Supreme Court emphasized the importance of distinguishing true mental retardation, with an onset before the

age of 18, from cognitive impairments acquired later in life and caused by injuries or conditions other than mental retardation.  118 Ohio St. 3d at 25, 885 N.E.2d at 917.  Petitioner explains that according to the Ohio Supreme Court in *White*, both experts in the case agreed that a person's mental retardation status does not change over his or her lifetime.  To this point, Petitioner states that evidence in his case also defeats any finding that Petitioner functioned at a normal level prior to the age of 18 and at a mental retardation level after the age of 18, a finding that would point to something other than mental retardation, such as a biological defect, as the cause of limitations on intellectual and adaptive functioning.  (*Id.* at 35.)  In view of case law and testimony at Petitioner's *Atkins* hearing indicating that a person's IQ score remains stable throughout his or her lifetime, solidifying around the age of 9 or 10, Petitioner notes that his IQ was assessed in 1999 at 72 and that his school records as well as Dr. Gelbort's more recent evaluation support a finding that he functioned at that low level prior to the age of 18.  Petitioner emphasizes that the fact that he had not undergone IQ or adaptive skills testing before the age of 18 does not defeat the possibility of finding that the onset of his mental retardation functioning was before the age of 18.  (*Id.* at 35-36.)  Based on the foregoing, Petitioner concludes, Dr. Rheinscheld testified that in his opinion, to a reasonable degree of psychological certainty, the onset of Petitioner's subaverage intellectual function and significant deficits in adaptive skills was before the age of 18.  (*Id.* at 36.)

Petitioner proceeds to explain why, in his view, the state courts' decision rejecting his *Atkins* claim was based on an unreasonable determination of the facts in light of the evidence that Petitioner presented during his *Atkins* proceeding, as well as an unreasonable application of the legal rule in *Atkins*.  Regarding the determination that Petitioner did not establish that he had significantly subaverage intellectual functioning, Petitioner argues that the trial court ignored the import of the evidence that Petitioner presented at the hearing and that the intermediate appellate court failed to undertake any independent analysis of the claim.  (*Id.* at 37.)  Petitioner further argues that the trial court was unreasonable in determining that Petitioner had not rebutted the

*Lott* presumption because the trial court failed to give proper weight to the standard error of measurement. Petitioner asserts that the trial court also placed too much weight on the fact that Petitioner had lived on his own in the same place for 18 years, had worked at the same job for 19 years and received adequate job performance reviews, had a good memory, and drove to Oregon on his own. "The trial court conversely," Petitioner explains, "failed to give proper consideration to the testimony of Dr. Rheinscheld and the literature whereby the field of psychology has shown that mildly mentally retarded individuals are capable of performing many tasks and having many skills." (*Id.*) Recounting evidence establishing that he had been classified as mentally retarded at the age of 15, Petitioner further faults the trial court for failing, unreasonably, to acknowledge the consistency of a person's IQ scores over time. (*Id.* at 38.)

Regarding the determination that Petitioner did not establish that he had significant deficits in adaptive skills, Petitioner identifies as unreasonable the trial court's apparent downplaying of the results of the SIB-R test that Dr. Rheinscheld administered, establishing in Dr. Rheinscheld's opinion significant deficits in adaptive skills, and the trial court's over reliance on the fact that Petitioner had lived on his own for 18 years and held the same job for 19 years. That determination was unreasonable, Petitioner argues, because it failed to take into account that those are tasks that mildly mentally retarded individuals are capable of performing.

According to Petitioner, "the trial court was unreasonable in determining that Lynch had not presented evidence that established his disability had an onset prior to his eighteenth birthday." (*Id.*) Petitioner points to the school records that he presented showing poor academic performance and a certification for mental retardation classes, as well as testimony and evidence establishing that an individual's IQ scores are consistent throughout his or her lifetime. (*Id.* at 38-39.)

Respondent argues that Petitioner is not mentally retarded and that "his attempt to escape justice for the aggravated murder of Mary by feigning to be a developmentally disabled individual must fail." (ECF No. 57, at 20.) Citing the three-part mental retardation standard

38

suggested by *Atkins* and adopted in *Lott*, Respondent argues that the state court's decision rejecting Petitioner's claim of mental retardation was based on an objectively reasonable determination of the facts in light of the evidence that both parties presented in the state court. (*Id*. at 22.) Respondent reasons that the state trial court afforded Petitioner a fair opportunity to litigate his *Atkins* claim and found, reasonably, in favor of the state. Respondent asserts that the record, including the testimony of the state's expert, Dr. Michael Nelson, supports the trial court's factual determinations.

Respondent argues first that the state court reasonably determined that Petitioner did not have significantly subaverage intellectual functioning. (*Id*. at 22.) Setting forth the trial court's decision verbatim, Respondent maintains that Petitioner's arguments that he satisfied that subaverage intellect component of *Lott* and that the trial court failed to accord proper salience to the standard error of measurement with respect to Petitioner's IQ score of 72 are flawed. (*Id*. at 22-23.) Respondent asserts that Petitioner's argument that the standard error of measurement places Petitioner's IQ as low as 67 ignores the reality that the standard error of measurement is *plus* or minus 5 points. Respondent argues that the standard error of measurement produces with respect to Petitioner a score between 66 and 77 and that the trial court acknowledged that IQ score range in its written decision. (*Id*. at 24.) Respondent further argues that assuming that Petitioner was experiencing some anxiety at the time he took the test–both Petitioner's expert and the state's expert testified that anxiety during the time of testing *could* cause the subject to score lower–Petitioner's IQ could be higher than the 72 that he scored on the day that he took the test. (*Id*.)

Respondent insists that the conclusion of Petitioner's expert Dr. Rheinscheld–applying a downward adjustment to Petitioner's score of 72 pursuant to the standard error of measurement–did not go unrebutted because the state's expert, Dr. Nelson, testified reliably and credibly that Petitioner's IQ score, despite the standard error of measurement and the "Flynn effect," was in excess of 70 and that Petitioner accordingly did not suffer from subaverage

intellectual functioning.  (*Id.* at 24-25.)  Respondent further appears to suggest that Dr. Nelson and the state court alike were reasonable in taking into account and relying on the hundreds of documents establishing that Petitioner had for years lived independently and worked dependably, had a good memory, and had successfully planned, budgeted for, and completed a solo cross-country trip.  (*Id.* at 25.)  Citing *Moore v. Quarterman*, 517 F.3d 781 (5th Cir. 2008), Respondent argues that Petitioner cannot demonstrate pursuant to § 2254(d)(2) that the state court's determination was objectively unreasonable because "where, as here, testimony in a state court proceeding is conflicting, the state court findings cannot be overcome."  (*Id.*)

Respondent also disputes Petitioner's argument that the "Flynn effect"–positing that over time a person's IQ score can rise without a corresponding increase in intellectual functioning–operates to reduce Petitioner's IQ score of 72 by .622 points.  Respondent reasons that some courts, such as the United States Court of Appeals for the Fifth Circuit, do not accept the "Flynn effect" as scientifically valid.  Even assuming that the "Flynn effect" is scientifically valid, Respondent argues that the concept does not apply to Petitioner's case.  (*Id.* at 25-26.) Explaining that the concept of the "Flynn effect" is that a person who takes a test more than once will score slightly better each time without a corresponding increase in actual intellectual functioning, Respondent points out that Petitioner had never before undergone an IQ test that resulted in his full scale score of 72.  Respondent further asserts that the "Flynn effect" is based on the WAIS-III norms becoming outdated, which was not the case with respect to Petitioner because Petitioner took the WAIS-III test just two years after it had been "normed."[5]  (*Id.* at 26.)

Next, Respondent sets forth arguments urging this Court to find as reasonable the state courts' determination that Petitioner did not have significant limitations in two or more adaptive skills–the second component for a finding of mental retardation.  Setting forth the trial court's

---

[5]     Respondent also raises several arguments discounting the import of the results of Dr. Gelbort's recent evaluation of Petitioner.  The Court need not set forth or consider those arguments because the Court will not consider Dr. Gelbort's materials in conducting its § 2254(d) inquiry.

decision verbatim, Respondent characterizes as "flawed" Petitioner's arguments that the trial court failed to give proper credit to the adaptive skills test and hands-on testing that, according to Petitioner, were sufficient to rebut the *Lott* presumption. (*Id.* at 30-31.) With respect to Petitioner's argument that the trial court failed to give appropriate weight to Petitioner's inability, during Dr. Rheinscheld's testing, to find a doctor in the white pages or to look up a word in a dictionary, Respondent counters that the trial court <u>did</u> consider that information and that the failure of a trial court to assign to evidence the weight desired by a petitioner does <u>not</u> render the trial court's determination unreasonable. (*Id.* at 31.)

Respondent proceeds to assert that the trial court reasonably determined that Petitioner failed to establish a significant deficit either in his ability to follow the law or in his ability to manage money. Supporting the trial court's determination that Petitioner did not demonstrate significant deficits in the social skill of obeying laws, Respondent asserts, is evidence in the record establishing that "[d]espite his being 55-years-old at the time of his *Atkins* hearing, Lynch had a criminal record consisting only of the offense giving rise to his capital sentence and a 1991 conviction for causing delinquency." (*Id.* at 31-32.) Respondent further asserts that Petitioner's employment and prison records reflect that he did not have significant limitations in his ability to follow rules. (*Id.* at 32.) Petitioner's own expert, Respondent points out, "agreed there did not appear to be any real disciplinary problems with Lynch." (*Id.* at 33.) To that point, Respondent asserts that Petitioner relied significantly on testimony by his expert and that Petitioner's expert "set the bar fairly low when assessing Lynch's ability." (*Id.*) Finally, with respect to the reasonableness of the trial court's determination, Respondent points out that the state's expert, Dr. Nelson, concluded that Petitioner did not demonstrate significant limitations in his ability to follow laws and rules.

Turning to Petitioner's assertion that he had significant deficits in his ability to manage money and that the state trial court erred in not finding as much, Respondent argues that the evidence supported the trial court's finding. Respondent points again to Petitioner's lifelong

41

record of maintaining adequate employment, self-care, and home living. Respondent also reiterates the skills reflected by Petitioner's taking a solo trip to Oregon. Respondent asserts that the trial court's decision was reasonable because it was consistent with the opinion of the state's expert, Dr. Nelson, and because both experts agreed that a person's having credit card debt and once filing for bankruptcy does not necessarily mean that the person is mentally retarded.

Concerning the third and final mental retardation criteria, Respondent argues that Petitioner failed to establish an onset of significant deficits in intellectual functioning and adaptive functioning before the age of 18. (*Id*. at 34-35.) Respondent argues that the record supports the trial court's determination that the evidence establishing onset before the age of 18 was sparse. (Ultimately, as Respondent acknowledges, the trial court actually declined to reach the issue of whether onset occurred before the age of 18, concluding that it was unnecessary to do so in view of the trial court's determination that Petitioner could not meet the first two criteria.) Notwithstanding the foregoing, Respondent proceeds to argue that even Petitioner's own expert agreed that there was very little documentation about Petitioner before the age of 18. (*Id*. at 35.) Specifically, Respondent points to testimony in which Dr. Rheinscheld acknowledged the possibility of improper diagnoses of mental retardation during the 1950's and 1960's, that he was not familiar with what testing, if any, prompted a school superintendent in 1964 to categorize Petitioner as mentally retarded, and that no adaptive behavior measures even existed until the 1970's. (*Id*. at 35-36.)

In his reply memorandum, Petitioner disputes Respondent's suggestion that Petitioner is feigning mental retardation to escape justice, noting that "[t]here has never been any suggestion that Lynch malingered on any test or evaluation." (ECF No. 58, at 3.) The fact that Dr. Tureen during Petitioner's mitigation phase, as well as Drs. Rheinscheld and Nelson during the *Atkins* hearing, relied on the WAIS-III that Dr. Tureen administered, Petitioner argues, "dispels the Warden's bald assertion that Lynch wasn't being truthful." (*Id*.) Challenging Respondent's assertion that the standard error of measurement should be applied as equally to increase an IQ

42

score by five points as to decrease the score by five points, Petitioner argues that Respondent's assertion "is inconsistent with the established field of psychology." (*Id.*)  Petitioner also disputes Respondent's suggestion that any anxiety that Petitioner may have experienced while taking the WAIS-III affected the results in a way that decreased Petitioner's score, reiterating that Drs. Tureen, Rheinscheld, and Nelson all accepted the results of the WAIS-III as valid.  In fact, Petitioner notes, the state's own expert testified that simply because anxiety <u>could</u> affect a person's performance does not mean that anxiety <u>did</u> affect performance.[6]

Concerning Respondent's arguments espousing the reasonableness of the state courts' determination that Petitioner failed to demonstrate significant limitations in adaptive functioning, Petitioner asserts that Respondent's reliance on the opinion of Dr. Nelson is misplaced because Dr. Nelson never met or administered a test to Petitioner.  To that point, Petitioner notes that Dr. Rheinscheld testified to the importance, in assessing adaptive functioning, of meeting an individual in person.  (*Id.* at 4-5.)  Petitioner proceeds to discount Respondent's reliance on Petitioner's job history as evidence that Petitioner did not have significant limitations in adaptive skills, noting that the jobs that Petitioner had held involved unskilled manual labor and were suited for mildly mentally retarded people.  Reiterating the importance, according to Dr. Rheinscheld's testimony, of actually testing an individual's adaptive functioning, Petitioner not only notes that Dr. Nelson performed no such testing and but also asserts that it was unreasonable for the state courts to not even mention the results of the SIB-R test that Dr. Rheinscheld administered to Petitioner.  (*Id.*)

Finally, with respect to Respondent's argument that Petitioner failed to establish an onset of mental retardation before the age of 18, Petitioner accuses Respondent of "selectively pars[ing] out words from Dr. Rheinscheld's testimony when criticizing his determination that the

---

[6]     Petitioner raised several arguments against Respondent's repeated entreaties urging this Court not to consider the materials from Dr. Gelbort that Petitioner developed and presented during these habeas corpus proceedings.  The Court need not set forth or consider Petitioner's arguments because the Court will not consider Dr. Gelbort's materials in conducting its § 2254(d) inquiry.

onset of Lynch's mental retardation was prior to the age of eighteen." (*Id*. at 5-6.) Petitioner proceeds to repeat the evidence in the record and upon which Dr. Rheinscheld relied: Petitioner's school records from Oregon and Ohio, the fact that IQ scores remain consistent after age 9 or 10, and the absence of any other explanation or cause for Petitioner's poor cognitive and adaptive skills functioning. (*Id*. at 6.)

The issue before the Court, in resolving Petitioner's first ground for relief, is not whether Petitioner has established that he is mentally retarded and therefore ineligible for the death penalty. The issue is whether the state courts' decision rejecting Petitioner's *Atkins* claim contravened or unreasonably applied clearly established Supreme Court precedent or involved an unreasonable determination of the facts in light of the evidence presented. As noted, a federal habeas court may not find a state adjudication to be "unreasonable" simply because the federal court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. *Williams*, 260 F.3d at 699. Rather, a state court's application of federal law is unreasonable "only if reasonable jurists would find it so arbitrary, unsupported or offensive to existing precedent as to fall outside the realm of plausible credible outcomes." *Barker v. Yukins*, 199 F.3d 867, 872 (6th Cir. 1999). Further, § 2254(e)(1) requires this Court to presume as correct any factual findings that the state court made, a presumption that a petitioner can rebut only with clear and convincing evidence. The high measures of deference that § 2254(d) requires are dispositive of Petitioner's *Atkins* claim.

The Court considers first the state courts' determination that Petitioner failed to satisfy the first component of the mental retardation definition, sub-average intellectual functioning. All three experts who based their opinions on the WAIS–III test that Petitioner took in 1999. Drs. Tureen, Rheinscheld, and Nelson agreed that Petitioner achieved a 72, a full-scale score in excess of 70. Dr. Tureen, who administered the WAIS-III to Petitioner in 1999, testified that Petitioner achieved a full-scale score of 72. (Tr. Vol. 9, at 1634.) Dr. Rheinscheld, who reviewed Dr. Tureen's test results and raw data, also testified that Petitioner achieved a full-scale

44

score of 72. (Tr. Vol. 11, at 67.) The state's expert, Dr. Nelson, who also found valid Dr. Tureen's test results and raw data, testified that Petitioner's full-scale score was 72. (Tr. Vol. 11, at 107.) Because all three experts agreed that Petitioner's full-scale IQ score was in excess of 70, it is difficult to characterize as unreasonable the state trial court's determination that according to the *Lott* presumption, Petitioner was not mentally retarded. (App. Vol. 12, at 293-95.)

Petitioner relies heavily on the standard error of measurement in arguing that because his score was falsely elevated, the trial court erroneously applied the *Lott* presumption. According to Dr. Rheinscheld's testimony, the standard error of measurement "is the error in any kind of psychological test that involves human behavior, basically." (Tr. Vol. 11, at 18.) Dr. Nelson described the standard error of measurement in terms of a "confidence band" by which an expert could be 95 percent confident that a person's IQ score was within a range of plus or minus five points from the person's actual score, *i.e.*, between 67 and 77 for a full-scale score of 72. (*Id.* at 104-05.) Petitioner argues that applying the standard error of measurement downward results in an IQ score as low as 67. But equally plausible according to the evidence in the record is that an application of the standard error of measurement could result in an IQ score as high as 77. During Petitioner's *Atkins* hearing, both experts agreed that the standard error of measurement applicable to Petitioner's score of 72 was plus *or* minus five points. (Tr. Vol. 11, at 18-19, 104-105.) Both experts testified that Petitioner's IQ score was anywhere within a range of 67 to 77. (*Id.*) Neither expert suggested that one end of that range was more likely than the other. Thus, Petitioner's argument that his IQ was closer to 67 than 72 finds no support in the record or the accepted science.

Dr. Rheinscheld's conclusion that Petitioner met the component of sub-average intellectual functioning requires a causal link that Dr. Rheinscheld failed to identify and that is not evident from the record. As noted above, Dr. Rheinscheld testified that Petitioner's full-scale IQ score was 72 and that applying the standard error of measurement, Petitioner's IQ score

45

fell within a range of 67 to 77.  Dr. Rheinscheld ultimately concluded that considering the standard error of measurement, Petitioner functioned intellectually in the mentally retarded range.  (Tr. Vol. 11, at 26-27.)  Aside from a passing reference to the significantly low score that Petitioner achieved on the arithmetic sub-test, Dr. Rheinscheld did not cogently explain in either his testimony or his report (App. Vol. 12, at 424) what caused him to apply the standard error of measurement only downward.  (Tr. Vol. 11, at 26-27.)

Petitioner argues that the trial court did not accord proper weight to the standard error of measurement.  Based on the testimony and evidence presented during Petitioner's *Atkins* hearing, however, this Court cannot disagree with, much less find unreasonable, the trial court's determination that the standard error of measurement of plus or minus five points placed Petitioner's full-scale IQ between 67 and 77.  (App. Vol. 12, at 294.)  In making that determination, the trial court referenced the testimony of both Dr. Rheinscheld and Dr. Nelson.  (*Id*.)  Petitioner does not explain, and it is not otherwise apparent to the Court, how the trial court's failure to apply the standard error of measurement only downward (as Petitioner urges) was unreasonable.

Beyond the standard error of measurement as an explanation for why Petitioner's IQ score was actually lower than the 72 he achieved and why Petitioner demonstrated sub-average intellectual functioning, Petitioner points to the "Flynn Effect."  That argument, however, is not supported by the record.  The "Flynn Effect," as defined by Dr. Rheinscheld, describes "the idea that over time people's IQs seem to rise."  (Tr. Vol. 11, at 21.)  Dr. Rheinscheld proceeded to clarify that "when a test first comes out, usually the person scores more valid compared to the norms, but as the test is used later, say like four or five, six years later on the same person, generally scores rise."  (*Id*. at 21-22.)  In the report that he prepared for Petitioner's *Atkins* hearing, Dr. Nelson explained the "Flynn Effect" as it applied to Petitioner as follows:

> Over the last century, IQ scores have been steadily rising, a phenomena of the "Flynn Effect."  Because of the Flynn Effect, IQ tests are periodically renormed, making them harder.  In other words, an individual tested on a particular IQ test must answer more questions correctly or must answer harder questions, to obtain

46

the same score on that intelligence test.  This holds practical and theoretical
importance.  Because the Flynn Effect takes effect immediately on the
introduction of a new IQ test, the norms are most valid at the times they are
initially released.  Thus, it is likely that the WAIS-III norms are valid because Mr.
Lynch was tested only approximately two years after the release of these norms.
Thus, his assessment was in the beginning of the WAIS-III's norming cycle.  A
score is most valid, and likely lower, when taken from a [sic] IQ test at the
beginning of its norming cycle.

(App. Vol. 11, at 36-37.)

Petitioner scored 72 on the WAIS-III test that he took in 1999.  The record contains no
evidence that, at the time of Petitioner's *Atkins* hearing, Petitioner ever took another WAIS-III
test before or after 1999.  Petitioner reasons that the Flynn Effect is nonetheless relevant,
asserting that it is a person's IQ or actual intelligence that increases over time.  The record lends
scant support to Petitioner's definition of the Flynn Effect.  It is more plausible to construe the
testimony and evidence about the Flynn Effect as establishing that a person's IQ *score* tends to
increase over time *without* a corresponding increase in the person's actual intellectual
functioning.  That being so, Petitioner fails to establish to the satisfaction of this Court that the
trial court was unreasonable in determining "that there is no evidence that the Flynn effect
affected Petitioner's test results."  (App. Vol. 11, at 294.)

As for other factors to which Petitioner points as proof of his sub-average intellectual
functioning and the unreasonableness of the state trial court's decision, Petitioner dismisses any
suggestion that anxiety on his part somehow drove his IQ score artificially lower.  It bears noting
that the record contains no evidence that Petitioner malingered while undergoing the WAIS-III;
Petitioner himself emphasizes that all three experts–Drs. Tureen, Rheinscheld, and
Nelson–found that the results of the WAIS-III that Dr. Tureen administered were valid.  (ECF
No. 58, at 3.)  Petitioner points to the concepts of "masking" and "a cloak of competence,"
ostensibly as evidence that he came across as higher-functioning, intellectually, than he actually
was.  Even if true, however, the record contains no evidence that any "coping" mechanisms that
Petitioner may have developed for functioning in everyday life would transfer to enable
Petitioner to score artificially higher on the WAIS–III than his intellectual functioning really

47

was.  Petitioner takes the trial court to task for placing too much weight on the fact that Petitioner had lived on his own in the same place for 18 years, had held the same job for 19 years and received adequate performance reviews, exhibited a good memory, and had once taken a solo road trip to Oregon.  A fair reading of the decision, however, reveals that the trial court did not place any more or less weight on those factors than it did on the other factors it considered.  If Petitioner is suggesting that those factors have no relevance to an assessment of his intellectual functioning, his suggestion flies in the face of the record.  Every expert who evaluated Petitioner relied on as relevant to Petitioner's intellectual functioning evidence of how Petitioner lived, functioned, cared for himself, worked, and interacted with people.  In short, none of the arguments set forth above demonstrate that the trial court was unreasonable in determining that Petitioner failed to demonstrate sub-average intellectual functioning.[7]

The reasonableness of the trial court's determination that Petitioner failed to satisfy the second component of mental retardation–significant deficits in at least two accepted categories of adaptive functioning–presents a closer call.  Dr. Rheinscheld explained in an affidavit dated August 6, 2003, that the second component of the diagnostic criteria for determining mental retardation is "significant impairment in adaptive behavior in at least two of the following skill domains: functional academics, communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, work, leisure, health and safety." (App. Vol. 10, at 153.)  Dr. Nelson stated the same in his report, describing the second component of mental retardation as "significant limitations in adaptive functioning in at least two scale areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety."  (App. Vol. 11, at

---

[7]       As further evidence that he has sub-average intellectual functioning and that the trial court's decision finding otherwise was unreasonable, Petitioner also relies on the findings of Dr. Gelbort.  As this Court has explained, however, it will not consider Dr. Gelbort's findings in determining whether the state courts' decision rejecting Petitioner claim contravened or unreasonably applied clearly established federal law or involved an unreasonable determination of the facts.

37.)

In his subsequent report, however, Dr. Rheinscheld explained the adaptive functioning component as follows: "The American Association on Mental Retardation (AAMR) states that significant limitations in adaptive behavior are operationally defined as performance that is at least 2 standard deviations below the mean in at least one of the three designated types of adaptive behavior: conceptual, social, and practical." (App. Vol. 12, at 424-25.)[8]  Dr. Rheinscheld clarified during his testimony at Petitioner's *Atkins* hearing that there was no significant difference between the two definitions of the adaptive functioning component. (Tr. Vol. 11, at 15-16.)  The trial court addressed both definitions, stating first that, "[u]nder Lott, [Petitioner] must show significant deficits in two of the eleven recognized adaptive skills." (App. Vol. 10, at 295.)  Subsequently, the trial court noted that, "[u]nder [a more recent AAMR definition], Petitioner must exhibit significant limitations in one of 3 groups of adaptive behavior–conceptual, social and practical–or on the total score." (*Id.* at 296-97.)

Dr. Rheinscheld concluded that Petitioner demonstrated deficits in adaptive behavior sufficient to satisfy the second component of the definition of mental retardation.  Dr. Rheinscheld based his conclusions on a three-hour clinical interview with Petitioner, the results of the SIB-R test that Dr. Rheinscheld administered to Petitioner, and review of hundreds of pages of documents concerning Petitioner's background and the offense for which he received the death penalty.  Under the AAMR's 1992 definition, Dr. Rheinscheld concluded that Petitioner had significant deficits in two adaptive skills: functional academics and home living. (App. Vol. 10, at 153-54.)  With respect to functional academics, Dr. Rheinscheld concluded that Petitioner had difficulties with reading and comprehension, as indicated by the fact that Drs. Tureen and Bley both reported having to read questions to Petitioner for the tests they administered.  Dr. Rheinscheld recounted with respect to home living that Petitioner had

---

[8]  It appears that the AAMR set forth the first definition in 1992 and then revised the definition in 2002.  (Tr. Vol. 11, at 16-16.)

difficulties with financial management, that Petitioner had difficulty keeping score when he went bowling, and that Petitioner required direction at work. During Petitioner's *Atkins* hearing, Dr. Rheinscheld added that indicative of his conclusion that Petitioner had significant deficits in adaptive functioning were such factors as Petitioner's requiring three hours to complete the MMPI test that Dr. Tureen administered in 1999, Petitioner's mother likely having been mentally retarded, and reports by relatives and other acquaintances characterizing Petitioner as "slow." Also relevant, Dr. Rheinscheld noted, were not only Petitioner's dual diagnoses of pedophilia and post traumatic stress disorder, but also the psychological trauma that Petitioner suffered during his developmental years consisting of sexual abuse, neglect, and lack of resources.

Under the AAMR's 2002 definition, Dr. Rheinscheld concluded that Petitioner had significant deficits in conceptual skills (money concepts and writing), social skills (following rules and obeying laws), and practical skills (managing money, preparing meals, and using the telephone). (App. Vol. 12, at 425-26.) Dr. Rheinscheld noted that Petitioner could add a column of numbers but could not fill out bank slips; that Petitioner had at least twice declared bankruptcy; that Petitioner required credit counselor Jerry Fuqua to assist Petitioner with finances, medical appointments, automobile maintenance, and housing; that Petitioner could not prepare meals (Petitioner reported that he did not know how to make spaghetti); that Petitioner relied on fast food restaurants for most of his meals; that Petitioner never made grocery lists and usually just roamed the aisles until he saw something he wanted; that Petitioner required days to write even a short letter; and that Petitioner often copied words from books in his correspondence.

Dr. Rheinscheld also based his conclusion on the three-hour clinical interview and the SIB-R test that he administered to Petitioner. Specifically, Dr. Rheinscheld noted that Petitioner could not find a doctor in the yellow or white pages, that Petitioner could not look up a word in the dictionary unless the word was written down, and that Petitioner scored a 69 on the SIB-R

subtests for personal living and community living skills. (App. Vol. 12, at 425-26; Tr. Vol. 11, at 28-56.) With respect to the SIB-R that he administered, Dr. Rheinscheld also noted that he relied on Petitioner's self-reporting responses, that Dr. Rheinscheld detected no signs of malingering on Petitioner's part, and that it was immaterial to the validity of the results, in Dr. Rheinscheld's view, that Petitioner had been incarcerated for 5 to 6 years at the time that he underwent the SIB-R test.

Dr. Rheinscheld raised several cautions to consider in connection with assessing Petitioner's adaptive functioning. Dr. Rheinscheld stressed that Petitioner, like most people, had certain strengths and weaknesses. Dr. Rheinscheld also cautioned that adaptive behaviors can be learned and forgotten over a person's lifetime. Dr. Rheinscheld further noted that an individual's adaptive functioning can be depressed by numerous other factors (presumably unrelated to mental retardation) such as poor resources, low intellectual level, mental illness, physical limitations, significant developmental issues, medical conditions, lack of education, and locale. Dr. Rheinscheld also noted the myriad pitfalls that make clinical testing the only method certain for assessing mental retardation, such as the fact that it not uncommon for mildly mentally retarded individuals to obtain drivers' licenses, own cars, hold jobs, and live independently. Dr. Rheinscheld noted that although Petitioner had held the same job for 19 years, his job consisted of repetitive tasks and Petitioner often required direction, and that although Petitioner had driven alone cross-country to Oregon, Petitioner received assistance from Jerry Fuqua planning the trip, had gotten lost several times despite extensive study of maps, and had had a passenger (his nephew) along with him on the return trip. Dr. Rheinscheld observed that Petitioner had a good memory but Dr. Rheinscheld denied that a good memory alone was a sign of intelligence. Dr. Rheinscheld also eschewed undue reliance on the fact that Petitioner had showed dependable attendance at work or the fact that Petitioner had very little criminal history and almost no disciplinary problems during his employment or in prison. Dr. Rheinscheld suggested that those indications of adaptive functioning were a product of the fact that Petitioner functioned best in a

51

routine-oriented, structured environment.

       Dr. Nelson concluded that Petitioner's capacity for adaptive functioning was not in the

mental retardation range and was at least in the borderline range.  (App. Vol. 11, at 37; Tr. Vol.

11, at 111-14.)  Dr. Nelson based his conclusion on a review of documents and materials about

Petitioner's background, from Petitioner's trial, and from the various mental health experts who

had evaluated or tested Petitioner.  Dr. Nelson did not personally meet with, talk to, or test

Petitioner.  In his report, Dr. Nelson stated as follows:

>      Mr. Lynch has never been formally administered an adaptive behavior
> scale instrument.[9]  Because he has lived in a very structured environment (prison)
> over the past five years, it is very difficult to assess this at the present.
> Nevertheless, it appears that Mr. Lynch has been successful at maintaining an
> adequate work history as well as self-care and home living.  He successfully
> "made a trip out of Oregon. . . (and) picked up his nephew while out in Oregon,
> and took him back to his sister's house in the Cincinnati area" (see Hamilton
> County Sheriff Investigation Report dated 6-24-98; p.294).  Thus, it appears that
> his capacity for adaptive functioning is also at least in the borderline range.

(App. Vol. 11, at 37.)  Dr. Nelson offered little elaboration at Petitioner's *Atkins* hearing.  For

instance, Dr. Nelson agreed that a person's declaring bankruptcy does not necessarily indicate

that that person has significant deficits in adaptive functioning within the meaning of the mental

retardation definition.  (Tr. Vol. 11, at 112.)  When asked whether an individual's having one

serious criminal conviction and one minor criminal conviction belies an finding that the person

has significant deficits in the adaptive skill of obeying laws, Dr. Nelson answered without

elaboration that this was a factor he would consider but that he was more inclined to look at the

person's functioning over a course of time.  (*Id*. at 112-13.)  On cross-examination, Dr. Nelson

testified that he was aware of Dr. Tureen's testimony that Petitioner required three hours to take

---

      [9]     It is not clear whether Dr. Rheinscheld had administered the SIB-R test to
Petitioner at the time that Dr. Nelson prepared his report.  Dr. Nelson's report is dated July 1,
2004.  The entry appointing Dr. Rheinscheld as Petitioner's mental retardation expert was dated
March 8, 2004.  Petitioner's *Atkins* hearing took place on June 17, 2005.  It is fair to presume
that Dr. Rheinscheld administered the SIB-R test to Petitioner sometime between those two
dates, but the record is unclear exactly when Dr. Rheinscheld did so.  Dr. Rheinscheld's post-
evaluation report is not dated.  And nowhere in the *Atkins* transcript does anyone mention the
date that Dr. Rheinscheld administered the test.

the MMPI test, that Drs. Tureen and Bley testified that they had to define words and read

questions aloud to Petitioner because he was reading slowly, and that Petitioner had undergone

bankruptcy proceedings even though he (Dr. Nelson) did not include that fact in his report.  (*Id*.

at 119-20.)

The trial court found that the evidence did not support Dr. Rheinscheld's conclusion that

Petitioner had significant limitations in social skills (the ability to follow the law) or functional

academics (money management).  With respect to the former, the trial court found that Petitioner

had a limited criminal record prior to the aggravated murder case, that Petitioner had committed

only one disciplinary infraction while incarcerated and got along well in prison, and that

Petitioner had had few disciplinary problems at work and had excellent attendance and

satisfactory reviews.  (App. Vol. 10, at 296.)  The trial court also found that Petitioner did not

have significant limitations in the functional academics skill of money management.  The trial

court explained that Petitioner's financial difficulties and use of a credit counselor were "simply

not sufficient to establish a significant limitation."  (*Id*.)  The trial court reasoned that the record

established that Petitioner had worked steadily at the same job for 19 years, that Petitioner had

had excellent attendance and good job reviews, and that Petitioner had lived alone in the same

apartment for 18 years and functioned on a daily basis.  (*Id*.)  Addressing the "more recent

AAMR definition of adaptive skills," requiring Petitioner to "exhibit significant limitations in

one of 3 groups of adaptive behavior – conceptual, social and practical – or on the total score,"

the trial court found that Petitioner "failed to establish that he exhibits significant limitations in

any of these."  (*Id*. at 296-97.)  The trial court's decision is fraught with enough problems as to

render it "unreasonable" within the meaning of 28 U.S.C. § 2254(d).

The trial court's finding that Petitioner had a limited criminal record prior to the

aggravated murder case is problematic because it is wholly inconsistent with what the trial court

found in its opinion explaining its rationale for imposing the death penalty.[10]  With respect to the

statutory mitigating factor set forth in O.R.C. § 2929.04(B)(5)–the offender's lack of significant

history of prior criminal convictions and delinquency adjudications–the trial court found the

following:

> This mitigating factor is actually not present in this case.  In fact, to the
> contrary, there is evidence of a prior conviction, other contacts with the criminal
> justice system as well as a number of other incidents which may or may not have
> come to law enforcement's attention but have been acknowledged by [Petitioner]
> to the various clinical psychologists.  This mitigating factor therefore was not
> present.

(App. Vol. 2, at 395-96.)  It is difficult to reconcile the trial court's 1999 sentencing opinion with

the trial court's 2005 *Atkins* decision.  Although the United States Supreme Court in *Bobby v.

Bies*, 129 S.Ct. 2145, 2153 (2009), held that "[m]ental retardation as a mitigator and mental

retardation under *Atkins* and *Lott* are discrete legal issues," that provides the state trial court little

cover in the instant case.  This is not a case in which the state courts vaguely made a finding

concerning mental retardation on direct appeal on the basis of the evidence developed in

mitigation and then specifically made an inconsistent finding concerning mental retardation on

the basis of the evidence developed during an *Atkins* proceeding.  This is a case in which the

state trial court made one finding on a discrete issue (Petitioner's criminal history) at trial and

then a completely opposite finding on the same fact in an *Atkins* proceeding, largely on the basis

of the same evidence.

In the instant case, the record concerning the adaptive functioning component of the

mental retardation standard is different than the record concerning the intellectual functioning

component.  With respect to the latter, both Dr. Rheinscheld and Dr. Nelson relied on the same

test results, raw data, and other documents, and agreed on numerous factors, such as the fact that

Petitioner achieved a full-scale score of 72, the fact that that score generally fell within the

borderline range of intellectual functioning, and the fact that the standard error of measurement

---

[10]     The Court recognizes that a different state court judge conducted Petitioner's
capital trial than the state court judge who conducted Petitioner's *Atkins* hearing.

was plus or minus five points.  There, it was easy enough to understand and find reasonable the trial court's finding that Petitioner's intellectual functioning did not fall within the mental retardation range.  Here, by contrast, Dr. Rheinscheld met with Petitioner for over three hours, during which Dr. Rheinscheld conducted a clinical interview and administered the SIB-R test.  Dr. Nelson did not talk to, meet with, or test Petitioner.  Dr. Rheinscheld's affidavit, report, and testimony were extensive, detailed, and definitive on the issue of Petitioner exhibiting significant deficits in adaptive functioning.  Dr. Nelson's report on this component consisted of a few lines in a single conclusory paragraph.  Dr. Nelson did not address the SIB-R results in either his report or his testimony.  In fact, Dr. Nelson's testimony at Petitioner's *Atkins* hearing was vague, conclusory, and insubstantial.  Consider the following exchange:

> Q.   Just because someone has filed for bankruptcy, would that indicate to you that they have a significant deficiency, for example, in the area of financial skills?
>
> A.   That they wouldn't – they're probably not managing their money very well.  Whether this was a result of mental retardation or not is a completely different story.

(Tr. Vol. 11, at 112.)  That was the entirety of Dr. Nelson's testimony supporting his conclusion that Petitioner did not have significant deficits in adaptive functioning in the functional academics skill of money management.  Dr. Nelson's testimony concerning Petitioner's adaptive functioning in the social skill of obeying laws was equally Spartan:

> Q.   Would you consider a criminal conviction, indeed two criminal convictions; one of them very serious, coupled with a life in which the person pretty much follows all the rules, does what he's supposed to, goes to work, does a good job, would the inability in those two instances, to follow the law in order to result in a conviction, would that lead you to one that has had a significant deficiency in that area?
>
> A.   I would consider that, but you'd really have to look at the individual's level of adaptive functioning over the course of time.

(Tr. Vol. 11, at 112-13.)  That, too, was the entirety of Dr. Nelson's testimony supporting his conclusion that Petitioner did not have significant deficits in adaptive functioning in the social skill of obeying laws and following rules.  The only matter on which Dr. Nelson was definitive

was in his conclusion that Petitioner did not exhibit significant deficits in adaptive functioning.

The Court considers it difficult to regard as reasonable the trial court's finding that Petitioner did not exhibit significant deficits in adaptive functioning in any skills–a finding that appears to have ignored much of Dr. Rheinscheld's detailed and supported conclusions in favor of conclusions (Dr. Nelson's) that found far less support in the record.  Respondent argues that it was reasonable for the trial court to rely on Dr. Nelson's conclusion because "Dr. Nelson reviewed virtually all available relevant information on Lynch, including around 700 pages of materials, before concluding Lynch did not have significant subaverage functioning in *any* of the adaptive skills." (ECF No. 57, at 31.)  Dr. Nelson's review of "virtually all available relevant information on Lynch" lends little credibility to his conclusions, however, in view of the paucity of his reasoning in support of his conclusions.

A fair reading of the record reveals that the trial court did not merely disagree with or find not credible Dr. Rheinscheld's observations.  In large part, rather, the trial court simply ignored many of them.  That is the hallmark of unreasonableness.  The trial court acknowledged that Dr. Rheinscheld tested Petitioner, but did not account for or mention the results of the SIB-R test or Dr. Rheinscheld's observation that Petitioner could not find a doctor in the telephone directory or look up a word in the dictionary.  Respondent argues that the trial court's failure to give that evidence the weight urged by Petitioner does not amount to unreasonableness.  (ECF No. 57, at 31.)  It is specious, however, to equate the failure to give any consideration to evidence with the failure to accord a certain weight to that evidence.  The trial court also did not account for or mention Petitioner's self-reported and observed difficulty in reading.

In dismissing Dr. Rheinscheld's conclusion that Petitioner had significant limitations in adaptive functioning in the social skill of following rules and the law, the trial court relied on the fact that Petitioner had had very little criminal record prior to the offense for which he was sentenced to death.  The Court explained above why that finding is problematic.  The trial court also relied on the fact that Petitioner had had only one disciplinary problem in prison and

56

functioned well there, without accounting for Dr. Rheinscheld's observation that Petitioner will function well in a structured environment. The trial court similarly relied on the fact that Petitioner had had few disciplinary problems at work, had demonstrated excellent attendance, and had achieved satisfactory performance reviews. Such reliance failed to account for Dr. Rheinscheld's suggestion that those indicators of adaptive functioning were a product of the fact that Petitioner functioned best when he performed simple, repetitive tasks and held to routine.

In dismissing Dr. Rheinscheld's conclusion that Petitioner had significant limitations in adaptive functioning in the academic skill of money management, the trial court concluded that Petitioner's financial difficulties and need for the services of a credit counselor were not sufficient to establish significant limitations. The trial court relied on Petitioner's holding the same job for the past 19 years, maintaining dependable attendance and achieving satisfactory reviews, but failed to mention or account for the fact that Petitioner's work consisted of routine, simple tasks or that Petitioner required direction to be productive. The trial court relied on Petitioner's living alone in the same place for 18 years, but failed to account for or mention the fact that Petitioner relied on a credit counselor to manage his finances, medical appointments, automobile maintenance, and housing–assistance that undercuts a finding that Petitioner truly lived alone and functioned on a daily basis. The trial court did not mention Petitioner's strengths and weaknesses or explain why the "masking" or the "cloak of competence" that can make a mildly mentally retarded individual appear higher functioning than he or she actually is were not relevant to an assessment of Petitioner's adaptive functioning.

Giving every benefit of the doubt to the trial court and cognizant of the considerable deference that § 2254(d) imposes, this Court nonetheless cannot conclude that the trial court's finding on the adaptive functioning component of the mental retardation standard was reasonable in light of the evidence presented. To be clear, this is not a matter of this Court merely disagreeing with the trial court's decision or explaining that this Court, if presented with the evidence *de novo*, would have reached a different result. Rather, this is a matter of this Court

examining the trial court's decision against the record and being able to reach no other conclusion than that the trial court's decision was unreasonable based on the evidence presented and that Petitioner rebutted by clear and convincing evidence any presumption of correctness to which the trial court's findings otherwise would be entitled.

Turning to the third component of the mental retardation standard–onset before the age of 18–the Court is satisfied that the trial court's finding that Petitioner failed to meet this component was reasonable in light of the record.  After noting that the record was sparse with regard to this component, that a November 1964 school record classified Petitioner as mentally retarded, and that Dr. Rheinscheld was of the opinion that Petitioner's mental retardation had onset before the age of 18, the trial court ultimately held that because it had found that Petitioner was not mentally retarded, the onset component was irrelevant.  (App. Vol. 10, at 297.)  The record supports the trial court's findings both that the evidence was sparse and that the issue was irrelevant.

Dr. Rheinscheld concluded that the onset of Petitioner's sub-average intellectual functioning and significant deficits in adaptive functioning was before the age of 18.  Dr. Rheinscheld based that conclusion on an Oregon school record reflecting that in November 1964, when Petitioner was 15, the school superintendent certified Petitioner as mentally retarded and eligible for special education classes.  (App. Vol. 10, at 150; App. Vol. 12, at 427; Tr. Vol. 11, at 59-60.)  Dr. Rheinscheld explained that because a person's IQ solidifies at age 8 or 9, it is reasonable to believe that if Petitioner was certified as mentally retarded at age 15, Petitioner had mental retardation before the age of 18.  (App. Vol. 10, at 154; App. Vol. 12, at 427; Tr. Vol. 11, at 58.)  Additional evidence suggesting the accuracy of Petitioner's mental retardation certification, Dr. Rheinscheld testified, was his consistently poor academic performance.  (Tr. Vol. 11, at 58-59.)  Dr. Rheinscheld also testified that it was not necessary for an individual to have been tested before the age of 18 to determine whether the onset of that person's mental retardation was before the age of 18.  (*Id*. at 60-61.)  Finally, Dr. Rheinscheld explained that he

58

found no indication that Petitioner's pre-18 sub-average intellectual ability and sub-average adaptive functioning were attributable to something other than mental retardation, such as a brain injury. (*Id*. at 57-58, 61-62.)

Dr. Nelson concluded that Petitioner was not an individual with mental retardation. (Tr. Vol. 11, at 114.) Dr. Nelson offered no observations or conclusions about the pre-18 onset component with respect to Petitioner, beyond agreeing on cross-examination that it is possible to make a determination whether an individual's mental retardation had an onset before the age of 18 even in the absence of any formal testing before the age of 18. (*Id*. at 123.)

It is beyond dispute that the record regarding this factor is sparse. That being so, this Court cannot disagree with, much less find unreasonable, the state trial court's finding that the record regarding the onset factor was sparse. The record consists of two pages of Loveland, Ohio school records documenting Petitioner's poor grades (App. Vol. 12, at 428-29), an Oregon school record certifying Petitioner as mentally retarded and eligible for special education in November 1964 when Petitioner was 15 (*Id*. at 431), a copy of an Oregon statute in effect at that time explaining the procedure for certifying a child as mentally retarded for purposes of eligibility for special education (*Id*. at 419), and evidence that a person's IQ generally solidifies at age 8 or 9. Petitioner's own expert agreed that there were very few records concerning Petitioner before the age of 18. (Tr. Vol. 11, at 63.)

The Court cannot find unreasonable the trial court's decision that, in view of the trial court's finding that Petitioner did not have sub-average intellectual or adaptive functioning, the onset component was irrelevant. Initially, the Court cannot find unreasonable any determination (or, in this case, assumption) that the Petitioner did not carry his burden of proving by a preponderance that the onset of his mental retardation was before the age of 18. Both experts reviewed and relied on the same materials, and agreed on several factors, such as the fact that the determination of pre-18 onset did not require pre-18 testing. Dr. Rheinscheld found pre-18 onset, while Dr. Nelson essentially made no explicit finding on the onset component.

59

The paucity and quality of the evidence supporting Dr. Rheinscheld's conclusion makes it difficult, in this Court's view, to characterize as unreasonable a determination that Petitioner did not meet his burden of proving the onset component. The most telling evidence, if not the only evidence, suggesting pre-18 onset–the November 1964 Oregon school document certifying Petitioner as mentally retarded–is fraught with enough problems as to undermine its persuasive force. Notwithstanding the statute in effect at the time stating that any such certification is to be made by the superintendent "with the advice of competent medical and educational authorities," (App. Vol. 12, at 419), the record contains no evidence about what, if anything, was done before the superintendent certified Petitioner as mentally retarded. Petitioner's own expert raised cautions about the certification process, noting that, "[a]t the time Mr. Lynch received secondary education, there were no systematic requirements as are in place today that requires a multi-factored evaluation to determine eligibility of special education services." (App. Vol. 12, at 427.). Also of little value is evidence that a person's IQ generally forms and remains the same at age 8 or 9, in view of the determination by Drs. Tureen, Rheinscheld, and Nelson that Petitioner's full-scale IQ score was 72–above, if only slightly, the mental retardation "cut off" of 70. Because the Oregon school document record is of questionable value, and the two pages of elementary school records documenting poor performance are of even less, it not unreasonable to find that the Petitioner did not meet his burden of proving the onset component.

More to the point, however, the trial court's determination that Petitioner did not have sub-average intellectual functioning or significant deficits in adaptive functioning, even if the latter was not reasonable in this Court's view, obviated any need for the trial court to determine the onset component. A finding of mental retardation requires meeting all three criteria. Further, the Court cannot find unreasonable the trial court's refusal, if not logical inability, to make a determination about the onset of a mental condition that the trial court found not to exist.

This Court's conclusion that the trial court's *Atkins* decision was not unreasonable is in line with decisions by the Sixth Circuit and other sister courts within the circuit. In *Murphy v.*

*Ohio*, 551 F.3d 485, 505-510 (6th Cir. 2009), the Sixth Circuit affirmed the district court's

decision declining to find as unreasonable the state appellate court's determination that the

petitioner was not mentally retarded within the meaning of *Atkins* and *Lott*.  After reviewing the

evidence presented during the petitioner's *Atkins* hearing, the state court decisions, and the

district court's decision, the Sixth Circuit concluded that "[the petitioner]'s *Atkins* claim does not

warrant habeas relief."  *Id*. at 509.  The Sixth Circuit began its analysis by examining the state

trial court's decision rejecting Murphy's *Atkins* claim.  The state trial court, according to the

Sixth Circuit, explained its reasoning as follows:

> 1.   The Defendant does not possess significantly sub-average intellectual
> functioning, which is a necessary requirement to be classified as being mentally
> retarded.
>
> 2.   Even though the Defendant-Petitioner has been evaluated by eight different
> psychologists, not a single one has diagnosed him as being mentally retarded.
>
> 3.   Defendant-Petitioner's IQ has consistently been found to be in excess of 70,
> which provides a presumption that he is not mentally retarded.
>
> 4.   After reviewing the tape recordings of the interviews with the Defendant-
> Petitioner, this Court cannot conclude that the Defendant-Petitioner lacked
> adaptive skills such as communication and self-direction.  In fact, this Court was
> impressed with Defendant-Petitioner's ability to communicate and logically carry
> on a conversation with the police officers.
>
> 5.   Any difficulties that the Defendant-Petitioner possesses did have an onset
> before age 18.

*Murphy*, 551 F.3d at 506.  After noting that the state appellate court had affirmed the trial court's

decision and that the Ohio Supreme Court had declined further review, the Sixth Circuit

proceeded to explain that the district court rejected Murphy's claim that he was mentally

retarded within the meaning of *Atkins* as follows:

> The State courts' findings were not unreasonable because they were based on the
> testimony of both experts at the hearing.  While Murphy chooses to emphasize
> different portions of the experts' testimony in support of his position, this Court is
> not free to disregard the [s]tate courts' factual findings merely because some of
> the hearing testimony at times supported Murphy's mental retardation claim.
> Instead, the Court finds that there was ample evidence to support the [s]tate
> courts' findings based on the hearing testimony of Dr. Sunbury, who concluded
> that Murphy was not mentally retarded, and Dr. Everington, who at various points
> in the hearing stated that it was difficult to determine whether Murphy had

significantly subaverage intelligence.

*Id*.

The Sixth Circuit next set forth its own account of the evidence presented during

Murphy's *Atkins* hearing.  Murphy called as his expert Dr. Caroline Everington–"a special

educator with extensive training and twenty-five years of experience in working with persons

with disabilities . . . ."  *Id*.  Dr. Everington was not a psychologist and did not regard herself as

qualified to make a diagnosis of mental retardation.  *Id*. at 508.  Dr. Everington testified about

the eleven different evaluations that Petitioner had undergone between the ages of 9 and 32 and

the IQ test scores that he had achieved ranging from 54 to 86.  As the Sixth Circuit set forth, Dr.

Everington testified about those test scores as follows:

> Overall, the battery of neuropsychological tests show indication of minimal brain
> dysfunction arising most notably in terms of frontal lobe deficits and temporal
> lobe impairment.  Information processing speed is consistently slowed and Mr.
> Murphy has difficulty organizing unstructured information efficiently and
> effectively.  Abstract reasoning tasks oftentimes proved to be quite overwhelming
> to him, leading to impaired logical abilities, poor reasoning, and subsequently
> poor judgment.  These problems arise out of neurocognitive limitations and
> deficits.  Overall, the patient shows indication of having a significant
> developmental delay in terms of intellectual functioning.  He is also showing
> indication of cognitive and reasoning deficits which effect [sic] his ability to
> function normal in everyday society and interpersonal situations.

*Id*. at 507.  It was because Murphy's IQ scores were so difficult to assess, the Sixth Circuit

explained, that Dr. Everington emphasized the importance of assessing Murphy's adaptive skills.

Dr. Everington testified that she administered to Murphy the Scales of Independent Behavior-

Revised ("SIB-R") and relied on conversations she had with "informants"–Murphy's

grandmother, brother, and former social worker.  Dr. Everington explained the need to "retro

diagnose" Murphy, due to the fact that he had been incarcerated for a significant amount of time

by the time Dr. Everington evaluated him.  Similarly, because Murphy was much older than 18

by the time Dr. Everington evaluated him, she was forced to base her SIB-R evaluation on the

informants' recollections about Murphy from twenty-five years earlier.  Dr. Everington

summarized her findings from the SIB-R test, characterizing Murphy as functioning more like a

child; not taking care of household duties such as paying rent, budgeting, buying supplies, managing his own money, maintaining a checking account or credit cards, living on his own, caring for himself, shopping for groceries, or planning meals.  *Id*.  Dr. Everington concluded, as the Sixth Circuit explained:

> He has–has had clear deficits in adaptive skills throughout his life.  And those deficits are in the mental retardation range.  And I would add that they are more significant than you typically see with somebody who has IQ scores in the range that he does.  These are much more significant than you typically see with somebody who has IQ scores in the 70s where he does.

*Id*.  The state challenged Dr. Everington's findings, forcing her to concede the possibility that the informants upon which she relied may have provided information with an eye toward aiding Murphy's claim and the fact that a diagnosis of "borderline mental retardation" is not the equivalent of a diagnosis of "mentally retarded."  *Id*. at 507-08.

The state called as its expert Dr. James Sunbury, "a psychologist whose practice includes work in the field of mental retardation."  *Id*. at 508.  The Sixth Circuit explained that based on evaluations that he conducted in 1985 and 1987, Dr. Sunbury concluded to a reasonable degree of psychological certainty that Murphy was not mentally retarded but rather exhibited borderline intellectual functioning, having an IQ in the range of 70 to 83.  In contrast to Dr. Everington, Dr. Sunbury testified that IQ scores, rather than adaptive skills, should be the primary focus of an assessment of an individual's mental functioning.  Dr. Sunbury dismissed one test he administered, on which Murphy scored a 66, noting that Murphy had admitted that he was " 'just having fun' " on a Minnesota Multiphasic Personality Inventory test that he had taken the same day.  *Id*.  Dr. Sunbury testified that further qualifying that score of 66 was the fact that Murphy suffered from other intellectual limitations other than mental retardation, such as poor academic performance, conduct disorder, and antisocial personality disorder.  Like Dr. Everington, Dr. Sunbury dismissed as an outlier, and inaccurate estimate of Murphy's intellectual abilities, the 54 that Murphy had scored at some point–the only other sub-70 score that Murphy ever achieved.  Dr. Sunbury concluded, the Sixth Circuit explained, that the rest of Murphy's IQ

scores were above 70 and that although he suffered intellectual limitations, he was not mentally
retarded. *Id.* at 509.

Based on the foregoing, the Sixth Circuit concluded that Murphy's *Atkins* claim did not
warrant habeas relief and that the state courts' decision rejecting the claim was not unreasonable.
The Sixth Circuit explained:

> In the IQ tests administered before he turned nineteen, Murphy received the
> following scores: 86, 76, 54, 83, 76; and 82. Of those scores, both Dr. Everington
> and Dr. Sunbury considered the 54 to be an outlier, and there was no indication
> that the other evaluations had not already considered the impact that an out-of-
> date test or some other measurement of error could have on Murphy's full-scale
> IQ. *See In re Bowling*, 422 F.3d 434, 437 (6th Cir. 2005) ("[T]here is no
> indication that the psychologists who administered the IQ tests to Bowling would
> not have already considered the adequacy and accuracy of the testing mechanisms
> in calculating his scores or in using these instruments for evaluation in the first
> place.") Accordingly, under *Lott*, there is a rebuttable presumption that Murphy's
> IQ scores prevent him from being classified as mentally retarded. Further, we do
> not find it to be an unreasonable evaluation of the facts that the trial court found
> that the evidence presented at the *Atkins* hearing does not allow Murphy to
> overcome this presumption.
>
> The lack of clarity as to possible deficits in Murphy's adaptive skills also
> undermines his claim. In *Bowling*, petitioner's mother submitted an affidavit
> containing possible evidence of deficits in his adaptive skills, stating that he was:
> "slow in learning to walk and in becoming toilet trained"; had suffered multiple
> head injuries as both an infant and a teenager; "wandered off as a child and
> teenager, got into fights, and was a follower"; and "had problems with money,
> difficulty in keeping jobs, and difficulty maintaining personal relationships." 422
> F.3d at 437. However, we denied petitioner's request to file a second or
> successive habeas petition based upon his *Atkins* claim because the information
> offered by his mother did not indicate mental retardation. *Id.* at 438. We
> explained,
>
> > These limitations do not state a prima facie case for Bowling's
> > mental retardation claim. Bowling's known, diagnosed,
> > psychological problems include attention deficit hyperactivity
> > disorder, alcohol abuse, and a personality disorder. These
> > diagnoses provide an explanation for the various problems noted
> > by Bowling's mother and sister. While some of the problems may
> > also be indicative of a low level of intellectual function, their
> > existence has little tendency to establish mental retardation, given
> > Bowling's other diagnoses and the fact that the psychological
> > evidence is inconsistent with mental retardation.
>
> 422 F.3d at 438.
>
> A similar determination can be made here. Dr. Everington's evaluation of
> Murphy's adaptive skills is unreliable. Though Dr. Everington identified skill

64

deficits she found to be indicative of mental retardation–Murphy's inability to maintain the household or do chores around the house–this information was culled from third parties' assessments of Murphy's abilities *twenty-five years* earlier.  Moreover, Dr. Everington acknowledged that Murphy's adaptive skill deficits could be attributed to something other than mental retardation, explaining that "[c]ertainly when you say 'some other mental problem,' you can't separate. He does have a dual diagnosis, and he does have some psychiatric issues as well." (JA 1463.)

Also, though it was not considered at the hearing, other testimony presented at Murphy's trial suggests that Murphy's adaptive skills were more developed than Dr. Everington believed.  For instance, Murphy's mother, Stella, testified that Murphy moved out of her house to live with his then-girlfriend, with whom he had a child.  Additionally, Dr. McBride, whose report was before the trial court at the evidentiary hearing, stated that "[e]ven though [Murphy] was somewhat unkempt, he has the ability to care for himself and his personal needs." (JA 1684.)

In conclusion, although it is evident that Murphy has severe psychological problems and certain mental deficiencies, these characteristics alone do not make him "mentally retarded" such that his execution would violate *Atkins*.  *Lott*, 779 N.E.2d at 1016; *see Bowling*, 422 F.3d at 438 (defendant's psychological disorders, alcohol abuse and personality disorder do not amount to mental retardation warranting the protection of *Atkins*).  Therefore, the Ohio appeals court's resolution of this claim was not an unreasonable application of, or contrary to, Supreme Court precedent, and we must affirm the district court's decision.

*Murphy*, 551 F.3d at 509-10.

In *Stallings v. Bagley*, 561 F. Supp. 2d 821, 884 (N.D. Ohio 2008), the district court "reluctantly" held that the state trial court's decision rejecting Stallings' *Atkins* claim was not so unreasonable a determination of the facts that Stallings could overcome the presumption of correctness that a factual determination enjoys under § 2254(e)(1).  After setting forth the holdings in *Atkins* and *Lott*, the district court began its analysis by deciding that the legal standard set forth in § 2254(d)(2), rather than § 2254(d)(1), applies to *Atkins* claims.  That is, as the district court explained, "to prevail on his *Atkins* claim, Stallings must demonstrate that the state court determination finding him not to be mentally retarded 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.' " *Stallings*, 561 F.3d at 881 (quoting 28 U.S.C. § 2254(d)(2)).

The district court then proceeded to consider the evidence adduced during Stallings' two-

day *Atkins* hearing.  The court noted that Stallings first called psychologist Dr. Luc Lecavalier, who concluded that Stallings met the first two prongs of the mental retardation definition.  Dr. Lecavalier administered an IQ test to Stallings, which produced a full-scale score of 74.  Taking into account a standard error of measurement of plus or minus four points, Dr. Lecavalier testified that Stallings true IQ score was between 70 and 78.  *Id.*  Dr. Lecavalier also testified that although Stallings was chronologically 26 years old, Stallings' approximate mental age was 13 years old.  With respect to two previous IQ tests that Stallings had undergone in 1993 when he was 16 years old and in 1998 just before his trial–both of which yielded a full-scale score of 76–Dr. Lecavalier testified that those results likely were inflated, due to improper administration of the tests.  Dr. Lecavalier also testified that it was highly unlikely, in his view, that Stallings had engaged in any malingering.

The adaptive skills testing that Dr. Lecavalier administered to Stallings in prison consisted of Dr. Lecavalier observing Stallings attempt to use a phone book and measure with a ruler.  Dr. Lecavalier conceded on cross-examination "that the test assumed these skills were necessary for proper adaption."  *Id.* at 882.

As characterized by the district court, Dr. Lecavalier was more equivocal concerning the issue of whether Stallings met the third prong of the mental retardation definition: onset before the age of 18.  *Id.* at 881-82.  Dr. Lecavalier proceeded to recite details from Stallings' background suggesting that the onset was before the age of 18, noting: the fact that records indicated that Stallings had difficulty in school from the time he started school and was once held back a grade; the fact that Stallings attended special education and developmentally handicapped classes; and the fact that family members, teachers, and psychologists all reported "descriptors" indicating that Stallings functioned like someone with mental retardation.  *Id.* at 881-82.  Those descriptors, Dr. Lecavalier recounted, consisted of Stallings' bed-wetting at age 7 or 8; Stallings' lack of understanding of personal relationships; the fact that Stallings was impulsive, immature, prone to follow rather than lead, and easily overwhelmed; the fact that

66

Stallings' records reflected deficits or impairments in learning, attention, language, memory, and self-monitoring; and the fact that one school record indicated that at age 17, Stallings required placement in a special education class to learn the names and functions of his body parts.  Dr. Lecavalier concluded that Stallings functioned like someone with mental retardation, which was, in Dr. Lecavalier's view, the equivalent of Stallings being mentally retarded.  Dr. Lecavalier conceded, as the district court explained, that he could not be "100 percent certain" that Stallings exhibited mental retardation before the age of 18.  *Id*. at 882.

The district court proceeded to explain that Stallings next called Dr. John Matthew Fabian–an expert who had been retained by state but whom the state decided not to call.  *Id*. at 882-83.  Dr. Fabian administered an IQ test that produced a full-scale score of 72.  Dr. Fabian characterized Stallings' reading and spelling level as that of a second grader and Stallings' mathematics level as that of a third grader.  Rather than administer adaptive skills testing, Dr. Fabian relied on "informants"–persons in a position to "observe a subject's ability to perform adaptive tasks on a daily basis without prompting possible malingering arising from an unawareness by the subject that he is being observed."  *Id*. at 883.  Dr. Fabian relied on Jennifer Risinger, a case manager on the death row unit.  "Based on the testing and report from Ms. Risinger," the district court explained, "Dr. Fabian found both a significantly sub-average intelligence and significant adaptive function deficits."  *Id*.  Like Dr. Lecavalier, Dr. Fabian testified that Stallings' earlier IQ score of 76 was likely "overstated" and "by a fairly significant margin."  *Id*.  Also like Dr. Lecavalier, however, Dr. Fabian wavered somewhat on the issue of onset, stating only that "it was 'more likely than not' that [Stallings'] intellectual and functional deficiencies began prior to the age of 18."  *Id*.  Dr. Fabian explained that it was not uncommon for there not to have been such testing of Stallings prior to the age of 18 and relied on Stallings' school records and family reports to support a finding that Stallings' "functional limitations and their severity were not new."  *Id*.

As the district court explained, having found at the close of the evidence that Stallings'

IQ had at all times been above 70, the trial court held that "Stallings would have to rebut the

presumption that he was not mentally retarded by demonstrating that he was of significantly sub-

average intelligence, had significant limitations in two or more adaptive skills, and that the onset

of these factors occurred prior to age 18." *Id*.  The trial court found that Stallings did have

significantly sub-average intelligence and significant limitations in his adaptive functions but

that Stallings could not demonstrate that it was more likely than not that the onset of these

deficits occurred before the age of 18.  The district court set forth the trial court's reasoning

verbatim:

> In finding that the Petitioner has not established that his mental retardation "onset before the age of 18," the Court finds that the testimony of the Petitioner's own experts is most compelling.  After all, neither Dr. LeCavalier nor Dr. Fabian were able to definitely conclude that the Petitioner's retardation onset before the age of 18.
>
> In his Report, Dr. LeCavalier never addresses the "onset before the age of 18" prong.  Dr. LeCavalier merely concludes in his Report that mental retardation "cannot be ruled out in all certainty **when considering the standard error of measurement on the instruments.**"  Dr. LeCavalier does not say that the Petitioner is mentally retarded, only that it is *possible* that he is.
>
> While Dr. Fabian addresses the "onset before the age of 18" prong, he does not conclude that the Petitioner was mentally retarded before age 18.  Dr. Fabian simply notes that "mild mental retardation *could not* have been ruled out when Mr. Stallings was about sixteen years of age.  He exhibited adaptive deficits of the disorder and his I.Q. score is questionable at that time."
>
> The testimony and evidence that has been presented to the Court does not establish by a preponderance of the evidence that the Petitioner's "significantly subaverage intellectual functioning" and "significant limitations in two or more adaptive skills" "onset before the age of 18."  The Petitioner's own experts cannot give a definitive opinion that retardation in the Petitioner "onset before the age of 18."  Dr. LeCavalier fails to address the "onset before the age of 18" prong in his Report and Dr. Fabian only says that mild retardation cannot be ruled out.

*Id*. at 883-83 (quoting *State v. Stallings*, No. CR 1997 05 1118(A), 2004 WL 5457509, at * 11-

12 (Ohio Ct. Common Pleas Jan. 16, 2004) (emphasis in original)).

After noting that the state appellate court had affirmed the trial court's decision and that

the Ohio Supreme Court had declined to exercise jurisdiction, the district court proceeded to

hold that Stallings' *Atkins* claim did not warrant habeas relief.  The district court qualified its

holding, explaining that:

> While this Court's findings may have been different if it had heard the experts'
> opinions in the first instance and believes reasonable minds could easily differ on
> the factual question presented to the trial court, this Court can not say that the trial
> court's decision was so unreasonable that the presumption of correctness which
> attaches to it can be overcome. * * * *

>                                                      *       *       *

> The Court reaches this conclusion reluctantly, however, and defers to the
> state courts' findings solely because the level of deference it must accord those
> findings under Section 2254(d)(2) is so high.

*Id.* at 884. The district court held as much *in spite* of expressing concerns that the trial court had

held Stallings to too high a standard of proof. *Id.* at 884-85. In conclusion, the district court

stated:

> Despite these concerns about the state court's reasoning, however, it
> remains the case that: (1) it was Stallings' burden to rebut the presumption arising
> from the fact that his I.Q. exceeded 70 (albeit barely so); (2) there was no evident
> I.Q. testing to which Stallings could point to satisfy that burden; (3) there was
> some I.Q. testing which, even if questionable, arguably supported the conclusion
> that his I.Q. was as high as 76 prior to age 14; (4) the state courts found that
> Stallings did not, in fact, satisfy his burden of proof; and (5) Section 2254(d)(2)
> provides this Court very little flexibility to disagree with the state courts'
> conclusion on this issue.

> If this Court were sitting in judgment in another forum, its conclusions
> may have differed from those of the state trial court. Given the deference it must
> afford to these state court findings of fact, however, this Court may not indulge its
> own view of the evidence. For the foregoing reasons, the Court must apply the
> deference required of it by § 2254(d)(2) and find that Stallings's tenth ground for
> relief is not well-taken.

*Id.* at 885-86.

*Murphy* and *Stallings* are instructive. *Murphy* teaches that the psychological problems

and mental deficiencies that the Sixth Circuit freely characterized as "severe" were nonetheless

insufficient to establish mental retardation within the meaning of *Atkins* and *Lott*. *Murphy* also

illustrates the importance of viewing the record as a whole, not just the aspects that militate in

favor of and emphasized by the petitioner. *Stallings* emphasizes the high degree of deference §

2254(d) requires federal habeas courts to exercise; there, despite explicit concerns about some of

the state courts' findings, the district court could not find that the state courts' decisions rejecting

69

the petitioner's *Atkins* claim were unreasonable.

For the foregoing reasons, this Court finds unpersuasive Petitioner's argument that the state courts' decisions rejecting his *Atkins* claim were unreasonable in light of the evidence presented. Accordingly, the Court **DENIES** Petitioner's first ground for relief.

An appeal from the denial of a habeas corpus action may not proceed unless a circuit justice or judge issues a certificate of appeal ability. 28 U.S.C. § 2253(c)(1). To warrant a certificate of appeal ability, a petitioner must make a substantial showing that he was denied a constitutional right. 28 U.S.C. § 2253(c)(2); *see also Barefoot v. Estelle*, 463 U.S. 880, 893 (1983); *Lyons v. Ohio Adult Parole Authority*, 105 F.3d 1063, 1073 (6th Cir. 1997). The petitioner need not demonstrate that he or she will prevail on the merits; he or she needs only to demonstrate that the issues he or she seeks to appeal are deserving of further proceedings or are reasonably debatable among jurists of reason. *Barefoot*, 463 U.S. at 893 n.4. The Supreme Court has explained that, "[where a district court has rejected the constitutional claims on the merits, the showing required to satisfy 28 U.S.C. § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDonnell*, 529 U.S. 473, 484 (2000).

This analysis also applies when the Court has denied a claim on procedural grounds. *Id.* at 483; *see also Porterfield v. Bell*, 258 F.3d 484, 486 (6th Cir. 2001). When the Court dismisses a claim on procedural grounds, a certificate of appealability is warranted when a petitioner demonstrates (1) that jurists of reason would find it debatable whether the petition states a valid claim and (2) that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *Slack*, 529 U.S. at 484.

The Court is satisfied that Petitioner's first ground for relief meets the requirements for a certificate of apppealability. In view of the fact-intensive nature of the claim, its importance to Petitioner's arguments that he never meant to kill the victim and is ineligible for the death penalty, and this Court's conclusion that the state courts' decisions as to the second part of the

70

mental retardation definition were unreasonable, the Court concludes that reasonable jurists could find its decision debatable or wrong.  The Court accordingly certifies for appeal Petitioner's first ground for relief.

  **B.**  <u>Second Ground for Relief</u>**: Petitioner's trial counsel were ineffective for failing to secure the appointment of a mental retardation expert to testify at the mitigation phase in violation of Petitioner's rights to due process and the effective assistance of counsel as guaranteed by the Fifth, Sixth, Ninth and Fourteenth Amendments to the United States Constitution.**

(Petition, ECF No. 11-5, at ¶¶ 36-42.)  Petitioner argues that his trial counsel performed deficiently and to his prejudice when they failed to obtain the services of a mental retardation expert to testify at Petitioner's mitigation hearing.  Petitioner explains that there exists a critical nexus between obtaining proper mental health experts and meeting the constitutional threshold for performing effectively because of the importance of translating complex subject matter for layperson-jurors.  Petitioner further argues that counsel's failure to obtain a mental retardation expert was objectively unreasonable because evidence existed at the time of Petitioner's trial documenting his low intellectual functioning, to wit: the WAIS-III test that Dr. Tureen administered on which Petitioner achieved a full-scale score within the 70-75 range considered indicative of subaverage intellectual functioning, as well as anecdotal evidence from Petitioner's family members and other acquaintances characterizing Petitioner as mentally slow.  Petitioner asserts that an expert in mental retardation could have explained to the lay jurors the impact that Petitioner's low cognitive abilities had on his actions on the day of the crime.

  Noting that a strategic decision made by counsel is reasonable only if based on a full investigation, Petitioner argues that any investigation that did not dig more deeply into the possibility that Petitioner was mentally retarded cannot be considered full.  Petitioner asserts that he was prejudiced by counsel's objectively deficient performance because relevant mitigating evidence was lost to Petitioner.  Finally, Petitioner states in conclusory fashion that the Ohio courts' decisions rejecting his claim were contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

Petitioner presented this claim to the state courts in his postconviction action as his fifteenth ground for relief. (App. Vol. 4, at 64-66.) He supported his claim with several exhibits outside of the trial record, consisting of several affidavits by Dr. William Friday, an affidavit by Robert Dixon, and an affidavit by Dorian L. Hall. Subsequently, Petitioner filed motions for funds for a neuropsychologist and a mental retardation expert, as well as for discovery. (App. Vol. 7, at 21, 31.) Petitioner also sought leave to amend his postconviction action to add an affidavit by Dr. Polly Jamison concerning her psychological evaluation of Petitioner's sister, Peggy Gomez. (*Id.* at 301-04.) Without granting Petitioner's motions for funds or discovery, the trial court on December 22, 2000, issued findings of fact and conclusions of law rejecting Petitioner's claim as follows:[11]

> (K)   Lynch's fifteenth grounds [sic] for relief asserts that trial counsel were ineffective at the mitigation phase for not requesting an expert on mental retardation.
>
> > (1)   This claim of presenting expert testimony on mental retardation to support defendant's mitigation defense is nothing more than an alternative theory of mitigation. State v. Coombs (1995), 100 Ohio App.3d 90, 103, 652 N.E.2d 205, 213.

(App. Vol. 7, at 364.) The Ohio Court of Appeals for the First Appellate District affirmed the trial court's decision, addressing multiple ineffective assistance claims together as follows:

> Lynch next asserted that his trial counsel were ineffective for failing to adequately prepare one mitigation expert, Dr. Jill Bley, a clinical psychologist, and for permitting the deficient performance of Dr. Bley and the second mitigation expert, Dr. Robert Tureen, a neuropsychologist. As it was objectively reasonable for trial counsel to defer to the professional judgment of these two experienced mental-health experts in matters concerning Lynch's limited cognitive function and sexual predilections and urges, Lynch's counsel did not render him ineffective assistance. See *State v. McGuire* (1997), 80 Ohio St.3d 390, 399, 686 N.E.2d 1112, 1120.

(App. Vol. 8, at 360-61.) The Ohio Supreme Court declined to accept jurisdiction. (App. Vol. 9, at 297.)

---

[11]   Due to a clerical error that resulted in Petitioner's not receiving timely notice of its December 22, 2000 decision, the trial court reissued its findings of fact and conclusions of law on February 21, 2001. (App. Vol. 7, at 364.)

Petitioner argues that his trial counsel performed deficiently and to his prejudice by failing to obtain a mental retardation expert for the mitigation phase and that the state courts' decisions concluding otherwise involved unreasonable applications of clearly established law as determined by the United States Supreme Court. (ECF No. 56, at 40-45.) Offering *Strickland v. Washington*, 466 U.S. 668 (1984), as the clearly established law governing his claim, Petitioner adds that the United State Supreme Court in *Wiggins v. Smith*, 539 U.S. 510, 538 (2003), and *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000), also emphasize the critical importance of counsel in capital cases conducting a thorough investigation for mitigation evidence. Petitioner further argues that the Sixth Circuit also " 'has taken great pains to insure that defendants do not suffer at the hands of defense counsel who fail to make a proper investigation for the penalty phase.' " (ECF No. 56, at 41 (quoting *Powell v. Collins*, 332 F.3d 376, 399 (6th Cir. 2003)).) Petitioner notes that the Sixth Circuit "has held counsel to the standards set forth in the American Bar Association Guidelines for the Appointment and Performance of Defense counsel in Death Penalty Cases cited in *Wiggins*." (ECF No. 56, at 41 (citations omitted).)

Petitioner proceeds to argue that although his trial counsel presented *some* evidence in mitigation, they fell below the constitutional threshold of effective representation when they failed to present an expert in mental retardation who could have enabled the jury to understand Petitioner's mental disability and the effect it had on his behavior. Petitioner argues that counsel's objectively deficient performance prejudiced him because there is a reasonable probability that had the jury heard the relevant mitigation evidence omitted due to counsel's deficiency the jury would have returned a sentence of less than death. Petitioner asserts that Dr. Tureen's testimony that Petitioner's intellectual functioning was in neither the normal range nor the mental retardation range, but rather the borderline range, in particular, critically required explanation that only an expert in mental retardation could have provided. Petitioner asserts that Dr. Tureen's testimony should have been qualified with an explanation that his "borderline range" characterization applied only to Petitioner's intellectual capacity because Dr. Tureen did

73

not perform a full mental retardation evaluation testing all three components–intellectual functioning, adaptive functioning, and onset before the age of 18.

Petitioner argues that it was objectively unreasonable for counsel to fail to obtain an expert in mental retardation because counsel had enough information available to them indicating that Petitioner had limitations in mental functioning to realize that they needed the services of an expert in mental retardation.  Petitioner asserts that counsel had conducted a deposition of Petitioner's cousin, Elizabeth Iverson, in which she testified in detail about how Petitioner appeared to have developed differently than other children, more slowly and with his share of problems learning.  Petitioner notes that his trial counsel even filed a motion asking the trial court to allow them to present Petitioner's unsworn statement in a question-and-answer format, citing as the reason Petitioner's limited abilities in comprehension and communication. Trial counsel pointed out that Drs. Tureen and Bley both reported having had to read and explain to Petitioner the questions on the tests that they were administering.  Petitioner proceeds to detail what an expert in mental retardation would have enabled him to present to the jury, such as the significance of a low IQ score, an explanation of what a full mental retardation assessment demonstrates, and the manner in which deficiencies in intellectual and adaptive functioning impacted Petitioner in his everyday life and the decisions he made.  Although *Atkins* was not governing law at the time of his trial, Petitioner argues that it provides invaluable insight into why evidence of mental retardation mitigates against a sentence of death, noting that " '[b]ecause of [mentally retarded persons'] impairments . . ., by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses and to understand the reactions of others.' " (ECF No. 56, at 44 (quoting *Atkins*, 536 U.S. at 318).)

Petitioner argues that the state courts' decisions rejecting his claim in postconviction involved not only unreasonable applications of clearly established law but also unreasonable factual determinations in light of the evidence presented.  Petitioner assails as unreasonable the

trial court's determination that a mental retardation expert would have offered merely an alternative theory in mitigation, arguing that counsel's omission cannot be characterized as a strategic decision between competing mitigation theories when it was not based on a full and thorough investigation.  For that reason, it was also unreasonable, Petitioner argues, for the trial court to find that counsel were within accepted professional norms in relying on the expertise of Drs. Tureen and Bley.  Finally, "[t]he lower courts similarly made an unreasonable determination of the facts in light of the evidence presented," Petitioner argues, because "[c]ounsel was aware of Lynch's compromised intellectual status and the need for presentation from an expert in mental retardation."  (ECF No. 56, at 45.)

Respondent argues that Petitioner cannot prevail on either his argument that the state courts' decisions unreasonably applied *Strickland* or his argument that the state courts' decisions involved an unreasonable determination of the facts.  (ECF No. 57, at 37-41.)  Respondent begins by arguing that Petitioner cannot meet his burden of proving prejudice from counsel's alleged deficiency because Petitioner, in fact, is not mentally retarded.  Counsel cannot be ineffective, Respondent reasons, for failing to present that which does not exist.  (*Id*. at 38.)

Respondent proceeds to assert, "for the sake of argument," that even if Petitioner were mentally retarded, he could not "bridge the causation gap between the alleged prejudice and the alleged deficient performance of his trial counsel" because Petitioner's trial attorneys were permitted, if not all but required, to rely on the professional judgment of the experts they consulted.  (*Id*.)  Respondent explains that Petitioner's trial counsel had the benefit assistance from mitigation specialist Jim Crates, psychoanalysis records from Dr. Berman, and the expertise and testimony of Dr. Tureen and Dr. Bley.  Respondent further explains that Dr. Tureen opined that Petitioner was not mentally retarded and that it was not Petitioner's intellectual deficits that caused him to rape and murder the victim.  Dr. Tureen also was of the view that Petitioner was not mentally retarded, but rather functioned in the borderline range of intellectual functioning. Respondent notes that Dr. Tureen administered an IQ test and concluded that Petitioner

functioned in the borderline range.  That meant, Dr. Tureen explained, that 97 % of the population had higher intellectual functioning than Petitioner.  Respondent emphasizes that Dr. Tureen did elaborate on the term "borderline," did explain the significance of Petitioner's intellectual deficits to the facts of the case, did screen for any other brain impairments, did relate Petitioner's errors to those with learning disabilities, did explain the manner in which Petitioner's deficits would impact academic learning, and did note Petitioner's poor performance in school and participation in special education beginning around sixth grade.  (*Id*. at 38-39.) Counsel are not ineffective, Respondent argues, for failing to question the professional judgment of the experts they retain or for failing to shop for experts who will testify as counsel wish.  (*Id*. at 39.)  Respondent also argues that Petitioner's experts' qualifications further belied any notion that counsel should have questioned their professional judgment.

Respondent proceeds to dismiss the myriad arguments advanced by Petitioner urging this Court to find that counsel were ineffective for failing to obtain a mental retardation expert and that the state courts' decisions finding otherwise was unreasonable.  Respondent dismisses Petitioner's reliance on Dr. Rheinscheld's conclusions, noting that Petitioner's *Atkins* hearing amounted to little more than a battle between competing experts–a battle that Dr. Rheinscheld lost–and that such testimony falls short of establishing that Petitioner's trial attorneys were ineffective for failing to obtain an expert in mental retardation for the mitigation phase.  (*Id*. at 40.)  Respondent also takes aim at Petitioner's reliance on counsel's motion to allow Petitioner to make his unsworn statement in a question-and-answer format as evidence that counsel were aware of the need for a mental retardation expert.  Respondent reasons that trial counsel's motion relied on Dr. Tureen's assessment that Petitioner functioned in the borderline range, which counsel were within their rights to trust.  Respondent also argues that there is no evidence either that Dr. Tureen assisted Petitioner with the IQ test that Dr. Tureen administered or that Dr. Tureen was without information from Petitioner's cousin Elizabeth Iverson when Dr. Tureen concluded that Petitioner was not mentally retarded.

In his reply memorandum, Petitioner takes issue with Respondent's position that Petitioner's trial attorneys acted reasonably in relying on the professional judgment of the experts that counsel consulted. Relying on *Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir. 2000), Petitioner emphasizes that trial counsel's reliance on the professional judgment of their experts was <u>not</u> reasonable because it was <u>not</u> based on an appropriate investigation into mental deficiencies of which trial counsel "were aware firsthand." (ECF No. 58, at 7.)

The issue before the Court is whether the state courts' decisions rejecting Petitioner's claim that his trial attorneys were ineffective for failing to obtain an expert in mental retardation for the mitigation phase involved an unreasonable application of clearly established law and/or an unreasonable determination of the facts based on the evidence presented. Resolution of that issue necessarily begins with an examination of the clearly established law governing Petitioner's claim.

The right to counsel guaranteed by the Sixth Amendment is the right to the effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). The standard for demonstrating a claim of ineffective assistance of counsel is composed of two parts:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). Scrutiny of defense counsel's performance must be "highly deferential." *Id.* at 689.

With respect to the first prong of the *Strickland* test, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* To establish the second prong of the *Strickland* test, prejudice, a Petitioner must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine

77

confidence in the outcome." *Id*. Because Petitioner must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance of counsel, should the court determine that Petitioner has failed to satisfy one prong, it need not consider the other. *Id*. at 697.

At its core, Petitioner's claim challenges the adequacy of counsel's investigation, preparation, and presentation of available evidence during both the culpability and mitigation phases of Petitioner's trial. It is well settled that "[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691; *see also Carter v. Bell*, 218 F.3d 581, 600 (6th Cir. 2000). The importance of competent representation during the penalty phase of a capital trial cannot be understated, especially with respect to the duty to investigate, because, as a practical matter, all that stands between a defendant who has been convicted of capital murder and a death sentence is whatever mitigation evidence he can muster. *Mapes v. Coyle*, 171 F.3d 408, 426 (6th Cir. 1999).

> Under the Ohio statute, a capital defendant found guilty of a death specification has to present some mitigating evidence in order to avoid the death penalty. If a jury has nothing to weigh against the aggravating circumstance, it almost certainly must find that the aggravating circumstance outweighs the (nonexistent) mitigating circumstances, and recommend death.

*Id*.; *see also Rompilla v. Beard*, 545 U.S. 374, 387 n.7 (2005) (incorporating the 2003 American Bar Association ("ABA") Guidelines regarding competent representation in capital cases); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (discussing the duty to investigate mitigating evidence and incorporating the 1989 ABA Guidelines regarding competent representation in capital cases). Thus, the Sixth Circuit has not hesitated to hold that "failure to investigate possible mitigating factors and failure to present mitigating evidence at sentencing **can** constitute ineffective assistance of counsel under the Sixth Amendment." *Martin v. Mitchell*, 280 F.3d 594, 612 (6th Cir. 2002) (citing *Carter v. Bell*, 218 F.3d at 600, & *Skaggs v. Parker*, 235 F.3d 261, 271 (6th Cir. 2000)).

In the Sixth Circuit, the scope of a court's review of a claim of ineffective assistance of

counsel during mitigation is shaped by the degree of counsel's alleged inadequacies. As the

Sixth Circuit has explained, "[o]ur circuit's precedent has distinguished between counsel's

*complete* failure to conduct a mitigation investigation, where we are likely to find deficient

performance, and counsel's failure to conduct an *adequate* investigation, where the presumption

of reasonable performance is more difficult to overcome." *Beuke v. Houk*, 537 F.3d 618, 643

(6th Cir. 2008) (citing *Campbell v. Coyle*, 260 F.3d 531, 552 (6th Cir. 2001), & *Moore v. Parker*,

425 F.3d 250, 255 (6th Cir. 2005)). In *Beuke*, the Sixth Circuit went on to explain:

> In the present case, defense counsel did not *completely fail* to conduct an
> investigation for mitigating evidence. Counsel spoke with Beuke's parents prior
> to [the] penalty phase of trial (although there is some question as to how much
> time counsel spent preparing Beuke's parents to testify), and presented his
> parents' testimony at the sentencing hearing. Defense counsel also asked the
> probation department to conduct a presentence investigation and a psychiatric
> evaluation. While these investigative efforts fall far short of an exhaustive search,
> they do not qualify as a complete failure to investigate. *See Martin v. Mitchell*,
> 280 F.3d 594, 613 (6th Cir. 2002) (finding that defense counsel did not
> completely fail to investigate where there was "limited contact between defense
> counsel and family members," "counsel requested a presentence report," and
> counsel "elicited the testimony of [petitioner's] mother and grandmother").
> Because Beuke's attorneys did not entirely abdicate their duty to investigate for
> mitigating evidence, we must closely evaluate whether they exhibited specific
> deficiencies that were unreasonable under prevailing professional standards. *See
> Dickerson v. Bagley*, 453 F.3d 690, 701 (6th Cir. 2006).

*Beuke*, 537 F.3d at 643.

Petitioner cannot plausibly suggest that his counsel completely failed to investigate or

present evidence in mitigation, particularly concerning Petitioner's limited intellectual abilities.

The record contains evidence that trial counsel sought funds for and utilized a mitigation

specialist and an two independent psychologists; that trial counsel sought and obtained funds for

a Positron Emission Tomography (PET) scan and a Magnetic Resonance Imaging (MRI) scan;

and that trial counsel traveled to Oregon to interview and depose various members of Petitioner's

family. At the mitigation hearing, trial counsel delivered an opening statement urging the jury to

take seriously its responsibility and to abide by its oath to be fair and impartial, and summarizing

the witnesses that counsel anticipated presenting not only to give the jury insight into

Petitioner's history, character, and background but also to explain how the sexual abuse that

79

Petitioner suffered at various points during his childhood transformed him from a victim to a victimizer. (Tr. Vol. 9, at 1582-88.) Trial counsel proceeded to present via videotape the testimony of Petitioner's cousin, Elizabeth Iverson, and of Petitioner's step-father, Milford Hayes, concerning Petitioner's background and upbringing. Trial counsel also presented testimony by Petitioner's half sister, Peggy Gomez, concerning incidents in Petitioner's background such as Petitioner losing an infant sister in a house fire, Petitioner being sent to live with men who sexually abused him and some of his sisters, Petitioner begging his mother to let him leave those homes and return to his family, and Petitioner beginning to visit Gomez and her family only after Petitioner's mother had died. Trial counsel proceeded to call clinical psychologist Dr. Tureen, who testified at length about Petitioner's background and upbringing, Petitioner's lifestyle prior to being incarcerated for the instant offense, other incidents of sexual contact with children committed by Petitioner, and particularly the results of the Wechsler Adult Intelligence Scale-III test that Dr. Tureen administered demonstrating that Petitioner had a full-scale IQ of 72, which placed him in the borderline range of intellectual functioning. (Tr. Vol. 9, at 1621-60.) Trial counsel also called another clinical psychologist, Dr. Bley, who testified at length about Petitioner's pedophilia. The foregoing punctures any argument that trial counsel *completely* failed to investigate or present mitigation concerning Petitioner's low intellectual functioning. Accordingly, this Court will "closely evaluate" whether Petitioner's attorneys "exhibited specific deficiencies that were unreasonable under prevailing professional standards." *Beuke*, 537 F.3d at 643.

Petitioner's precise argument is that his trial attorneys performed deficiently and to his prejudice in failing to obtain an expert in mental retardation for the mitigation phase and that the state courts' decisions finding otherwise were unreasonable. Dr. Tureen was a clinical psychologist whose work consisted primarily of court-ordered evaluations and who also had a specialization in neuropsychology. (Tr. Vol. 9, at 1621-25.) Dr. Bley was a clinical psychologist who practiced some general psychology but who specialized in treatment of sexual

abuse survivors, treatment of sexual compulsivity, and working with individuals experiencing sexual dysfunctions.  (Tr. Vol. 10, at 1681-84.)  Neither expert was an expert in mental retardation.  But the record does not support Petitioner's argument that trial counsel's failure to obtain an expert in mental retardation, based on what was known to counsel at the time about Petitioner's limited intellectual functioning, was objectively unreasonable and prejudicial or that the state courts' decisions reaching the same conclusion were unreasonable within the meaning of § 2254(d).

This Court takes its cue from the Sixth Circuit.  In *Clark v. Mitchell*, the Sixth Circuit considered a claim of ineffective assistance of counsel for the failure to obtain certain experts for the mitigation phase and began its analysis as follows:

> In assessing whether a defendant's counsel was ineffective at the mitigation hearing for failing to introduce certain evidence, the focus must be on whether the investigation supporting counsel's decision not to introduce mitigating evidence of the defendant's background was itself reasonable. . . .  In assessing the reasonableness of an attorney's investigation, the quantum of evidence known to counsel must be considered, as well as whether that evidence should have led a reasonable attorney to investigate further. . . .

425 F.3d 270, 284 (6th Cir. 2005) (citations omitted).  *Clark* forecloses relief on Petitioner's claim.

The Court does not disagree with Petitioner's assertion of what trial counsel (through their own investigation) knew about Petitioner's background leading up to his mitigation hearing.  The Court does disagree with Petitioner's assertion that this knowledge would have prompted reasonable counsel to probe further than Petitioner's trial counsel did.  Through their early mitigation investigation, counsel knew at a minimum that Petitioner exhibited limited or low intellectual functioning, initially as related by the deposition of Petitioner's cousin, Elizabeth Iverson, characterizing Petitioner as having developed slowly and differently from other children and as having learning problems.  Trial counsel also learned through their mitigation investigation of Petitioner's other incidents of sexual contact with children and the incidents of sexual abuse that Petitioner himself suffered as a child.  Trial counsel were further

aware that Petitioner did not enjoy a stable home life during his formative years, having moved frequently and having been sent to live away from his mother, step-father, and siblings with non-relative adult males who sexually abused Petitioner. On the basis of what they had learned about Petitioner's background and low intelligence, trial counsel retained not one but two clinical psychologists who, after reviewing records and conducting evaluations, explained in detail Petitioner's low intellectual functioning, deprived upbringing, sexual abuse, and proclivities for sexual contact with children. Petitioner does not explain with any persuasiveness why trial counsel should have recognized, either from the anecdotal evidence they received early on concerning Petitioner's low intelligence or from the opinions of Drs. Tureen and Bley, the need to obtain an expert in mental retardation.

Dr. Tureen administered the WAIS-III intelligence test to Petitioner–the results and raw data of which were later accepted as perfectly valid by Drs. Rheinscheld and Nelson–and determined that Petitioner had a full-scale IQ score of 72. Dr. Tureen testified that a score of 72 placed Petitioner in the borderline range of intellectual functioning. Dr. Tureen explained that this meant that 97 % of the population functioned higher than Petitioner. Dr. Tureen further explained that the borderline range of intellectual functioning described functioning that was not as high as normal or average but not as low as mentally retarded. That aspect of Dr. Tureen's testimony was consistent with testimony by Dr. Rheinscheld, the mental retardation expert that Petitioner obtained for his *Atkins* litigation, when describing Petitioner's intellectual functioning. Specifically, when asked what Petitioner's full-scale score of 72 meant, Dr. Rheinscheld answered: "Seventy-two is significantly below average. It lies in the borderline range of intelligence." (Tr. Vol. 11, at 27.) Although Dr. Rheinscheld proceeded to testify at Petitioner's *Atkins* hearing why Petitioner's low intellectual functioning, combined with significant deficits in adaptive functioning, both of which onset before the age of 18, qualified Petitioner as mentally retarded, there was nothing unreasonable or unfounded about Dr. Tureen's mitigation testimony that Petitioner's IQ score placed in him the borderline range of intellectual functioning

and nothing unreasonable or unfounded about Petitioner's trial counsel relying on Dr. Tureen's professional judgment.  Thus, the record does not support Petitioner's assertion that the information available to Petitioner's trial counsel in preparation for the mitigation hearing would have alerted reasonable counsel to probe further and recognize the need for an expert in mental retardation.

The Court returns to the Sixth Circuit's *Clark* decision.  The Sixth Circuit found no ineffectiveness on the part of Clark's trial counsel for the failure to obtain a neuropsychologist, pharmacologist, and additional family members for Petitioner's mitigation hearing, explaining:

> It is clear that the defense did investigate and present evidence regarding Clark's mental health, drug abuse, and family background at the mitigation hearing. Although Clark asserts that counsel should have employed a pharmacological expert, the psychological expert that counsel did employ, Dr. Kisin, addressed Clark's drug addiction and its effect on his criminal conduct.  As to the necessity of employing a neuropsychologist, it was not unreasonable for the state court to determine that Clark's counsel was not deficient for failing to recognize the need for such an expert, since Dr. Gelbort's own report admitted that Clark's deficits generally would not be recognizable to a lay person, or even to a psychologist. Moreover, it does not appear that either the psychologist or psychiatrist retained by the defense to evaluate Clark suggested that Clark suffered from organic brain damage or that Clark required any additional mental health testing.  *It was not unreasonable for Clark's counsel, untrained in the field of mental health, to rely on the opinions of these professionals.*

*Clark*, 425 F.3d at 285 (emphasis added).

In *Clark*, the Sixth Circuit relied on its earlier decision of *Campbell v. Coyle*, 260 F.3d 531, 555-56 (6th Cir. 2001).  There, the Sixth Circuit rejected a claim of ineffective assistance for the failure to retain an expert in Post Traumatic Stress Disorder, largely because the defense counsel had a trained psychologist examine Campbell and the psychologist failed to detect evidence of any possible mental disorders, as well as because the record contained no evidence suggesting that the expert was incompetent or that counsel had any reason to question the expert's qualifications.  As in *Clark* and *Campbell*, it does not appear in the instant case that either Dr. Tureen or Dr. Bley either suspected from their review of documents or their testing that Petitioner may have been mentally retarded or saw a need for additional testing.  It is unpersuasive for Petitioner to suggest that his trial counsel should have recognized from the

83

same anecdotal evidence and materials that Drs. Tureen and Bley reviewed that Petitioner may have been mentally retarded or that counsel should have obtained an expert in mental retardation. This is not a case such as *Skaggs v. Parker*, 235 F.3d 261, 269-75 (6th Cir. 2000), in which the Sixth Circuit found that the defense expert's "bizarre and eccentric testimony" from the first phase of Petitioner's trial clearly provided a basis for reasonable counsel to question that expert's qualifications and professional judgment.

In rejecting Petitioner's claim in postconviction, the trial court held that Petitioner's argument merely constituted an alternative theory of mitigation that defense counsel could have presented, which is insufficient to establish a claim of ineffective assistance of counsel. The appellate court affirmed the trial court's decision denying postconviction relief, finding that it was objectively reasonable for trial counsel to defer to the professional judgment of the two mental health experts. This Court cannot find that those decisions involved an unreasonable application of clearly established law or an unreasonable determination of the facts.

Recently, the United States Supreme Court made clear that a state court's decision need not include comprehensive (or even any) reasoning in order to constitute an "adjudication on the merits" deserving of the high measure of deference that § 2254(d) requires. *Harrington v. Richter*, 131 S.Ct. 770, 784 (2011) ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."). The Supreme Court proceeded to reiterate the high measure of deference a state court's decision enjoys, stating that "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 786-87.

Under that standard, Petitioner cannot prevail on his claim that his attorneys were ineffective for failing to obtain an expert in mental retardation for the mitigation phase. No

reasonable reading of the record enables this Court to say that the state courts' decisions rejecting Petitioner's claim in postconviction were so lacking in justification as to amount to an error beyond any possibility of fair-minded disagreement.  Petitioner's trial counsel retained not one, but two, mental health experts who conducted comprehensive evaluations of Petitioner, who provided competent testimony at Petitioner's mitigation hearing, and who, to date, have yet to be discredited in any fashion sufficient that reasonable counsel would have questioned their professional judgment and obtained an expert in mental retardation.

The Court concludes that Petitioner has failed to satisfy the deficient-performance component of *Strickland*'s standard for a claim of ineffective assistance.  Although that failure is dispositive of Petitioner's claim, the Court further concludes that Petitioner also cannot satisfy the prejudice prong.  As Respondent points out, it is far from a foregone conclusion that Petitioner is mentally retarded.  On the basis of the same test results, raw data, and documents, Dr. Rheinscheld concluded that Petitioner was mentally retarded, while Dr. Nelson concluded that Petitioner was not.  The most that counsel would have accomplished by calling an expert in mental retardation was the presentation of one more expert presenting a cumulative opinion on Petitioner's IQ status.  This Court is not persuaded that had Petitioner's defense counsel presented an expert in mental retardation, there is a reasonable probability that the outcome of Petitioner's mitigation hearing would have been different.

For the foregoing reasons, this Court finds unpersuasive Petitioner's argument that the state courts' decisions rejecting his claim of ineffective assistance of counsel for the failure to obtain a mental retardation expert for the mitigation phase involved an unreasonable application of clearly established law or an unreasonable determination of the facts.  Accordingly, the Court **DENIES** Petitioner's second ground for relief.

The Court is satisfied, however, that Petitioner's second ground for relief meets the requirements for a certificate of appealability.  Much like Petitioner's first ground for relief, the fact-intensive nature of his second ground for relief, its importance to Petitioner's case, and the

85

scrutiny that the Sixth Circuit has accorded to claims challenging attorneys' mitigation-phase performance persuade this Court that Petitioner's second ground for relief deserves further consideration on appeal. The Court accordingly certifies for appeal Petitioner's second ground for relief.

      **C.**     **<u>Fifth Ground for Relief</u>: Petitioner's trial counsel rendered ineffective assistance by failing to present testimony from a mental health professional to support the motions to suppress. Petitioner's rights to the effective assistance of counsel and due process as guaranteed by the Fifth, Sixth, Ninth and Fourteenth Amendments to the United States Constitution were violated.**

(Petition, ECF No. 11-5, at ¶¶ 56-67.) The essence of Petitioner's claim is that as a result of his mental retardation, he was incapable of knowingly, intelligently, or voluntarily waiving his *Miranda* rights and Fourth Amendment rights, and that had counsel obtained a mental retardation expert, counsel would have prevailed on their motions to suppress both Petitioner's statements to the police and evidence recovered pursuant to Petitioner's consent to search. Petitioner references the questioning that he voluntarily underwent on June 26 and July 3, 1998, the latter of which resulted in Petitioner's confession. Petitioner likewise points to the consents to search his residence and his van that he signed on June 27 and July 3, 1998.

      Petitioner explains that following a June 26, 1998 neighborhood canvass conducted by the FBI, Hamilton County Sheriff investigators asked Petitioner to go to the police station for more questioning. Petitioner agreed and drove himself. There, Petitioner continues, investigators questioned Petitioner for over four hours before they advised him of his *Miranda* rights, which he acknowledged understanding and then waived in writing. Petitioner states that investigators questioned him for fifteen total hours that day. Petitioner proceeds to explain that Hamilton County Sheriff investigators asked him to report to the station again on July 3, 1998–ostensibly so they could make prints of the tire tracks from his van, which reason officers admitted later was a "ruse" to get Petitioner back to the station. When Petitioner arrived, he states, officers immediately advised him of his *Miranda* rights. Petitioner again stated that he

understood those rights and signed a form waiving them.  "It was during this questioning," Petitioner explains, "that he confessed to the crime."  (ECF No. 56, at 46.)

Petitioner asserts that during the February 12, 1999 suppression hearing, his "[d]efense counsel tried to show primarily that Petitioner had been a suspect from the beginning of the investigation and that he was extremely tired because he had just gotten off work, where he worked the third shift, when questioned."  (*Id.*)  Petitioner complains that his trial counsel "failed to present any evidence that Petitioner was limited in his mental functioning and that he did not understand what he was doing by waiving his <u>Miranda</u> rights."  (*Id.*)  Petitioner explains that his July 3, 1998 confession was the primary evidence upon which he was convicted and that suppression of that statement would have been fatal to the State's case against him.  Petitioner asserts that both of his statements were a product not of his free will, but of "his inability to appreciate the implications of his actions and his lack of ability to understand the consequences of waiving his constitutional rights."  (*Id.* at 46-47.)  Citing *Colorado v. Connelly*, 479 U.S. 157, 163 (1986), Petitioner also emphasizes that a confession may be involuntary even where the interrogator informs the accused of his *Miranda* rights.

Petitioner argues that trial counsel, at a minimum, should have presented testimony by their mitigation expert, Dr. Tureen, concerning Petitioner's mental limitations.  Petitioner reiterates that Dr. Tureen testified at the mitigation hearing that Petitioner achieved a full-scale score of 72 on the WAIS-III IQ test, that 97% of the population was higher functioning than Petitioner, that Petitioner had been in special educations classes and performed poorly in school, that Dr. Tureen had to assist Petitioner in completing the MMPI-2 personality test, that Petitioner required twice as much time as most people to complete the test, that Dr. Tureen had to explain questions and define words for Petitioner, and that based on the above Dr. Tureen concluded that Petitioner had some "brain disturbance."  (ECF No. 56, at 47-48.)  Petitioner asserts that trial counsel knew about Petitioner's difficulty in communicating, as evidenced by the fact that they filed a motion asking the trial court to allow Petitioner at his mitigation hearing to give his

unsworn statement in a question-and-answer format.

Ideally, Petitioner continues, trial counsel should have presented testimony by a neuropsychologist. Petitioner relies on findings by Dr. Gelbort in connection with the instant habeas corpus proceeding that Petitioner appears "normal" in casual conversations but that Petitioner actually has lower intellectual functioning than he demonstrates. According to Petitioner, Dr. Gelbort also opined that Petitioner had difficulty with tasks involving multiple ideas or concepts and that Petitioner had impaired language and verbal comprehension skills. "Dr. Gelbort's findings," Petitioner maintains, "demonstrate that Lynch's poor intellectual functioning would easily lead him to agree to go to the Sheriff's Department, be uncounseled when questioned by law enforcement, and ultimately confess." (*Id*. at 48.)

Beyond the findings that Dr. Tureen presented, and the findings that a neuropsychologist such as Dr. Gelbort could have presented, Petitioner argues that testimony from a mental retardation expert was necessary to refute the prosecution's assertion that Petitioner's waiver of his *Miranda* rights was knowing, intelligent, and voluntary. Petitioner relies on Dr. Rheinscheld's findings from Petitioner's state court *Atkins* litigation, findings that this Court has already discussed at length.

Respondent raises several arguments against Petitioner's claim. First, citing arguments against Petitioner's tenth ground for relief, Respondent argues that Petitioner was not even entitled to *Miranda* warnings for the questioning that took place on June 26 and June 27, 1998. Counsel cannot be ineffective, Respondent apparently reasons, for failing to present expert testimony to prove unknowing, unintelligent, and involuntary a waiver of rights to which Petitioner was not entitled in the first place. Respondent further argues that Petitioner "cannot obtain habeas relief based on a violation of the Fifth or Ninth Amendments, as he asserted in his petition, because he did not fairly present these legal bases in state court." (ECF No. 57, at 44.) Respondent proceeds to offer several arguments why Petitioner's stripped-down claim–ineffective assistance for the failure to use a mental health expert to suppress the validity

of Petitioner's July 3, 1998 *Miranda* waiver–does not warrant habeas corpus relief.

      Respondent argues that the testimony of a mental health expert would not have provided a basis for invalidating Petitioner's *Miranda* waiver because "[o]fficers neither had reason to believe that Lynch misunderstood the *Miranda* warnings they provided, nor had any indication that Lynch's age, experience, education, background, and intelligence may have prevented him from understanding those warnings." (*Id*. at 45.) Respondent asserts that pursuant to *Garner v. Mitchell*, 557 F.3d 257, 261 (6th Cir. 2009) (en banc), the relevant inquiry is not what Petitioner was able to understand, but what the questioning officers could have concluded about Petitioner's ability to understand. Respondent argues that Petitioner's case mirrors *Garner* in several respects.

      As in *Garner*, Respondent asserts, Petitioner's conduct before and during the interrogation demonstrated an understanding of the *Miranda* rights and the consequences of waiving those rights. Respondent explains:

>       On July 3, Lynch arrived at the police department and agreed to speak with Detectives Pat Dilbert and Jerry Diersing. Tr. 291. Officers immediately advised Lynch of his *Miranda* rights, both verbally and in writing. Tr. 269, 319-322; Apx. Vol. 17 at 11 (State's Exh. 6). Lynch then waived those rights, both verbally and in writing. Tr. 269, 310-322; Apx. Vol. 17 at 11 (State's Exh. 6). That evening, Lynch informed police where they could locate Mary's body. Tr. 361. Police suspended the interview while Lynch directed detectives to that location. Tr. 333. After locating the body, police returned to headquarters with Lynch, who then provided a taped statement. Tr. 336; Apx. Vol. 17 at 12 (State's Exh. 9). Police transcribed Lynch's statement, and Lynch reviewed it for accuracy before signing. Tr. 341. In this very statement, Lynch confirmed that police informed him of his rights, that he understood his rights, and that he signed a written waiver form indicating he understood his rights. Apx. Vol. 17 at 13; Tr. 340, 323. Throughout the interview, Lynch also projected a calm demeanor. Tr. 380, 389; State's Exhs. 7-8.

(ECF No. 57, at 46.)

      Also as in *Garner*, according to Respondent, Petitioner projected a capacity to understand the criminal nature and consequences of his actions. Respondent notes that Dr. Bley testified at the mitigation hearing that Petitioner understood the wrongfulness of his actions and the lengths to which Petitioner went to conceal his crimes. "In all," Respondent asserts, "the facts of this

case demonstrate Lynch knew what was going on but acted in a manner consistent with a person attempting to avoid being caught." (*Id*. at 47.)

Finally, Respondent argues that as in *Garner*, the record in Petitioner's case also contained no evidence suggesting that officers had any reason to believe that anything about Petitioner's age, experience, education, background, or intelligence may have prevented Petitioner from understanding the *Miranda* warnings. Respondent notes that Petitioner's "purported expert" in the instant case, Dr. Gelbort, opined that Petitioner's limitations were not readily noticeable because Petitioner appeared "normal" in casual conversations. (*Id*. at 48.)

Respondent concludes that because the totality of the circumstances does not demonstrate that Petitioner's *Miranda* waiver was invalid, even with the testimony of a mental health expert, Petitioner "cannot meet his burden of proving his trial counsel was ineffective under *Strickland* or satisfy his burden under the AEDPA." (*Id*.)

Petitioner presented this claim to the state courts in the ninth claim for relief of his postconviction action. He argued that at his suppression hearing, his defense counsel attempted to demonstrate that Petitioner had been a suspect from the beginning of the investigation (and accordingly should have received *Miranda* warnings at the outset) and that Petitioner was tired because he had just finished working the third shift when he reported to the station for questioning. What defense counsel should have presented, Petitioner argued, was evidence that Petitioner was mentally retarded and understood neither the *Miranda* warnings nor the consequences of waiver. (App. Vol. 4, at 47-49.) Petitioner supported his postconviction claim with three separate affidavits by Dr. William Friday. (App. Vol. 5, at 379-91.) The state courts rejected Petitioner's claim as barred by *res judicata*. (App. Vol. 7, at 327-28; App. Vol. 8, at 359-60.) This Court, however, concluded that Petitioner's inclusion of that claim in his postconviction action, rather than on direct appeal, was proper because the claim relied on and was supported by evidence outside the record. (ECF No. 25, at 34-35.)

Petitioner offers reasons herein why this Court should conclude that the state courts'

decision rejecting his claim was unreasonable within the meaning of § 2254(d). Petitioner's arguments are, however, unnecessary. Because the state courts rejected Petitioner's claim not on the merits but on procedural grounds, their decisions do not constitute an adjudication on the merits sufficient to invoke the high measure of deference that § 2254(d) commands. That being so, this Court reviews Petitioner's claim not within the confines of § 2254(d), but *de novo*. *See, e.g., Harrington*, 131 S.Ct. at 785 (allowing for negating applicability of § 2254(d) deference where record reflects reason to believe that state court decision was based on something other than the merits of the claim); *see also Thompson v. Bell*, 580 F.3d 423, 438-39 (6th Cir. 2009) (reviewing *de novo* claim that state courts had rejected, improperly, on basis of state procedural default).

In urging this Court to find the state courts' decision rejecting his claim unreasonable, Petitioner asserts that the state courts "also held that the claim was second-guessing trial counsel's strategy and thus, was not ineffective." (ECF No. 56, at 50.) This Court's February 25, 2009 procedural default decision did not, however, find that the state courts had rejected Petitioner's claim on the merits. Rather, this Court found only that the Petitioner did not violate Ohio's *res judicata* rule when he raised his claim in postconviction instead of on direct appeal and that the state courts had erred in rejecting Petitioner's claim on that state procedural ground. Again, this Court reviews Petitioner's claim *de novo*. Moreover, because the state courts did not adjudicate Petitioner's fifth ground for relief on the merits, *Cullen v. Pinholster* does not, in this Court's view, preclude the Court from considering Dr. Gelbort's materials.

The issue before the Court is whether Petitioner's trial counsel performed deficiently and to Petitioner's prejudice by failing to present a mental health expert during the hearing on Petitioner's motion to suppress his statements to police. Petitioner argues that because of his mental retardation, he was unable to execute a knowing, intelligent, and voluntary waiver of his *Miranda* rights and that only the testimony of a mental health expert to that effect could have negated any finding that Petitioner's *Miranda* waiver was voluntary. Such evidence, Petitioner

91

reasons, would have enabled trial counsel to eliminate the only evidence upon which the State convicted Petitioner: Petitioner's July 3, 1998 confession.

The Court is not persuaded that trial counsel performed deficiently or to Petitioner's prejudice by failing to call a mental health expert at the suppression hearing. First, a defendant's mental deficiencies alone will not render a *Miranda* waiver invalid or a confession involuntary, absent a showing of some measure of police coercion or overreaching.  In *United States v. Newman*, the Sixth Circuit explained that "[e]vidence that a defendant suffered, at the relevant time, from a condition or deficiency that impaired his cognitive or volitional capacity is never, by itself, sufficient to warrant the conclusion that his confession was involuntary for purposes of due process; some element of police coercion is always necessary."  889 F.2d 88, 94 (6th Cir. 1989)  Similarly, in Ohio, as a general rule, an individual's low intellect does not necessarily render him or her incapable of waiving *Miranda* rights.  *See State v. Jenkins*, 15 Ohio St. 3d 164, 233, 473 N.E.2d 264, 321 (1984); *State v. Hall*, 48 Ohio St. 2d 325, 333, 358 N.E.2d 590, 595 (1976).  Rather, a person's low intellect is but one of many factors under the totality of circumstances that a court must consider in assessing the voluntariness of a *Miranda* waiver or confession.  *State v. Frazier*, 115 Ohio St. 3d 139, 154, 873 N.E.2d 1263, 1285 (2007).

The record in the instant case lacks the necessary element of police coercion or overreaching.  The initial neighborhood canvass that the FBI conducted involved uniform questions asked of all residents in child-abduction cases.  (Tr. Vol. 2, at 196-97.)  The FBI asked nothing specific to Petitioner or otherwise focused on him.  When Petitioner went to the police station for questioning on June 26-27 and July 3, 1998, he did so voluntarily, on both occasions driving himself to the station.  (*Id*. at 212, 317-18.)  During both sessions, detectives freely permitted Petitioner food, drinks, and the opportunity to smoke.  (*Id*. at 219, 220, 226, 234, 328.)  Detectives took periodic breaks during the interviews.  (*Id*. at 219.)  At no time did Petitioner express or demonstrate discomfort or ask to stop.  (*Id*. at 220, 291, 229, 380-81.)  The record contains no evidence that detectives made threats or promises to Petitioner.  (*Id*. at 230-31, 317,

323, 340.)  Detectives described Petitioner as chatty, forthcoming, and, once he confessed, relieved and apologetic.  (*Id*. at 217, 374, 380, 389.)

It is true that police employed a ruse to get Petitioner to respond to the station, telling him falsely that they forgot to take prints of his tire treads.  (*Id*. at 305.)  That does not strike the Court as undue coercion or overreaching because the record as a whole demonstrates that Petitioner voluntarily reported to the station the first time officers asked and invited officers to contact him if they needed anything else from him.  It is also true that the interviews on both occasions lasted hours.  As noted, however, at no time did Petitioner express or demonstrate discomfort, ask to stop, or ask to leave.  That Petitioner was questioned in the basement of the station, because that is where the interrogation rooms were located, and that the door to the interrogation room was usually closed, hardly constitute coercion or overreaching.  (*Id*. at 263-64.)  Petitioner asserts in his reply memorandum that "the conduct of the police officers involved did not allow Lynch to intelligently waive his rights and foster any understanding of his rights." (ECF No. 58, at 7.)  Specifically, Petitioner notes that none of the officers ever told Petitioner that he was free to leave or that he had the right to have an attorney present.  The Court is not persuaded, however, that even those omissions on the part of the police constitute coercion or overreaching.

Petitioner cites *Colorado v. Connelly*, 479 U.S. 157 (1986), in support of his argument that a confession may be involuntary even if the interrogator apprised the accused of his *Miranda* rights.  On the instant facts, however, *Connelly* undermines rather than supports Petitioner's claim. In *Connelly*, the Supreme Court held that even where the accused suffered a mental deficiency at the time of his or her confession, "[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law."  *Id*. at 164.  Law enforcement officers testified uniformly that Petitioner always appeared to understand what was going on, the rights of which they had advised him, and the waiver form(s) that he signed.  Although it is true that the

93

testimony of an expert such as Dr. William W. Friday (App. Vol. 5, at 370-94) or Dr. Rheinscheld might have enabled trial counsel to demonstrate that Petitioner appeared to be higher functioning than he actually was, such testimony would have been of limited value in the absence of any evidence suggesting police coercion or overreaching.  That being so, Petitioner fails to demonstrate not only deficient performance, but also prejudice.

Second-guessing strategy that did not work is insufficient to establish ineffective assistance where counsel's strategy was reasonable based on what counsel knew or reasonably should have known at the time.  *See Strickland*, 466 U.S. at 689; *White v. McAninch*, 235 F.3d 988, 995 (6th Cir. 2000).  Petitioner's claim of ineffective assistance does not fare well against this standard.  The record reflects that Petitioner's trial counsel filed motions to suppress his statements on September 15, 1998 and October 15, 1998.  (App. Vol. 1, at 266; App. Vol. 2, at 45.)  The trial court conducted a hearing on Petitioner's motions to suppress on February 12, 1999.  (Tr. Vol. 2, at 185.)  On February 16, 1999, the trial court overruled the motions to suppress.  (Tr. Vol. 2, at 421-25; App. Vol. 2, at 176.)  Crucial to the inquiry before this Court is what, if anything, counsel knew or reasonably should have known about Petitioner's intellectual deficits prior to and in preparation for the hearing on the motions to suppress.

On the same day that they filed their first motion to suppress, trial counsel also filed motions for the appointment of a mitigation investigator/specialist and for funds for a PET Scan and an MRI Scan.  (App. Vol. 1, at 253, 307.)  In support of the latter, trial counsel stated that Petitioner had reported to them having had black-outs on the day of the offense and on numerous occasions prior to that.  On September 21, 1998, trial counsel filed a motion for authorization to employ a defense psychologist, Dr. Robert Tureen.  (App. Vol. 1, at 321.)  In support, trial counsel cited case law and other standards governing appointment of experts in capital cases but advanced no information indicating specific reasons to question Petitioner's mental functioning.  On November 2, 1998, trial counsel filed another motion for the appointment of a mitigation specialist, this time specifically requesting James Crates.  (App. Vol. 2, at 111.)  On July 30,

94

1999, trial counsel filed a motion for the appointment of a second defense psychologist, Dr. Jill Bley.  (App. Vol. 2, at 213.)  It appears from the record that it was not until June 1999 that trial counsel traveled out of state to interview members of Petitioner's family and conduct other investigation.  (App. Vol. 2, at 194, 200.; App. Vol. 17, at 64, 126, 173.)

Dr. Tureen's report was dated August 30, 1999.  (App. Vol. 17, at 183.)  According to that report, Dr. Tureen conducted interviews and/or evaluations of Petitioner on October 6, 1998; February 5, 1999; June 17, 1999; June 23, 1999; July 9, 1999; July 29, 1999; August 6, 1999; and August 28, 1999.  According to his report, Dr. Tureen made collateral contact with Petitioner's cousin Elizabeth Iverson on August 22, 1999; with Petitioner's half-sister Peggy Gomez on August 23, 1999; and with prosecuting attorney Mark Piepmeier on August 30, 1999. Dr. Tureen also detailed in his report the documents and other material that he reviewed.  The date appearing on Dr. Jill Bley's report was August 26, 1999.  (App. Vol. 17, at 190.)

The record does not support a finding that prior to and in preparation for the suppression hearing, trial counsel knew or reasonably should have known that Petitioner had deficits in mental functioning or that the services of a mental health expert would have assisted them in demonstrating that Petitioner's limited intellectual functioning rendered his *Miranda* waiver invalid and his statements to police involuntary.  As evidence that trial counsel had ample notice of Petitioner's difficulty with communicating, Petitioner points to the motion that counsel filed asking the trial court to allow Petitioner to give his unsworn statement assisted by counsel through a question-and-answer format.  But counsel did not file that motion until August 26, 1999, on the basis of information that counsel gleaned from their experts and Petitioner's family members just a month or so before Petitioner's trial began.  (App. Vol. 2, at 249.)  To be clear, however, the foregoing does not demonstrate counsel were anything but diligent in their efforts to obtain and consult with experts, interview family members and other acquaintances, and conduct other investigation into Petitioner's background.  Petitioner's trial counsel filed motions for experts in October 1998, ten months before Petitioner's trial commenced.  Trial counsel

95

traveled out of state to investigate Petitioner's background and depose members of Petitioner's family in June 1999, two months before Petitioner's trial commenced. This is not a case where counsel waited until the last minute to conduct their investigation or consult with experts.

Thus, the record does not support a finding that the strategy that defense counsel employed–emphasizing that Petitioner was a suspect from the beginning of the investigation (and accordingly should have received *Miranda* warnings from the beginning), that Petitioner was twice subjected to questioning that lasted hours, and that Petitioner had just finished working the third shift and was extremely tired the second time he was questioned–was so objectively unreasonable as to render counsel's performance deficient and prejudicial. Information available to trial counsel when they pursued their motions to suppress fully supported a strategy of attempting to demonstrate that Petitioner was a suspect from the beginning of the investigation and should have received *Miranda* warnings each time he was questioned, as well as that the length of the interviews and Petitioner's fatigue undermined the validity of his *Miranda* waivers and incriminating statements. Concomitantly, nothing from the record–*e.g.*, the affidavits of Dr. William W. Friday that Petitioner submitted in postconviction–or governing case law demonstrates that trial counsel's failure to call a mental health or mental retardation expert was unreasonable or that the strategy that trial counsel did employ in urging the trial court to suppress Petitioner's statements was unreasonable.

In sum, the Court is not persuaded that Petitioner's trial counsel performed deficiently or to his prejudice in failing to call a mental health expert or mental retardation expert during the suppression hearing. Accordingly, the Court **DENIES** Petitioner's fifth ground for relief.

The Court is satisfied that Petitioner's fifth ground for relief meets the requirements for a certificate of appealability. Petitioner's confession and other statements were by the far the linchpin of the state's case against Petitioner. Equally important and related is the issue of Petitioner's limited intellectual functioning and the effect that it had not only on his actions on the day of the offense, but also on his decision to cooperate with police. In view of the

foregoing, as well as the length of the interrogations that Petitioner underwent and the ruse that police employed to persuade Petitioner to return to the station on July 3, the Court is satisfied that reasonable jurists could find its *de novo* decision rejecting Petitioner's claim debatable or wrong.  The Court accordingly certifies for appeal Petitioner's fifth ground for relief.

> **D.**  **Sixth Ground for Relief: Trial counsel were ineffective for failing to present testimony from a mental health expert to support Petitioner being convicted of a lesser offense. Petitioner's rights to due process and the effective assistance of counsel as guaranteed by the Fifth, Sixth, Ninth and Fourteenth Amendments to the United States Constitution were violated.**

(Petition, ECF No. 11-5, at ¶¶ 68-73.)  Petitioner argues that his trial counsel performed deficiently and to his prejudice by failing to utilize a mental health expert in support of their argument that an instruction on the lesser offense of involuntary manslaughter was warranted because Petitioner did not possess the requisite mental state required for aggravated murder. Petitioner reasons that a mental health expert could have described Petitioner's mental retardation and lack of ability to plan or perceive the consequences of his actions.  Petitioner asserts that trial counsel were deficient also for failing to present expert testimony during the trial phase to reinforce Petitioner's statements that he did not intend to kill the victim and to rebut the prosecution's case-in-chief that Petitioner's actions did in fact demonstrate an intent to kill.  Petitioner further argues that the state courts' decisions rejecting his claim not only contravened or unreasonably applied clearly established federal law but also involved an unreasonable determination of the facts in light of the evidence presented.

Petitioner raised this claim of ineffective assistance as the twelfth claim for relief in his postconviction action.  The trial court rejected his claim in its findings of fact and conclusions of law, explaining that the claim involved the second-guessing of defense counsel's trial strategy and that the Petitioner failed to present sufficient operative facts to demonstrate that counsel were ineffective or that counsel's performance prejudiced Petitioner.  (App. Vol. 7, at 368.)  The Court of Appeals for the First Appellate District held as follows:

Lynch's twelfth claim for relief, erroneously denoted by the trial court as his eleventh, challenged his trial counsel for not presenting the testimony of a mental-health professional during the guilt-or-innocence phase of the trial to aid the jury in concluding that Lynch could not have formed the requisite mental state for aggravated murder and, therefore, that involuntary manslaughter was the more appropriate charge.

This claim for relief failed as, even without the assistance of a mental-health expert, the trial court gave an instruction to the jury on the lesser offense of involuntary manslaughter. Lynch's confession indicated that he had strangled Love for about three minutes, thus calling into question the efficacy of pursuing at length a defense before the jury that claimed the killing was accidental. Lynch did not present sufficient evidence to overcome the strong presumption that his trial counsel were competent and that their failure to act was a sound trial strategy under the circumstances. See *Strickland v. Washington*, 466 U.S. at 689, 104 S.Ct. at 2065.

(App. Vol. 8, at 360.)  The Ohio Supreme Court declined to accept Petitioner's appeal, leaving the appellate court's decision the last reasoned state court decision addressing Petitioner's ineffective assistance claim.

Petitioner asserts that the state courts unreasonably applied *Strickland* when they held that the trial court had properly limited the involuntary manslaughter instruction to the second and fourth aggravated murder counts and held that counsel were not ineffective for failing to present expert testimony in support of their argument that the trial court also should have given the instruction as to the fifth aggravated murder count.  Petitioner explains that although trial counsel stated in their closing argument that Petitioner had not intended to kill the victim and that his intention was only to quiet her, trial counsel were not experts in ascertaining or explaining to the jury Petitioner's mental status and low intellect.  (ECF No. 56, at 53.) Petitioner asserts that testimony from a mental health expert would have established that in view of Petitioner's cognitive deficits and low intellectual functioning, Petitioner did not possess the requisite mental state to be convicted of aggravated murder.  As Petitioner explains, "[t]rial counsel filed a motion for the charge of involuntary manslaughter to be given in the jury instructions and stated in closing argument that Lynch lacked the purposeful mental state, yet failed to take the next step which was to present objective expert testimony to support that claim."  (*Id.*)  Petitioner further notes that trial counsel already had such an expert, Dr. Tureen,

98

"and were aware of his findings from his evaluation of Petitioner."  (*Id.*)

Respondent argues that Petitioner is not entitled to habeas corpus relief on this claim. Respondent begins by accusing Petitioner of improperly adding a basis for relief that Petitioner did not fairly present to the state courts, namely a "Fifth Amendment error."  (ECF No. 57, at 49.)  Respondent proceeds to argue that the state courts' decisions rejecting Petitioner's claim in postconviction did not involve an unreasonable application of clearly established law. Respondent reasons that:

> The evidence in Lynch's case did not reasonably support any argument that Lynch killed Mary by accident.  Evidence of Lynch'[s] guilt included his confession wherein he stated he placed his hand around the neck of a 6-year-old and squeezed for approximately three minutes.  Lynch also confessed to a separate act evidencing his intent:
>
> > [Lynch]: Then she gasp and I got some water[.] And I poured some water in her lungs[.] [T]he water went down in her lungs.
>
> Apx. Vol. 17 at 21-22 (State's Exh. 9).  This was no accident.  In fact, Lynch was undeterred in his pedophilia immediately following Mary's death: after killing her, "[h]e placed his finger into her vagina."  *See Lynch*, 98 Ohio St. 3d at 527.  If anything, defense counsel better served their client by maintaining credibility with the jury during the guilt-phase, thereby increasing any chance of securing a life sentence option.

(ECF No. 57, at 51.)

A second argument that Respondent advances is that Petitioner has failed to establish that his trial counsel even could have offered expert testimony on the issue of whether Petitioner's low mental functioning warranted an involuntary manslaughter instruction.  Respondent points out that " 'Ohio does not recognize the defense of diminished capacity, and a defendant may not offer expert psychiatric testimony, unrelated to the presentation of an insanity defense, to show that she lacked the mental capacity to form the specific mental state required for a particular crime or degree of crime.' " (ECF No. 57, at 51-52 (quoting *Wong v. Money*, 142 F.3d 313, 323 (6th Cir. 1998) (citing *Ohio v. Wilcox*, 70 Ohio St. 2d 182, 436 N.E.2d 523 (1982))).) Respondent asserts that defense counsel cannot be found ineffective for failing to offer inadmissible evidence.

99

A third reason why the state courts' decisions rejecting Petitioner's claim were not unreasonable, according to Respondent, is that "Lynch is not mentally retarded." (ECF No. 57, at 52.) Respondent points out that neither Dr. Tureen, Dr. Bley, nor the psychotherapist whose earlier treatment notes Drs. Tureen and Bley reviewed, ever opined that Petitioner was mentally retarded. In fact, Respondent emphasizes, "Dr. Tureen [] opined Lynch was *not* mentally retarded." (ECF No. 57, at 52 (emphasis in original).) Respondent argues that trial counsel cannot be found ineffective for relying on their experts' opinions or for failing to "shop" for an expert who would testify as counsel wished in support of their trial strategy.

The issue before the Court is whether the state courts' decisions rejecting this ineffective assistance claim contravened or unreasonably applied clearly established Supreme Court precedent, and/or involved an unreasonable determination of the facts in light of the evidence presented. Petitioner's claim fails under this standard.

Counsel did persuade the trial court, albeit with the acquiescence of the prosecution, to give an instruction on the lesser included offense of involuntary manslaughter as to the counts of felony aggravated murder with which Petitioner was charged in Counts 2 (aggravated murder committed during the commission of rape) and 4 (aggravated murder committed during the commission of kidnapping). The record provides no reason to believe that testimony by an expert would have nudged the trial court to give that instruction on the aggravated murder count charged in Count 5–purposely causing the death of a child under the age of 13–for a simple reason: the basis underlying the trial court's refusal to give an involuntary manslaughter instruction on the Count 5 aggravated murder charge was a purely legal one, not a factual one. Even if Petitioner could demonstrate under *Strickland* that his trial counsel performed unreasonably in failing to present an expert in support of counsel's request for a lesser included instruction on the aggravated murder charges, Petitioner cannot demonstrate that counsel's performance prejudiced Petitioner.

In Ohio, involuntary manslaughter is a lesser included offense of (felony) aggravated

100

murder.  *State v. Campbell*, 69 Ohio St. 3d 38, 47, 630 N.E.2d 339, 349 (1994) (citing *State v. Thomas*, 40 Ohio St. 3d 213, 533 N.E.2d 286, paragraph one of the syllabus (1988)).  The only difference between the two offenses is that (felony) aggravated murder requires a purpose to kill while involuntary manslaughter requires only killing as a proximate result of committing or attempting to commit a felony.  *Campbell*, 69 Ohio St. 3d at 47, 630 N.E.2d at 349 (citing *State v. Jenkins*, 15 Ohio St. 3d 164, 218, 473 N.E.2d 264, 310 (1984)).  A jury instruction on a lesser included offense is warranted "only where the evidence presented at trial would reasonably support both acquittal on the crime charged and a conviction upon the lesser included offense." *Thomas*, 40 Ohio St. 3d at 216, 533 N.E.2d at 289.  In *Campbell*, the Ohio Supreme Court concluded that a defendant charged with aggravated murder was not entitled to an involuntary manslaughter instruction because the evidence adduced at trial demonstrated an *intent* to kill. *Campbell*, 69 Ohio St. 3d at 47-48, 630 N.E.2d at 349-50; *see also State v. Williams*, 74 Ohio St. 3d 569, 574, 660 N.E.2d 724, 730-31 (1996) (concluding that involuntary manslaughter instruction was not warranted where severity of the decedent's injuries belied the accused's assertion that he did not intend to kill the victim).

  In the instant case, consistent with Ohio law, the trial court agreed to give an involuntary manslaughter instruction as to the felony aggravated murder offenses charged in Counts 2 and 4. The trial court declined, however, to give an involuntary manslaughter instruction as to the aggravated murder offense that was *not* predicated on upon the commission of an underlying felony of violence: Count 5 charging Petitioner with purposely killing a child under the age of 13.  The prosecution explained (and the trial court subsequently agreed):

   MR. PIEPMEIER:    Judge, with reference to the lesser-included of involuntary manslaughter, I think whenever you proceed under the felony murder theory, which the State has in this case, that whenever you have a defendant that indicates that he did not mean to do it, I think the Court is almost mandated to give manslaughter, so the State would not object to the lesser-included of manslaughter for Counts 2 and 4.

   However, Judge, Count 5 is not a felony murder charge of homicide, and it's under the new section which just says purposefully causes the death of a child under 13, and I do not believe involuntary is a lesser-included of that because you

would be adding the element of a felony.

(Tr. Vol. 7, at 1323-24.) Thus, although Count 5 contained the "purpose" element that trial counsel sought to negate with Petitioner's assertion that he did not mean to kill the victim, Count 5 did *not* contain as an element the commission of an underlying felony. In view of the trial court's position, no testimony from a mental health expert bolstering Petitioner's assertion that he did not intend (and because of his mental limitations could not have formed the intent) to kill the victim would have persuaded the trial court to give an involuntary manslaughter instruction on Count 5.

The first component of the *Strickland* test requires Petitioner to demonstrate that counsel performed objectively unreasonable. The fact that the trial court was not inclined to give an involuntary manslaughter instruction on the Count 5 aggravated murder charge does not obviate counsel's duty to attempt to offer expert evidence in support of the request if it appears that the trial court ultimately was in error.[12] Petitioner's claim still fails the second part of the *Strickland* test because Petitioner cannot demonstrate prejudice from counsel's failure to offer a mental retardation expert in support of counsel's request for an involuntary manslaughter instruction on the aggravated murder charges. The Court is not persuaded that but for counsel's alleged error, there is a reasonable probability that the outcome of his trial or sentencing hearing would have been different. As noted above, the fact that the trial court would not give an involuntary manslaughter instruction on the Count 5 aggravated murder charge *regardless of expert testimony* does not allow a conclusion that Petitioner was prejudiced by counsel's failure to present a mental retardation expert in support of counsel's request for an involuntary manslaughter instruction on all of the aggravated murder charges.

A second factor undermining Petitioner's ineffective assistance claim is the nature of the

---

[12]    As the Court discusses in Section V.L below, the Ohio Supreme Court held on direct appeal that involuntary manslaughter is a lesser included offense of the Count 5 aggravated murder offense charging that Petitioner purposefully caused the death of a child under the age of 13.

expert testimony Petitioner is arguing counsel should have presented.  To the extent that Petitioner faults trial counsel for failing to present such testimony during the trial phase to persuade the jury that Petitioner was guilty of involuntary manslaughter but not felony aggravated murder, Respondent is correct that Ohio law places substantial restrictions on the ability of an expert to offer an opinion, unrelated to an insanity defense, whether a defendant lacked the capacity to form the requisite mental state to commit a particular crime.  *See State v. Wilcox*, 70 Ohio St. 2d 182, 199, 436 N.E.2d 523, 533 (1982); *see also State v. Huertas*, 51 Ohio St. 3d 22, 28, 553 N.E.2d 1058, 1065-66 (1990).  Even assuming defense counsel could have presented such evidence not for the purpose of persuading the jury that Petitioner was guilty of involuntary manslaughter rather than aggravated murder, but for the purpose of attempting to persuade the trial court to give an instruction on the offense of involuntary manslaughter as to all of the aggravated murder counts instead of just the two felony murder counts, Petitioner's claim still fails for the reasons this Court explained above.

Finally, the record leaves this Court unconvinced that trial counsel violated a duty owed to Petitioner by failing to present such evidence in support of their request for an involuntary manslaughter instruction during the trial phase.  The Court also finds unpersuasive any argument that there is a reasonable probability that had trial counsel presented such evidence, the trial court would have instructed the jury on the lesser offense of involuntary manslaughter as to all of the aggravated murder counts or that the jury would have acquitted Petitioner on the Count 5 aggravated murder and returned verdicts of involuntary manslaughter on Counts 2 and 4.  In short, the evidence adduced at trial demonstrates that Petitioner intended to kill the victim. Petitioner contends now, as he did in statements to police and at trial, that he never intended to kill the victim, only to quiet her.  But Petitioner did not place a hand, briefly, over the victim's mouth or take some other similar action. Rather, Petitioner, by his own admission, squeezed the victim's neck for three minutes.  Petitioner did not stop there.  After squeezing the victim's neck for three minutes to the point where she was certainly unconscious and probably dead, Petitioner

103

carried her into the bathroom and poured water down her throat into her lungs.  Such actions undermine Petitioner's assertion that he did not act with purpose.

For the foregoing reasons, the Court does not disagree with, much less find unreasonable, the state courts' decisions rejecting Petitioner's claim of ineffective assistance of counsel for the failure to present expert testimony to support the lesser included offense of manslaughter.  The record does not demonstrate that trial counsel performed deficiently or to Petitioner's prejudice.  Accordingly, the Court **DENIES** Petitioner's sixth ground for relief.

The Court is not persuaded that Petitioner's sixth ground for relief meets the requirements for a certificate of appealability.  Because Ohio case law appears to foreclose definitively relief on Petitioner's claim, the Court cannot find that reasonable jurists would find its decision debatable or wrong.  The Court denies a certificate of appealability on Petitioner's sixth ground for relief.

> **E.** **Seventh Ground for Relief: Petitioner was denied the effective assistance of counsel at the mitigation phase by counsels' failure to investigate, prepare and present valuable testimony and records to support a sentence less than death.  Petitioner's rights to a fair trial, due process and the effective assistance of counsel as guaranteed by the Fifth, Sixth, Ninth and Fourteenth Amendments to the United States Constitution were violated.**

(Petition, ECF No. 11-5, at ¶¶ 74-81.)  Petitioner argues in his seventh ground for relief that his trial counsel performed deficiently and to his prejudice by failing to interview, or failing to interview adequately, many of Petitioner's friends and relatives.  Petitioner asserts that had counsel conducted a full mitigation investigation, "the jury would have learned that Petitioner's uncle sexually abused others in the family, which only contributed to Petitioner's lack of sexual boundaries; that Petitioner and his siblings were forced to have sexual intercourse with friends of their parents both inside and outside their home; that Petitioner's father had a gambling addiction; that Ralph and his sisters were tied to the kitchen table and drugged while being forced to have intercourse with different men; and that Petitioner functioned slow in everything

he did." (ECF No. 11-5, at ¶ 78.)  Petitioner also asserts that counsel failed to gather valuable records, such as Hamilton County jail records demonstrating that Petitioner felt remorse for his crime, as well as employment records showing that Petitioner functioned well in a structured environment and when engaged in repetitive tasks and that Petitioner was reliable in attendance and helpful to others.

Petitioner asserts that he presented this claim to the state courts as claims thirteen through seventeen of his postconviction action.  (ECF No. 56, at 60.)  Respondent disagrees, asserting that the "habeas petition does not reflect all of these bases" and "object[ing] to any expansion of the claim Lynch originally asserted in his habeas petition."  (ECF No. 57, at 54.)  Respondent's objections are not unfounded.  A review of the record confirms not only that the seventh ground for relief, as Petitioner pled it in his petition (ECF No. 11-5, at ¶¶ 74-81), is identical to the sixteenth claim for relief that Petitioner presented in state postconviction (App. Vol. 4, at 67-69), but also that Petitioner pleaded nowhere in his seventh ground for relief the allegations comprising Petitioner's thirteenth, fourteenth, fifteenth, and seventeenth state postconviction claims.  (App. Vol. 4, at 58-66, 70-71.)  It is true that Petitioner expands in his merit brief the scope of his habeas ground to include an allegation that counsel performed ineffectively in mitigation when they failed to obtain a neuropsychologist to assess and testify about Petitioner's organic brain impairment.  In support of the allegation, Petitioner relies primarily on the findings of Dr. Gelbort but also references the fact that Dr. William W. Friday questioned the adequacy of the mitigation evaluation that Dr. Jill Bley performed (ECF No. 56, at 56)–an allegation that Petitioner presented to the state courts in the thirteenth claim for relief of his postconviction action (App. Vol. 4, at 58-60) but not in his seventh ground for relief as pled in the instant habeas corpus petition.

In response to Respondent's complaint that he expanded the scope of ground seven, Petitioner asserts only that "the procedure employed by the District Court here of having Petitioner file a merit brief first, instead of the Warden filing a 'return of writ' first, cures any

lack of specificity complained of by the Warden." (ECF No. 58, at 9.) That may be so, but it does not fully excuse Petitioner's surreptitiousness. As a general rule, any effort to expand upon the scope of a claim requires leave of the Court, through the filing of either a motion to amend the petition or a motion to expand the record. *Cf. Sowell v. Collins*, 557 F. Supp. 2d 843, 889 (S.D. Ohio 2008). In this case, however, the Court discerns no prejudice from Petitioner's adding arguments to ground seven. *See generally Coe v. Bell*, 161 F.3d 320, 341 (6th Cir. 1998). As Petitioner points out, Respondent had an opportunity to respond to Petitioner's allegations. Further, Petitioner's allegation is not unexhausted, as he did present it to the state courts in postconviction and the state courts rejected it on the merits. (App. Vol. 4, at 58-60; App. Vol. 7, at 369.) Finally, Petitioner's added allegation does not salvage a claim that, for the reasons that follow, this Court finds is without merit.

Before proceeding further, however, the Court notes that in considering the added component–ineffective assistance of trial counsel for the failure to obtain a neuropsychologist–the Court may consider only the evidence that Petitioner presented to the state courts. As the Court explained more fully above in Section II, with respect to a claim that the state courts adjudicated on the merits, *Cullen v. Pinholster* prohibits federal courts in habeas corpus cases to utilize new evidence that the state courts did not have before them determining whether the state courts' decision was unreasonable. In the instant case, that means that this Court may consider the evidence that Petitioner presented to the state courts (Dr. William W. Friday's affidavits) but not the evidence that Petitioner developed in these habeas corpus proceedings (Dr. Michael Gelbort's findings).

As noted above, the essence of Petitioner's claim is that his trial counsel performed deficiently and to his prejudice by failing to conduct an adequate mitigation investigation. Specifically, Petitioner asserts that counsel failed to interview many friends and family members and/or conducted inadequate interviews of the people counsel did contact, failed to discover and collect records containing evidence in mitigation, and failed to obtain a neuropsychologist to

assess and testify about Petitioner's organic brain impairment.  Because of trial counsel's

deficient performance, Petitioner argues, the jury never learned additional details about repeated

sexual abuse that Petitioner and his siblings suffered, anecdotal and clinical evidence

demonstrating that Petitioner would function well in a structured environment such as prison,

and medical evidence that Petitioner did not have a normal functioning brain that impaired his

coping skills and impulse control.

      As the Court explained above, Petitioner presented the essence of these allegations to the

state courts in the thirteenth and sixteenth claims for relief in his postconviction action.  In

support, Petitioner submitted affidavits of his maternal cousin Ronald Kidwell, work supervisor

Charlie Bevens, maternal cousin Carol Gay, Dr. William W. Friday, attorney Robert Dixon,

younger sister Peggy Gomez, and mitigation specialist Dorian L. Hall.  (App. Vol. 5, at 362, 364,

366, 379, 389, 392; App. Vol. 6, at 2, 44; App. Vol. 7, at 9.)  In its findings of fact and

conclusions of law, the state trial court rejected Petitioner's thirteenth claim for relief in which

Petitioner had challenged counsel's effectiveness in connection with the expert witnesses that

they presented, on the ground that it was reasonable for trial counsel to have deferred to the

professional judgment of their expert witnesses.  (App. Vol. 7, at 369.)  The trial court rejected

Petitioner's sixteenth claim for relief, alleging as ineffective assistance counsel's failure to

interview or present more friends and family members, on the ground that second-guessing trial

counsel's strategy and offering an alternative mitigation theory do not establish ineffective

assistance of counsel.  (*Id*. at 369-70.)

      The last state court to issue a reasoned decision addressing Petitioner's claims, the Ohio

Court of Appeals for the First Appellate District, affirmed the trial court's decision denying

Petitioner's claims.  The appellate court addressed Petitioner's thirteenth claim for relief with his

other claims challenging various aspects of counsel's presentation of mental health experts and

rejected those claims as follows:

      Lynch next asserted that his trial counsel were ineffective for failing to
adequately prepare one mitigation expert, Dr. Jill Bley, a clinical psychologist,

and for permitting the deficient performance of Dr. Bley and the second mitigation expert, Dr. Robert Tureen, a neuropsychologist. As it was objectively reasonable for trial counsel to defer to the professional judgment of these two experienced mental-health expert in matters concerning Lynch's limited cognitive function and sexual predilections and urges, Lynch's counsel did not render him ineffective assistance. See *State v. McGuire* (1997), 80 Ohio St.3d 390, 399, 686 N.E.2d 1112, 1120.

(App. Vol. 8, at 360-61.) The appellate court rejected Petitioner's sixteenth claim for relief as follows:

In his sixteenth and twenty-fourth claims for relief, Lynch alleges that his trial counsel were ineffective for failing to interview adequately Lynch's friends, family, and prison mates for the penalty phase of the trial. The limited interviews, for example, purportedly did not provide an opportunity for family member [sic] to disclose details of the sexual abuse that Lynch had suffered as a child.

The mitigation evidence contained in the affidavits attached to Lynch's postconviction petition were merely cumulative of the substantial mitigation evidence presented in the penalty phase of the trial. The affidavit evidence was not sufficient to show that Lynch's counsel had deviated from an objectively reasonable standard of professionalism at trial. See *State v. Combs*, 100 Ohio App.3d at 103, 652 N.E.2d at 213.

(*Id*. at 361.)

Petitioner asserts that those decisions were unreasonable on a number of levels. First, Petitioner questions the reasonableness of the appellate court's characterizing Petitioner's thirteenth and fourteenth claims as criticizing only the performance of the defense mitigation experts. Petitioner appears to argue that counsel's ineffective performance was an essential component of the experts' resulting poor performance. (ECF No. 56, at 60-61.) With respect to the appellate court's rejection of Petitioner's claim challenging counsel's failure to interview more friends and family members as mere second-guessing of trial counsel's strategy, Petitioner insists that trial counsel's errors in this regard cannot be classified as "trial strategy" and that accordingly, "second guessing" their deficiencies is entirely in order. (*Id*. at 61.) To the extent that the state courts incorrectly applied Ohio's *res judicata* bar against claims that relied on evidence outside the record, Petitioner argues that this Court should review those claims *de novo*. (*Id*. at 62.) Finally, Petitioner asserts without any elaboration that

the merits decisions of the Ohio courts on Petitioner's claims were contrary to, or

108

an unreasonable application of, clearly established federal law as determined by
the United States Supreme Court or resulted in a decision that was based on an
unreasonable determination of the facts in light of the evidence presented in state
court.

(*Id*. at 62-63.)

Respondent asserts that the state court adjudication rejecting the component of
Petitioner's claim alleging counsel's failure to conduct adequate interviews of friends and family
members was objectively reasonable. Respondent points to evidence in the record indicating
that counsel recognized at an early stage the importance of mitigation, such as counsel's motion
just one month into the case for appointment of a mitigation specialist, counsel's subsequent
motions for mental health experts, and counsel's trip out of state to depose members of
Petitioner's family. (ECF No. 57, at 56-57.) Respondent also notes that Petitioner's trial
counsel "billed over 900 hours working on both phases of trial." (*Id*. at 58.) Respondent asserts
that counsel's "defense at the mitigation presentation was much more elaborate" than what they
had been able to present during the trial phase, in the face of overwhelming evidence against
Petitioner. (*Id*.) Respondent proceeds to repeat verbatim the Ohio Supreme Court's lengthy
factual summary of the information learned about Petitioner through trial counsel's mitigation
presentation. (*Id*. at 58-62 (quoting *Lynch*, 98 Ohio St. 3d at 540-43, 787 N.E.2d at 1214-16).)
Addressing the substance of Petitioner's claims concerning counsel's alleged failure to conduct
adequate interviews and investigation, failure to introduce evidence showing that Petitioner
would make a positive adjustment to prison, and failure to obtain a neuropsychologist,
Respondent dismisses the value of that mitigation evidence compared to mitigation evidence that
counsel did present and in view of the "monumental" aggravating circumstances against
Petitioner. (*Id*. at 66.)

The issue before the Court is whether the state courts' decisions rejecting Petitioner's
claim that his trial attorneys were ineffective for failing to obtain an expert in mental retardation
for the mitigation phase involved an unreasonable application of clearly established law and/or
an unreasonable determination of the facts based on the evidence presented. Resolution of that

109

issue necessarily begins with an examination of the clearly established law governing Petitioner's claim.

As the Court stated in its discussion of Petitioner's second ground for relief, the right to counsel guaranteed by the Sixth Amendment is the right to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. at 687; *McMann v. Richardson*, 397 U.S. at 771 n.14. Petitioner must demonstrate both deficient performance and prejudice, and scrutiny of defense counsel's performance must be "highly deferential." *Strickland*, 466 U.S. at 689. As with any claim challenging the adequacy of counsel's investigation, preparation, and presentation of available evidence at the mitigation phase, the Court explained earlier that "[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691; *see also Carter v. Bell*, 218 F.3d at 600. The Court reiterates the importance of competent representation during the penalty phase of a capital trial; as a practical matter, all that stands between a defendant who has been convicted of capital murder and a death sentence is whatever mitigation evidence he or she can muster. *See, e.g., Mapes v. Coyle*, 171 F.3d at 426; *Rompilla v. Beard*, 545 U.S. at 387 n.7 (incorporating the 2003 "ABA" Guidelines regarding competent representation in capital cases); *Wiggins v. Smith*, 539 U.S. at 524 (discussing the duty to investigate mitigating evidence and incorporating the 1989 ABA Guidelines regarding competent representation in capital cases).

As previously set forth, in the Sixth Circuit, the scope of a court's review of a claim of ineffective assistance of counsel during mitigation is shaped by the degree of counsel's alleged inadequacies. Again, precedent in the Sixth Circuit distinguishes between "counsel's *complete* failure to conduct a mitigation investigation, where we are likely to find deficient performance, and counsel's failure to conduct an *adequate* investigation, where the presumption of reasonable performance is more difficult to overcome." *Beuke*, 537 F.3d at 643 (citing *Campbell v. Coyle*, 260 F.3d at 552, & *Moore v. Parker*, 425 F.3d at 255).

In the instant case, Petitioner is not arguing, and the record does not demonstrate, that

110

Petitioner's trial counsel completely failed to investigate or present evidence in mitigation.  The record contains evidence that early on trial counsel sought funds for and utilized a mitigation specialist and an two independent psychologists and that trial counsel traveled to Oregon to interview and depose various members of Petitioner's family.  At the mitigation hearing, trial counsel urged the jury to take seriously its responsibility and to abide by its oath to be fair and impartial.  Counsel summarized the witnesses that counsel anticipated presenting to give the jury insight into Petitioner's history, character, and background.  Counsel explained how the sexual abuse that Petitioner suffered during his childhood transformed him from a victim to a victimizer.  (Tr. Vol. 9, at 1582-88.)  Trial counsel presented testimony by Petitioner's cousin, Elizabeth Iverson, and of Petitioner's step-father, Milford Hayes, concerning Petitioner's background and childhood.  Petitioner's half sister, Peggy Gomez, testified concerning incidents in Petitioner's background such as Petitioner losing an infant sister in a house fire, Petitioner being sent to live with sexually abusive men, and that Petitioner had begged his mother to let him leave those homes and return to his family.   Gomez testified that Petitioner began to visit her and her family only after Petitioner's mother had died.  Trial counsel called clinical psychologist Dr. Robert Tureen, who testified at length about Petitioner's background and upbringing, Petitioner's lifestyle prior to being incarcerated for the instant offense, other incidents of sexual contact with children committed by Petitioner, and particularly the results of the Wechsler Adult Intelligence Scale-III test that Dr. Tureen administered demonstrating that Petitioner had a full-scale IQ of 72, which placed him in the borderline range of intellectual functioning.  (Tr. Vol. 9, at 1621-60.)  Trial counsel also called another clinical psychologist, Dr. Jill Bley, who testified at length about Petitioner's pedophilia.  Because the foregoing precludes any argument that trial counsel *completely* failed to investigate or present mitigation concerning Petitioner's low intellectual functioning, this Court must "closely evaluate" whether Petitioner's attorneys "exhibited specific deficiencies that were unreasonable under prevailing professional standards." *Beuke*, 537 F.3d at 643.

111

Petitioner's precise argument is that his trial attorneys performed deficiently and to his prejudice in inadequately interviewing certain family members and acquaintances, failing altogether to interview other family members and acquaintances, and failing to adequately obtain, prepare, and present mental health experts.  In considering Petitioner's claim, it bears reminding that the precise issue for this Court to decide is not whether Petitioner's trial attorneys performed deficiently and to his prejudice in mitigation as Petitioner alleges, but whether the state courts' decisions denying Petitioner's claim contravened or unreasonably applied clearly established Supreme Court precedent or involved an unreasonable determination of the facts in light of the evidence presented.  The record reasonably suggests that counsel exercised due diligence in obtaining, consulting with, and relying on not one expert, but two.  Nothing from the testimony or reports of either Dr. Tureen or Dr. Bley, even as questioned after the fact by Dr. William W. Friday, strikes this Court as an obvious lead that reasonable counsel would have pursued further.  The same can be said for the interviews and depositions of family members that trial counsel.  That is, nothing that those individual recounted or revealed strikes this Court as an obvious lead that Petitioner's trial counsel failed to investigate further.

Although Petitioner's failure to satisfy the deficient performance component is dispositive of Petitioner's ineffective assistance claim, the Court further finds that Petitioner has not satisfied the prejudice component.  Although not "cumulative" in the sense that it was a word-for-word repetition, there was considerable overlap between the omitted information that Ronald Kidwell, Charlie Bevens, Carol Gay, Dr. Friday, Peggy Gomez, or additional jail records could have provided and the information that was presented.  This Court is of the view that what was omitted was not so substantially different from what was presented that it can be said that but for counsel's failure to present the omitted information, there is a reasonable probability that the jury would have returned a life sentence.  *See, e.g., Beuke v. Houk*, 537 F.3d at 645 (finding that although some of the omitted evidence in mitigation, such as the petitioner's low self-esteem and the degree of his parents' sheltering him, was not cumulative, "this non-cumulative evidence

112

is not powerful mitigating evidence that is reasonably likely to have changed the jury's recommendation of death."). Would additional testimony about additional sexual abuse, privation, and abhorrent parenting have tipped the scales in favor of a sentence less than death? Would another expert putting a neurological spin on Petitioner's intellectual limitations and compromised brain functioning have tipped the scales? Would additional evidence demonstrating that Petitioner felt remorse for his crimes and was likely to adjust positively to life in prison tipped the scales? Indulging Petitioner every benefit of the doubt, this Court answers these questions in the negative. This Court cannot find that but for counsel's failure to investigate, develop, and present the additional evidence that Petitioner described, there is a reasonable probability that the jury or trial court would have determined a sentence less than death.

In view of the foregoing, the Court cannot find that the state courts' decisions rejecting Petitioner's claims contravened or unreasonably applied clearly established Supreme Court precedent or involved an unreasonable determination of the facts. Having reviewed the materials that Petitioner submitted in support of these claims in postconviction, this Court finds nothing unreasonable about the state courts' decisions that counsel acted reasonably in relying on their mental health experts' professional judgment. The Court likewise finds nothing unreasonable about counsel's failure to interview or depose even more family members and acquaintances than they did.

For the foregoing reasons, the Court cannot find unreasonable the state courts' decisions rejecting Petitioner's claim of ineffective assistance of counsel for the failure to conduct adequate mitigation investigation and interviews. The record does not demonstrate that trial counsel performed deficiently or to Petitioner's prejudice. Accordingly, the Court **DENIES** Petitioner's seventh ground for relief.

The Court is satisfied, however, that Petitioner's seventh ground for relief meets the requirements for a certificate of appealability. The Court reaches this decision because of the

113

emphasis that the Sixth Circuit has placed repeatedly and consistently on addressing claims of

ineffective assistance of counsel during mitigation.  The Court accordingly certifies for appeal

Petitioner's seventh ground for relief.

> **F.**    **<u>Eighth Ground for Relief</u>: The evidence presented was insufficient, as a matter of law, to support the verdicts, denying Petitioner due process of law in violation of the Fifth and Fourteenth Amendments to the United States Constitution.**

(Petition, ECF No. 11-5, at ¶¶ 82-87.)  Petitioner argues that the state failed to present any

witnesses or physical evidence establishing that Petitioner deliberately and intentionally killed

Mary Jennifer Love.  Petitioner asserts that the trier of fact not only considered improperly

admitted and admissible evidence alike, but also refused to consider admissible and relevant

testimony from defense witnesses.  Asserting that his inculpatory statement was the sole

evidence that he had killed Love, Petitioner argues first that the trial court should have

suppressed that statement and at the same time that the statement established that Petitioner did

<u>not</u> intend to cause the victim's death.  Petitioner takes issue with the state's argument that he

had intentionally killed the victim to avoid being prosecuted for his sexual offenses.  First,

Petitioner notes that he admitted those offenses to the police.  Second, Petitioner reasons that the

fact that he hid the victim's body is proof only of his desire to hide the killing itself, not that he

killed to hide his sexual offenses.  Thus, according to Petitioner, he was entitled to acquittal by

the trial court upon defense counsel's motion for acquittal of the capital murder charge and to

conviction only of a lesser included offense.  Finally, Petitioner asserts without elaboration that

the merit decisions of the Ohio courts on his claims contravened and unreasonably applied

clearly established federal law or involved an unreasonable determination of the facts.

Petitioner challenged the sufficiency of the evidence in his fifteenth proposition of law on

direct appeal.  The Ohio Supreme Court rejected his claim as follows:

> In proposition of law XV, Lynch argues that the state failed to prove that
> he intentionally killed Love.  He also claims that the state failed to prove
> aggravated murder to avoid detection in Specification 1 of Counts 2, 4, and 5.

> In reviewing a record for sufficiency, "[t]he relevant inquiry is whether,

after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.E.2d 560. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.

As we held in *State v. Garner* (1995), 74 Ohio St.3d 49, 60, 656 N.E.2d 623, "The law has long recognized that intent, lying as it does within the privacy of a person's own thoughts, is not susceptible of objective proof. The law recognizes that intent can be determined from the surrounding facts and circumstances, and persons are presumed to have intended the natural, reasonable and probable consequences of their voluntary acts.

The nature and duration of Lynch's acts established his intent to kill. Lynch lured Love into his apartment, undressed her, and then orally raped her. Lynch put his hands around her neck after she started to cry and strangled her for three minutes.

The jury clearly rejected Lynch's claim that he was only trying to quiet Love and did not intend to kill her. The evidence and surrounding circumstances strongly support the jury's verdict that Lynch intended to kill Love. Cf. *State v. Eley* (1996), 77 Ohio St.3d 174, 180, 672 N.E.2d 640 (firing a loaded gun at victim established intent to kill despite defendant's claim that he was only trying to hit the victim in the shoulder).

Lynch argues that evidence supporting his conviction for aggravated murder to escape detection is purely circumstantial and consists almost entirely of proof that he hid Love's body after killing her. We also reject this argument.

The jury could infer from the timing of the murder that Lynch strangled Love so that neighbors would not hear screams and call the police. The jury could also reasonably conclude that Lynch killed Love to eliminate the only witness against him. See *State v. Wiles* (1991), 59 Ohio St.3d 71, 85, 571 N.E.2d 97 (where defendant killed the only witness against him, the jury could conclude that the defendant murder the victim to escape detection). Moreover, evidence that Lynch dumped Love's body in a remote wooded area and disposed of her clothing in dumpsters provided additional evidence that he had killed her to escape detection. Thus, there was sufficient evidence for the jury to reasonably conclude that Lynch murdered Love for the purpose of escaping detection.

Finally, we reject Lynch's claim that constitutional, statutory, and evidentiary errors, prosecutorial misconduct, and ineffective assistance of counsel permeated his trial.

Based on the foregoing, we find that the evidence is sufficient to establish Lynch's guilt for the crimes for which he was convicted. Accordingly, we overrule proposition XV.

*Lynch*, 98 Ohio St. 3d at 528-29, 787 N.E.2d at 1204-05; (App. Vol. 3, at 271-72.)

In his merit brief, Petitioner reiterates the arguments that he raised in his petition and then takes more focused aim at the reasonableness of the Ohio Supreme Court's decision denying his claim.[13]  (ECF No. 56, at 63-67.)  Specifically, Petitioner challenges the Ohio Supreme Court's conclusion that the nature of his actions justified the jury's determination that he intended to kill the victim and that he did so to prevent his neighbors from hearing the victim's cries.  Petitioner complains that "the court then speculated that [he] intended to kill [Love] to hide his crime, then further stacks an inference upon an inference by saying the disposal of the body was evidence of his desire to hide the rape, as opposed to simply wanting to hide the killing itself."  (*Id*. at 65.)  "It is impermissible," Petitioner argues, "for the trier of fact or a reviewing court to stack one inference upon another."  (*Id*.)  Citing the unreported decision of *Hopson v. Foltz*, Petitioner asserts that "[s]tacking inferences creates 'facts' that are not present."  818 F.2d 866, 1987 WL 37432, at *2 (6th Cir.1987) (unpublished table decision). (ECF No. 56, at 65-66.)  Petitioner concludes by arguing that the Ohio Supreme Court's decision contravened or unreasonably applied clearly established federal law or involved an unreasonable determination of the facts.  (*Id*. at 66-67.)

Setting forth the Ohio Supreme Court's decision rejecting Petitioner's claim, Respondent argues that Petitioner's reliance on the "contrary to" component of § 2254(d)(1) "is plainly meritless."  (ECF No. 57, at 73.)  Respondent explains that the Ohio Supreme Court's adjudication was neither contrary to any clearly established federal law nor the federal law governing sufficiency of the evidence challenges under *Jackson v. Virginia*, 443 U.S. 307 (1979).

According to Respondent, "Lynch also cannot prevail under the 'unreasonable

---

[13]     Petitioner also attempts to add an allegation that had the jury known of Petitioner's organic brain impairment as demonstrated by Dr. Michael Gelbort's findings in the instant proceedings, the jury would have been in a better position to understand how Petitioner thought that squeezing the victim's throat would quiet her and that pouring water in her mouth would revive her.  (ECF No. 56, at 65.)  Those allegations are not properly before the Court, not only because Petitioner did not exhaust them in the state courts but also because their sole basis consists of evidence that *Cullen v. Pinholster* prohibits this Court from considering.

application' language." (ECF No. 57, at 74.) Respondent argues that "[t]he Ohio Supreme

Court's 'application of established standards for determining sufficiency was not so offensive to

existing precedent, so devoid of record support, or so arbitrary as to indicate that it is outside the

universe of plausible, credible outcomes.' " (*Id.* (quoting *Brazzell v. Smith*, 201 F.3d 440, 1999

WL 1204795 (6th Cir. Dec. 7, 1999) (unpublished table decision) (per curiam)).)  The Ohio

Supreme Court reasonably concluded that the nature and duration of Petitioner's actions

established Petitioner's intent to kill, according to Respondent, because Petitioner admitted that

he put his hands around the victim's neck and squeezed until she was dead and because the state

presented evidence about the cause of her death–namely the testimony of Deputy Coroner Dr.

Phalzgraf that the cause of death was asphyxia–that nothing in the record contradicted.

Respondent argues that a rational jury could reasonably determine Petitioner's intent based on

Petitioner's admission that he squeezed the victim's neck for three minutes and that Petitioner's

subsequent actions of pouring water into her mouth while continuing his pedophilia by inserting

his finger in her vagina undermined any assertion that the victim's death was an accident.  (ECF

No. 57, at 75.)  Respondent also asserts as objectively reasonable the Ohio Supreme Court's

finding that a rational jury could determine that Petitioner killed the victim in order to escape

detection.  "Any alternative interpretations of the evidence by Lynch," Respondent maintains,

"fall[] outside the limited scope of federal habeas review, which cannot infiltrate the factfinder's

exclusive province in determining the credibility of witnesses, resolution of conflicts of

evidence, and reasonable inferences."  (*Id.* (citing *Jackson*, 443 U.S. at 326).)

     Respondent concludes by arguing that Petitioner cannot overcome the two levels of

deference owed to the instant claim.  Specifically, Respondent argues that "[t]he evidence itself

was sufficient under *Jackson* to convict Lynch, and the state court was objectively reasonable

under the AEDPA."  (ECF No. 57, at 75.)

     In his reply memorandum, Petitioner states that he rests on his main merit brief, except to

the extent that Petitioner charges Respondent with "mischaracteriz[ing] the record when he states

that Petitioner admitted he put his hands around the victim's neck and squeezed until she was dead." (ECF No. 58, at 9 (citing Tr. 1197).)  According to Petitioner, "[n]o such admission is made in the record at that cite or anywhere else." (*Id*.)

The issue for this Court to decide is whether the Ohio Supreme Court's decision rejecting Petitioner's sufficiency of the evidence challenge contravened or unreasonably applied clearly established Supreme Court precedent or involved an reasonable determination of the facts.  If the Court resolves any of those questions in the affirmative, then it may issue habeas corpus relief.

Petitioner and Respondent correctly identify the clearly established federal law that governs sufficiency of the evidence challenges, namely *Jackson v. Virginia*.  In *Jackson v. Virginia*, the United States Supreme Court held that as a matter of fundamental due process, a criminal conviction cannot stand unless each essential element is proven beyond a reasonable doubt.  443 U.S. at 316.  The Supreme Court explained that when reviewing a challenge to the constitutional sufficiency of the evidence supporting a criminal conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 319.  The Supreme Court cautioned, with respect to the role of a reviewing court, that "[t]his familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id*.  Thus, after reviewing the evidence in a light most favorable to the prosecution and respecting the trier of fact's role in determining witnesses' credibility and weighing the evidence, a federal court must grant habeas corpus relief "if it is found that upon the record evidence at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id*. at 324.

It is important to remember when reviewing a sufficiency of the evidence challenge that this Court "do[es] not reweigh the evidence, re-evaluate the credibility of the witnesses, or substitute [its] judgment for that of the jury." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir.

118

2009).  If the record contains credible, competent evidence enabling a rational jury to find each essential element beyond a reasonable doubt, then Petitioner's challenge to the sufficiency of the evidence fails.  *Cf. Matthews v. Abramajtys*, 319 F.3d 780, 788-89 (6th Cir. 2003) ("The mere existence of sufficient evidence to convict therefore defeats a petitioner's claim.").

Further, as the Sixth Circuit has explained, "[i]n a habeas proceeding, however, we cannot simply conduct de novo review of the state court's application of [the *Jackson v. Virginia*] rule, but must review its sufficiency-of-the-evidence decision under the highly deferential standard of the AEDPA."  *Saxton v. Sheets*, 547 F.3d 597, 602 (6th Cir. 2008).  In *Tucker v. Palmer*, 541 F.3d 652 (6th Cir. 2008), the Sixth Circuit explained in more detail:

> Accordingly, the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan Court of Appeals' consideration of the trier-of-fact's verdict, as dictated by the AEDPA.

*Id*. at 656.  *See also Parker v. Renico*, 506 F.3d 444, 448 (6th Cir. 2007); *Nash v. Eberlin*, 258 F. App'x 761, 765 (6th Cir. 2007).  This Court recognizes, however, that "even after AEDPA, [the Court] must 'distinguish reasonable speculation from sufficient evidence' when reviewing a state court's application of *Jackson*."  *Smith v. Romanowski*, No. 07-1578, 2009 WL 1884451, at *6 (6th Cir. Jul. 1, 2009) (Moore, J., dissenting) (quoting *Brown v. Palmer*, 441 F.3d 367, 352 (6th Cir. 2006)).

Against this legal standard, Petitioner's claim fails.  Petitioner gave a transcribed statement to police.  (State's Exhibit 9, App. Vol. 17, at 12.)  Before making that statement, Petitioner received his *Miranda* rights, affirmatively indicated that he understood those rights, and signed a card formalizing his waiver of those rights.  After making his statement, Petitioner reviewed the transcript and signed it.   Petitioner admitted in his statement that when the victim began screaming and crying, following his looking at and touching her vagina, he put his hand around her neck and began squeezing.  (App. Vol. 17, at 21.)  Petitioner stated that at first, he was just trying to scare her.  When asked how long he squeezed her neck, Petitioner replied in his own words, without suggestions from the questioners, "[a]hh, approximately ahh, three

119

minutes." (*Id.*) Petitioner stated that he then heard a gasp, carried the victim from his bedroom

to his bathroom with his left arm, maintained his right hand "around her neck," placed her in the

bathtub, and poured water down into her lungs. (*Id*. at 21-23.) At some point either while he

was transporting the victim to the bathroom or when she was in the bathtub, by Petitioner's own

admission, Petitioner inserted a finger into her vagina. (*Id*. at 24.) In addition to the transcript of

Petitioner's statement, the jury heard secondary testimony relating Petitioner's admissions.

Detective Corbett testified that in the car en route to the location where Petitioner indicated he

had hidden the body, Petitioner stated that he had "choked her." (Tr. Vol. 6, at 1111.) Detective

Goebel, who waited in the car with Petitioner while other detectives exited the car to locate the

victim's body, testified that Petitioner said that he had strangled her, that he was sorry, and that

he had not meant to. (Tr. Vol. 7, at 1286.) Detective Dilbert was present during Petitioner's

taped statement and testified that Petitioner admitted that he had squeezed the victim's throat for

three minutes and demonstrated how he had carried her from the bedroom to the bathroom while

maintaining his right hand around her neck. (Tr. Vol. 6, at 1197.) This evidence was sufficient

to support the jury's finding both that Petitioner deliberately and intentionally killed the victim

and that Petitioner did so to escape detection for the sexual crimes he had committed against the

victim.

      To the extent that Petitioner challenged his statements to the police as inadmissible, the

Court notes that the Ohio Supreme Court had already found Petitioner's confession to be

voluntary, addressing the matter in considerable detail. *Lynch*, 98 Ohio St. 3d at 520-23, 787

N.E.2d at 1197-1201; (App. Vol. 3, at 266-68.) Petitioner's contention that the trial court *should*

have suppressed his confession is insufficient to remove that evidence from the analysis. The

state courts found that Petitioner's statement was valid and that statement was enough to

establish the requisite intent. As the Sixth Circuit reiterated in *Tucker v. Palmer*, 541 F.3d 652

(6th Cir. 2008), concerning the nature of evidence necessary to support a conviction, "[i]n

assessing the adduced proof, the Court may sustain a conviction based upon nothing more than

120

circumstantial evidence." *Id*. at 675.

Petitioner stated on numerous occasions that he did not mean to kill the victim.  His actions, however, do not suggest inadvertence or accident.  Petitioner, in his own words, admitted squeezing the 6-year-old victim's neck for three minutes.  Petitioner, in his own words, described keeping his right hand around her neck even as he carried her from his bedroom to the bathroom and tub.  Petitioner, in his own words, admitted that he subsequently poured water into her lungs.  Finally, Petitioner, by his own admission, committed another sexual offense by inserting his finger into the victim's vagina during this process.  This evidence belies any reasonable finding from the evidence that Petitioner's actions were unintended or accidental. Further, contrary to Petitioner's assertion in his merit brief, nowhere in his taped statement did he suggest that his act of pouring water into the victim's lungs, after he had choked her for approximately three minutes, was an attempt on his part to revive her.  It was Detective Dilbert and Detective Corbett who asked Petitioner whether his pouring water into the victim's mouth was an attempt to "try and bring her back," to which Petitioner responded, "I wish I had of but I didn't, I . . . ."  (App. Vo. 17, at 22.)  The record contained sufficient evidence for a rational factfinder to infer the requisite intent.  *See, e.g., Hudson v. Lafler*, 421 F. App'x 619, 626-27 (6th Cir. 2011) (finding requisite intent for assault with intent to commit murder where accused pointed gun at the victim's chest and threatened him).

The factfinder is permitted to draw reasonable inferences, even as to intent.  *Cf. Hudson*, 421 F. App'x at 626 ("intent may be shown by inference from any fact in evidence, provided that the inference is reasonable").  In the instant case, that Petitioner killed the victim in such close proximity to when he committed the sexual offenses against her, and considering the natural consequences of the actions he took that caused her death, constitute sufficient evidence for a rational factfinder to find beyond a reasonable doubt that Petitioner deliberately and intentionally killed Love and did so to avoid detection for the sexual crimes that he committed against her. By Petitioner's own admission, he wanted to suppress the victim's screams and crying–screams

121

and crying that, according to the only other person in the room with her, were the result of her being scared about what Petitioner was doing to her.  (App. Vol. 17, at 20-21.)  That is the essence of killing in order to avoid being detected for other offenses.

In view of the foregoing, this Court cannot find that the Ohio Supreme Court's decision rejecting Petitioner's claim contravened or unreasonably applied clearly established Supreme Court precedent or involved an unreasonable determination of the facts.  The Ohio Supreme Court identified the correct legal precedent and applied it reasonably, finding that the nature and duration of Petitioner's actions, as well as the timing of the murder, constituted sufficient evidence for the jury to find that deliberately and intentionally killed the victim and did so to avoid detection for the sexual crimes he had committed.  Accordingly, the Court **DENIES** Petitioner's eighth ground for relief.

The Court is satisfied that Petitioner's eighth ground for relief meets the requirements for a certificate of appealability.  Because sufficiency of the evidence claims are, by their nature, fact-intensive, they are deserving of further scrutiny on appeal.  That is especially so when, as here, the particular sufficiency of the evidence challenge concerns the defense that Petitioner has maintained since the time that he confessed to police: that he never intended to kill the victim.  The Court accordingly certifies for appeal Petitioner's eighth ground for relief.

> **G.  Ninth Ground for Relief: The prosecutor used facts not in evidence to appeal to the passions and prejudices of the jury in violation of Petitioner's rights to due process and a fair trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.**

(Petition, ECF No. 11-5, at ¶¶ 88-98.)  Although styled as a claim of prosecutorial misconduct during closing arguments, Petitioner's ninth ground for relief actually consists of allegations of prosecutorial misconduct during direct examination of the victim's mother and during closing arguments, allegations of trial court errors during the sentencing process, and allegations of trial counsel ineffectiveness for the failure to object to the alleged prosecutorial misconduct. Petitioner argues that the prosecutor committed misconduct by eliciting a description of the

victim's personality from her mother, by alluding to stuffed animals in Petitioner's closet and popcorn in his kitchen as "tools of the trade" for a child molester, and by referring to the brutality of the murder as a non-statutory aggravating circumstance.  Petitioner also alleges that the trial court compounded the latter instance of prosecutorial misconduct by including among the aggravating circumstances it considered in sentencing Petitioner to death similar non-statutory aggravating circumstances and by alluding several times to the facts supporting Petitioner's conviction for gross abuse of a corpse–facts, Petitioner asserts, that were not relevant to any aggravating circumstances or mitigating factors that were presented.  Finally, Petitioner also argues that his trial attorneys performed deficiently and to his prejudice to the extent that they failed to object to some of these errors.[14]

Petitioner presented <u>some</u> of his allegations of trial court error and prosecutorial misconduct to the Ohio Supreme Court on direct appeal.  The Court will look first at Petitioner's claims that the prosecutor argued and the trial court considered non-statutory aggravating circumstances.  Petitioner presented those claims in his third proposition of law.  The Ohio Supreme Court rejected the claims as follows:

> In proposition of law III, Lynch asserts that the nature and circumstances of the offenses were improperly considered as aggravating factors.
>
> First, Lynch argues that the following comments in the prosecutor's penalty-phase closing argument were improper: "And when you think of the aggravated murder, the purposeful killing of this child, the only caress she received was from him, for his pleasure, and the only grasp she received was not one of comfort, but as those big hands closed around her neck.  And when Mary Love passed, unlike children that die of natural death, she wasn't thanking [sic] God to spare her life; she was probably begging him to take it.  And that is the final aggravating circumstance.  And when you put that on the other side of the ledger, ladies and gentlemen, that's what you weigh against what he presented to you these last couple days."  However, Lynch failed to object to this argument and waived all but plain error.  See *State v. Wade*, 53 Ohio St.2d 182, 7 O.O.3d

---

[14]     The allegations that Petitioner pleaded in paragraph 89 of his petition, claiming as error the prosecution's various references to the victim's thoughts just prior to and during her murder, are not before the Court because the Court already denied them as procedurally defaulted.  (ECF No. 25, at 42.)  Similarly, the Court will not consider allegations of ineffective assistance concerning the alleged instances of prosecutorial misconduct or trial court error to which counsel failed to object; Petitioner also defaulted those allegations.  (*Id.* at 41-42.)

362, 373 N.E.2s 1244, paragraph one of the syllabus.

The prosecutor erred in inviting the jury to consider what the victim experienced and was feeling in her last moments of life. As recognized in *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 357, 662 N.E.2d 311, citing *State v. Combs* (1991), 62 Ohio St.3d 278, 283, 581 N.E.2d 1071, such argument improperly "invites the jury to speculate on facts not in evidence."

The prosecutor compounded the error by arguing that the jury could consider the victim's anguish as the "final aggravating circumstance." As stated in *State v. Wogenstahl*, 75 Ohio St.3d 344, 662 N.E.2d 311, paragraph two of the syllabus, "[i]t is improper for prosecutors in the penalty phase of a capital trial to make any comment before a jury that the nature and circumstances of the offense are 'aggravating circumstances.' "

However, we find that the prosecutor's improper argument did not affect the outcome of the trial in view of the four statutory aggravating circumstances that Lynch had been found guilty of committing. On this point the instructions were very clear, and we can assume that the jury followed the trial court's instructions. *State v. Wogenstahl*, 75 Ohio St.3d at 360, 662 N.E.2d 311.

Lynch also argues that the trial court, in its sentencing opinion, improperly considered the nature and circumstances of the offense as aggravating circumstances. See R.C. 2929.03(F).

In its opinion, the trial court identified "the four separate specifications" in Counts 2, 4, and 5 as the aggravating circumstances. The trial court found that the evidence proved each of these aggravating circumstances beyond a reasonable doubt. The trial court also commented that "the defendant's killing of Mary Jennifer Love, was a cruel act of violence and the result of a perverse sexual orientation by the defendant."

The trial court's comment that the crime was "a cruel act of violence and the result of a perverse sexual orientation" referred to the rape as an aggravating circumstance. Moreover, the trial court correctly identified the four aggravating circumstances in its sentencing opinion, and this court can presume that the trial court relied on only those circumstances and not on nonstatutory aggravating circumstances. *State v. Clemons* (1998), 82 Ohio St.3d 438, 447, 696 N.E.2d 1009; *State v. Hill* (1995), 73 Ohio St.3d 433, 441, 653 N.E.2d 271.

Finally, Lynch complains about references in the sentencing opinion to his conviction for gross abuse of a corpse. In summarizing the crime, the trial court stated that Lynch admitted that he was "the principal, sole offender and that he kidnapped her, raped her and disposed of her body in a gross and abusive way." The trial court, in discussing the mitigating factors, commented that "tragically *** [Lynch] committed Rape, Kidnapping, the killing of a child under thirteen and then unceremonious[ly] discarded this helpless child's body in a gross manner." While the trial court may have made gratuitous comments about the disposal of the body, the trial court's opinion shows that it properly identified the four aggravating circumstances and understood the difference between the aggravating circumstances and the nature and circumstances of the offense.

Any misstatements in the sentencing opinion were harmless. The trial court properly weighed the aggravating circumstances against the mitigating factors. Moreover, we have independently reevaluated the sentence and thereby rectified any error in the sentencing opinion. *State v. Fox* (1994), 69 Ohio St.3d 183, 191, 631 N.E.2d 124; *State v. Lott* (51 Ohio St.3d 160, 170, 555 N.E.2d 293. We overrule proposition III.

*Lynch*, 98 Ohio St.3d at 533-35; 787 N.E.2d at 1208-10; (App. Vol. 3, at 274-75.)

Petitioner presented his other claims of prosecutorial misconduct in his second proposition of law. The Ohio Supreme Court rejected those claimed instances of prosecutorial misconduct as follows:

In proposition of law II, Lynch complains that the prosecutor committed misconduct by appealing to the passions and prejudices of the jury.

The test for prosecutorial misconduct is whether the remarks were improper and, if so, whether they prejudicially affected the accused's substantial rights. *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883. The touchstone of analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78.

Lynch argues that the prosecutor committed misconduct by eliciting a description of the victim's personality from her mother. During the prosecution's case-in-chief, Carol Williams, the victim's mother, described her daughter as "a very sweet little girl, very friendly, open heart to everybody * * * [and] sometimes too nice." Williams also testified that her daughter was a very trusting little girl and said, "I don't think Mary considered anybody a stranger."

Williams's brief testimony about her daughter's friendly and trusting nature was highly relevant. Evid.R. 401. Such evidence showed that Lynch could have easily lured Love into his apartment. Here, testimony about the victim's personality was not introduced to elicit the jury's sympathy. Instead, it focused on events leading to Love's kidnapping, rape, and murder. There was no prosecutorial misconduct in introducing such evidence. Cf. *State v. Broom* (1988), 40 Ohio St.3d 277, 289, 533 N.E.2d 682; *State v. Williams* (1988), 38 Ohio St.3d 346, 354, 528 N.E.2d 910.

Lynch also claims that the prosecutor committed misconduct during the penalty-phase closing argument by (1) alluding to the emotions of the victim, (2) arguing that the brutality of the victim's death was an aggravating circumstance, and (3) referring to stuffed animals found in Lynch's apartment as "tools of the trade for the child molester." However, Lynch failed to object and waived all but plain error. See *State v. Wade*, 53 Ohio St.2d 182, 7 O.O.3d 362, 373 N.E.2d 1244, paragraph one of the syllabus. As earlier discussed in propositions of law III and VI, the prosecutor's comments did not result in plain error. For the foregoing reasons, we reject proposition II.

*Id*. at 537-38, 787 N.E.2d at 1211-12; (App. Vol. 3, at 277.)

In his merit brief, Petitioner argues with little elaboration that the Ohio Supreme Court's decision rejecting his claims of prosecutorial misconduct and trial court error not only was contrary to or an unreasonable application of clearly established federal law but also involved an unreasonable determination of the facts. (ECF No. 56, at 75-76.) The only aspect of his ninth ground for relief that Petitioner mentions concerns the Ohio Supreme Court's conclusion that the presence of stuffed animals in Petitioner's apartment was relevant to explain how Petitioner lured the victim into his apartment. (*Id.* at 75.) Beyond that, Petitioner offers nothing in support of his assertion that the Ohio Supreme Court's decision ran afoul of § 2254(d). When Respondent makes the same observation in his response in opposition, "Petitioner simply responds that the abundant case law and accompanying argument found in his brief on Ground #9 supports the conclusion that he met his statutory burden warranting issuance of the writ." (ECF No. 58, at 10.)

Before addressing the merits of the components of ground nine that are at issue, the Court must address a component of ground nine that appears subject to procedural default: paragraph 91, in which Petitioner claims that the prosecutor committed misconduct by characterizing stuffed animals that police found in Petitioner's apartment as "tools of the trade" of a child molester. Respondent emphasizes that Petitioner did not object to that remark and that the Ohio Supreme Court recognized Petitioner's noncompliance with the contemporaneous objection rule by enforcing the rule against Petitioner's claim and reviewing it only for plain error. In other words, Respondent argues that Petitioner procedurally defaulted this component of his ninth ground for relief.

In its February 25, 2009 Opinion and Order addressing procedural default, in which the Court considered the procedural default allegations that Respondent raised against Petitioner's ninth ground for relief in Respondent's motion to dismiss (ECF No. 16, at 7-8), this Court did not explicitly find that Petitioner defaulted the "tools of the trade" component (¶ 91) of his ninth ground for relief. Explaining that it was only by "inadvertence" that he neglected to follow up in

his reply on a procedural default argument that he initially levied in his motion to dismiss, Respondent asserts now that a finding of procedural default would be consistent with the Court's ruling on Petitioner's eleventh ground for relief.  (ECF No. 57, at 78-79.)  According to Respondent, the second part of Petitioner's eleventh ground for relief involved the very same remark at issue here–the prosecutor's characterization of stuffed animals and popcorn in Petitioner's apartment as "tools of the trade" of a molester–and this Court found that Petitioner had procedurally defaulted that component of his eleventh ground for relief by failing to object at trial.

A review of the Court's February 25, 2009 Opinion and Order confirms Respondent's assertion.  That is, this Court specifically found, in connection with a claim that the trial court erred in admitting evidence that had no bearing on Petitioner's guilt and that the prosecution introduced to establish Petitioner's bad character–the presence in Petitioner's apartment of the stuffed animals and popcorn–that Petitioner had procedurally defaulted any claim challenging the prosecutor's "tools of the trade" remark because Petitioner failed to raise a contemporaneous objection at trial.  (ECF No. 25, at 45-48.)

Petitioner insists that because this Court already determined which grounds Petitioner procedural defaulted, Respondent's "attempt to argue procedural default at this stage of the proceedings is moot."  (ECF No. 58, at 10.)  The Court disagrees.  That this Court addressed procedural default when it did was dictated neither by the civil rules nor by the local rules, but by this Court's scheduling order.  The Court finds nothing inequitable or unfair about revisiting the issue of procedural default under a scenario such as the instant one.  Respondent initially raised a procedural default argument against paragraph 91 (ECF No. 16, at 7-8) and then neglected, apparently inadvertently, to follow up with that argument in his reply in support of the motion to dismiss.  When subsequently Respondent renewed the argument in the instant response in opposition, Petitioner had a full opportunity to respond in his reply, thereby eliminating any prejudice Petitioner might have suffered had he not had the opportunity to

127

respond to an after-the-fact procedural default argument.  *See, e.g., Lorraine v. Coyle*, 291 F.3d 416, 426 (6th Cir. 2002) (finding procedural default *sua sponte* where the petitioner had an opportunity to respond to the procedural default argument).  Also militating in favor of finding procedural default in this instance is the fact that the procedural default is obvious from the face of the record and the fact that this Court enforced essentially the same default against Petitioner's challenge to the "tools of the trade" remark in the context of a different claim (ground eleven).  *See, e.g., Elzy v. United States*, 205 F.3d 882, 887 (6th Cir. 2000) (finding procedural default *sua sponte* where the procedural default was "manifest in the record").

It is indisputable that Ohio's contemporaneous objection rule required Petitioner to object to actions he believed to constitute prosecutorial misconduct, that Petitioner failed to object to the prosecutor's "tools of the trade" remark, and that the Ohio Supreme Court rejected Petitioner's claim not on the merits, but solely on the basis of noncompliance with Ohio's contemporaneous objection rule.  The Court already determined in its February 25, 2009 Opinion and Order that Ohio's contemporaneous objection rule is an adequate and independent state procedural ground upon which to deny habeas corpus relief.  (ECF No. 25, at 40.)  To the extent that Petitioner might offer as cause and prejudice to excuse the default trial counsel ineffectiveness for the failure to object to the "tools of the trade" remark, this Court cannot consider that argument because it does not appear that Petitioner ever fairly presented that claim of trial-counsel ineffectiveness to the state courts.  *See Edwards v. Carpenter*, 529 U.S. 446, 452-53 (2000) (holding that an ineffective assistance of counsel claim offered as cause for the default of a substantive federal claim must first be properly presented to the state courts before it may be considered by a federal court).[15]  Accordingly, the Court finds Respondent's motion to dismiss paragraph 91 of Petitioner's ninth ground for relief to be well taken.  The Court

---

[15]    Petitioner argues in the alternative in his reply memorandum that "the issue was also raised under ineffective assistance of counsel with the Ohio Supreme Court, and thus the issue may be analyzed under that rubric."  (ECF No. 58, at 10.)  The Court could find no evidence in the record that Petitioner ever fairly presented this precise claim of trial counsel ineffectiveness–counsel's failure to object to the prosecutor's "tools of the trade" remark.

**DENIES** paragraph 91 of Petitioner's ninth ground for relief as procedurally defaulted.

The Court turns now to Respondent's arguments against the remaining components of Petitioner's ninth ground for relief. Beyond remarking that Petitioner provided no argument or explanation of how he satisfied his burden under § 2254(d), Respondent asserts that the Ohio Supreme Court's decision was objectively reasonable. With respect to the Ohio Supreme Court's handling of the claimed prosecutorial misconduct for eliciting testimony about the victim's personality, Respondent explains:

> The state court concluded the mother's minimal testimony was focused on the events leading to Lynch's criminal acts, and her testimony about her daughter's trusting nature explained how Lynch gained her confidence to lure her into his apartment. The prosecutor's question was not improper. Indeed, the prosecutor's questions immediately following the single question at issue focused the testimony on the victim's being a trusting person who did not consider[] anyone a stranger. Tr. 1027. This has no tendency to mislead the jury or improperly prejudice Lynch. In addition, this question occurred in the guilt phase of trial where the evidence was overwhelmingly strong. Indeed, the Ohio Supreme Court's independent reweighing confirms the absence of constitutional error. *Id*. at 544. In sum, there is nothing objectively unreasonable with the state court adjudication, and the conduct was neither improper nor so egregious that Lynch's entire trial became fundamentally unfair.

(ECF No. 57, at 77-78.)

It is well settled that "[t]o grant habeas relief based on prosecutorial misconduct that does not violate a specific guarantee under the Bill of Rights, the misconduct must be so egregious as to deny the Petitioner due process." *Lorraine v. Coyle*, 291 F.3d 416, 439 (6th Cir. 2002) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 643-45 (1974)). In the Sixth Circuit, once a court finds that the challenged conduct was improper, the court must determine whether the misconduct was so flagrant as to deny the Petitioner a fundamentally fair trial. *See, e.g., Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006). A court makes that determination by considering the following four factors:

> (1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant.

129

*Bates v. Bell*, 402 F.3d 635, 641 (6th Cir. 2005) (citations omitted). Of course, the precise issue

before the Court is not whether Petitioner has demonstrated a meritorious claim of prosecutorial

misconduct, but whether the Ohio Supreme Court's decision rejecting Petitioner's claim of

prosecutorial misconduct contravened or unreasonably applied clearly established federal law or

involved an unreasonable determination of the facts. *See, e.g., Frazier v. Huffman*, 343 F.3d

780, 793 (6th Cir. 2003) (holding that although the Court might have found meritorious a claim

of prosecutorial misconduct were it reviewing that claim in the first instance, habeas corpus

relief was not warranted because the state court's decision rejecting the same claim was not

unreasonable).

      In the instant case, this Court cannot find that the Ohio Supreme Court's decision

rejecting this component of Petitioner's ninth ground for relief contravened or unreasonably

applied clearly established federal law or involved an unreasonable determination of the facts.

The Ohio Supreme Court characterized testimony from the victim's mother about the victim's

friendly and trusting nature as not only "brief" but also "highly relevant." Regarding the latter,

the Ohio Supreme Court explained that the prosecutor elicited the testimony not to elicit

sympathy from the jury, but to demonstrate how easily Petitioner could have lured the victim

into his apartment. The Court does not disagree with, much less find unreasonable, either of

those characterizations. The prosecutor's questions to the victim's mother about the victim's

personality were brief, few in number, and aside from including the remark, "Carol, this may be

difficult," fairly innocuous as opposed to inflammatory. (Tr. Vol. 6, at 1027.) The questions

provided a context for understanding how easily the victim could have been persuaded to enter

an apartment other than her own. This Court's conclusion that the Ohio Supreme Court's

decision was not unreasonable is consistent with that of courts throughout the Sixth Circuit,

which in keeping with binding precedent have set the bar high for granting habeas corpus relief

on claims of prosecutorial misconduct. *See, e.g., Stallings v. Bagley*, 561 F. Supp. 2d 821, 845

(N.D. Ohio 2008) (finding no prosecutorial misconduct for eliciting testimony about the victim's

infant son that, although "unnecessary," enabled prosecutor to provide jury with an understanding of events prior to, during, and immediately following murder); *Knapp v. White*, 296 F. Supp. 2d 766, 775 (E.D. Mich. 2003) (finding that state court's decision rejecting claimed prosecutorial misconduct was not unreasonable where challenged testimony about extramarital affairs was relevant to defense theory); *Wiecek v. Lafler*, No. 2:06-CV-12233, 2009 WL 2616441, at *15-16 (E.D. Mich. Jan. 14, 2009) (finding reasonable state court's rejection of prosecutorial misconduct claim where challenged testimony was relevant), *rev'd on other grounds*, 2011 WL 1042184 (6th Cir. Mar. 22, 2011).

With respect to Petitioner's argument that the prosecutor committed misconduct by urging the jury to consider–and that the trial court compounded the error by also considering–the nature and circumstances of the offense as aggravating factors, Respondent asserts that the Sixth Circuit's decision in *Nields v. Bradshaw*, 482 F.3d 442 (6th Cir. 2007), forecloses habeas corpus relief on Petitioner's claim.  (ECF No. 57, at 86.)  Specifically, Respondent argues that "[t]he three determinative findings of *Nields* also occurred in Lynch's case."  (*Id.* at 87.)  First, according to Respondent, as was the case in *Nields*, the trial court in Petitioner's case instructed the jury that counsel's arguments were not evidence and juries are presumed to follow the trial court's instructions.  Second, Respondent points out that in *Nields*, the Sixth Circuit recognized that " 'consideration of a non-statutory aggravating circumstance, even if contrary to state law, does not violate the Constitution.' "  (*Id.* (quoting *Nields*, 482 F.3d at 451).)  Finally, Respondent argues that, as was the case in *Nields*, the Ohio Supreme Court's independent re-weighing of the aggravating circumstances and mitigating factors, in which it weighed only "irrefutably appropriate" aggravating circumstances, demonstrates that the prosecutor's remarks about aggravating circumstances did not harm Petitioner.  (ECF No. 57, at 87.)  With respect to the component of Petitioner's claim alleging that the trial court referenced, and therefore obviously considered, improper aggravating circumstances, Respondent argues simply that the trial court identified the correct aggravating circumstances in its sentencing opinion and that the Ohio

131

Supreme Court did the same when it re-weighed the aggravating circumstances and mitigating factors.  (*Id*. at 88.)

Petitioner raises three arguments in response.  (ECF No. 58, at 10-11.)  *Nields* is not dispositive, according to Petitioner, when *Nields* is viewed in the context of the case law and discussion that Petitioner set forth in his merit brief (ECF No. 56, at 72-74).  Next, Petitioner argues that, "although the jury is presumed to follow the instructions of the trial court on what constitutes aggravating factors and to not consider the arguments of counsel as law, the Supreme Court has acknowledged that some errors are so significant that no limiting instruction will cure the error."  (ECF No. 58, at 10.)  Finally, with respect to Respondent's reliance on the Ohio Supreme Court's independent re-weighing as evidence that Petitioner suffered no prejudice, Petitioner argues that, "[t]he Ohio Supreme Court is not infallible in this regard[]" and that "[t]he Sixth Circuit has reversed the Ohio Supreme Court's determination that such errors are not harmless."  (*Id*. at 11.)  Citing *DePew v. Anderson*, 311 F.3d 742, 751 (6th Cir. 2002), Petitioner proceeds to argue that, "[w]hen, like here, the error is repeated numerous times, and when it is viewed cumulatively in light of all the prosecutor's other misconduct and improper comments throughout mitigation closing, it is [clear] that the error was not harmless."  (ECF No. 58, at 11.)

The precise claim that Petitioner presented to the Ohio Supreme Court and that this Court now considers consists of two parts.  First, Petitioner argues that the prosecutor committed misconduct by urging the jury to consider the nature and circumstances of the offense–specifically the victim's anguish and/or the brutality of her death–as an aggravating circumstance.  (App. Vol. 3, at 45, 46, and 48.)  Petitioner argues that the prosecutor's argument ran afoul of Ohio Revised Code § 2929.04(B), which directs the trier of fact to consider the nature and circumstances of the offense as a mitigating factor and to weigh them against the aggravating factors that the trier of fact found beyond a reasonable doubt.  The Ohio Supreme Court held that the prosecutor erred in arguing that the jury could consider the nature and circumstances of the offense–specifically "the victim's anguish"–as an aggravating

132

circumstance. *Lynch*, 98 Ohio St. 3d at 534, 787 N.E.2d at 1209; (App. Vol. 3, at 275.) The

Ohio Supreme Court proceeded to find that the error was harmless because it did not affect the

outcome of the trial. The Ohio Supreme Court reached that conclusion primarily "in view of the

four statutory aggravating circumstances that Lynch was found guilty of committing and the lack

of compelling mitigation evidence," but also because the trial court properly instructed the jury

that it could consider only the four aggravating circumstances that the jury had found in the trial

phase, because the instructions were clear, and because it is fair to assume that the jury followed

the trial court's instructions. *Id.*

The second part of Petitioner's argument alleges that the trial court committed error by

referencing in its Ohio Revised Code § 2929.03(F) sentencing opinion, and therefore obviously

considering, improper aggravating circumstances.[16] Specifically, Petitioner argued to the Ohio

Supreme Court on direct appeal and argues to this Court herein that the trial court remarked, in

concluding that the aggravating circumstances outweighed the mitigating factors, that the murder

was a cruel act of violence and the result of Petitioner's perverse sexual orientation. (App. Vol.

3, at 47.) Petitioner also argues that the trial court several times alluded to the facts underlying

Petitioner's conviction for gross abuse of a corpse, even though those facts were not relevant to

any of the aggravating circumstances or mitigating factors. (*Id.*) The Ohio Supreme Court

found no error. Regarding the trial court's comment concerning the cruelty of the murder and it

resulting from Petitioner's sexual perversion, the Ohio Supreme Court concluded that the

comment related to the aggravating circumstance of rape and observed that the trial court not

only had identified correctly the four aggravating circumstances that the jury had found

---

[16]    Section 2929.03(F) of the Ohio Revised Code provides in relevant part:

The court or the panel of three judges, when it imposes sentence of death, shall
state in a separate opinion its specific findings as to the existence of any of the
mitigating factors set forth in division (B) of section 2929.04(B) of the Revised
Code, the existence of any other mitigating factors, the aggravating circumstances
the offender was found guilty of committing, and the reasons why the aggravating
circumstances the offender was found guilty of committing were sufficient to
outweigh the mitigating factors.

Petitioner guilty of committing but also presumably had weighed only those four aggravating circumstances against the mitigating factors.  The Ohio Supreme Court proceeded to dismiss as "gratuitous" the trial court's references to Petitioner's conviction for gross abuse of the corpse and remarked again that the sentencing opinion reflected on the part of the trial court a correct identification of the four aggravating circumstances and a recognition of the difference between the nature and circumstances of the offense and those four aggravating circumstances.  Finally, the Ohio Supreme Court concluded that any misstatements in the trial court's sentencing opinion were harmless because the trial court had weighed the proper aggravating circumstances against the mitigating factors and because the Ohio Supreme Court's own independent re-weighing of the aggravating circumstances and mitigating factors rectified any possible errors in the sentencing opinion.

This Court concludes that both components of the Ohio Supreme Court's decision–one rejecting the claimed prosecutorial misconduct for arguing the nature and circumstances of the offense as an aggravating circumstance and the other rejecting the claimed trial court error for considering non-statutory aggravating circumstances–did not contravene or unreasonably apply clearly established federal law and did not involve an unreasonable interpretation of the facts. The Court is of the view, as was the Ohio Supreme Court, that although it was an error for the prosecutor to characterize the brutality of the manner in which the victim died as "the final aggravating circumstance" (Tr. Vol. 10, at 1765), the error did not deprive Petitioner of a fundamentally fair trial or call its result into question.

This is not a case such as *Bates v. Bell*, 402 F.3d 635, 644-49 (6th Cir. 2005), in which the Sixth Circuit found a meritorious prosecutorial misconduct claim for the prosecutors' repeated expressions of personal opinions as to the credibility of mitigation witnesses and the appropriateness of a death sentence, repeated denigration of mitigation evidence, and repeated suggestions of future murders the accused would commit if not put to death.  In the instant case, the challenged comment was isolated.  Although the comment had the possibility of misleading

134

the jury as to what constituted an aggravating circumstance, that possibility was diminished by the fact that the jury repeatedly heard from the prosecutor, defense counsel, and most importantly, the trial court, as to what four aggravating circumstances the jury was to weigh against the mitigating factors.  Finally, the evidence against Petitioner, at both the trial phase and the penalty phase, was substantial.  *See, e.g., Beuke v. Houk*, 537 F.3d at 649-50 (finding reasonable the state court's rejection of a prosecutorial misconduct claim where the prosecutor's reference to personal experience and opinion, although improper, was unlikely to mislead the jury, was isolated, and was benign compared to strong evidence against the accused); *Broom v. Mitchell*, 441 F.3d 392, 413-14 (6th Cir. 2006) (finding reasonable the state court's rejection of prosecutorial misconduct claim where although prosecutor made improper statements, they did not deprive accused of fundamental fairness because they were general in nature and not pervasive); *Hill v. Mitchell*, 400 F.3d 308, 328-29 (6th Cir. 2005) (finding reasonable state court's rejection of prosecutorial misconduct claim where although prosecutor misstated law as to weighing process, error was de minimis and prosecutor many times stated the weighing standard correctly).  Because the Court does not find that the challenged comments so infected the mitigation phase with unfairness as to make Petitioner's death sentence a denial of due process, the Court does not find that the Ohio Supreme Court's decision rejecting the prosecutorial misconduct claim contravened or unreasonably applied clearly established federal law.

The Court further concludes that the record does not support Petitioner's claim that the trial court considered non-statutory circumstances in deciding to sentence Petitioner to death. Review of the trial court's Ohio Revised Code § 2929.03(F) sentencing opinion reveals that the trial court correctly identified, and weighed against the mitigating factors, only the four aggravating circumstances the jury had found Petitioner guilty of committing and clearly listed the nature and circumstances of the offense as a mitigating factors, not aggravating circumstances.  (App. Vol. 2, at 389-91, 396-97.)  Any references that the trial court made to the

135

facts underlying Petitioner's conviction for gross abuse of a corpse (*Id*. at 391, 392, 399) were just that–references.  The trial court's remark that the murder was a cruel act of violence and the result of a perverse sexual orientation was just that, a remark.  At worst, the challenged statements were gratuitous.  More logically, the challenged comments reasonably could be construed as constituting not non-statutory aggravating circumstances that weighed the scale down in favor of a death sentence, but merely explanations for why, in the trial court's view, the four statutory aggravating circumstances outweighed beyond a reasonable doubt the mitigating factors. *See, e.g., Smith v. Mitchell*, 348 F.3d 177, 209-10 (6th Cir. 2003) ("a trial court or three-judge panel may rely upon and cite the nature and circumstances of the offense as reasons supporting its finding that the aggravating circumstances were sufficient to outweigh the mitigating factors."); *Davie v. Mitchell*, 291 F. Supp. 2d 573, 629 (N.D. Ohio 2003) (same).  The Court does not disagree with, much less find unreasonable, the Ohio Supreme Court's decision rejecting the component of Petitioner's claim alleging that the trial court relied on non-statutory circumstances in its sentencing opinion.

For the foregoing reasons, the Court **DENIES** Petitioner's ninth ground for relief.

The Court likewise concludes that Petitioner's ninth ground for relief does not meet the requirements for a certificate of appealability.  Because the facts and controlling case law so definitively foreclose relief on Petitioner's claim, and in view of the high bar the Sixth Circuit has set for finding claimed prosecutorial misconduct deserving of habeas corpus relief, this Court cannot find that reasonable jurists could find its decision rejecting Petitioner's claim debatable or wrong.  Accordingly the Court does not certify for appeal Petitioner's ninth ground for relief.

> **H.**     <u>Tenth Ground for Relief</u>: **Petitioner's waiver of his *Miranda* rights and consent to search were not knowing, intelligent and voluntary in violation of Petitioner's rights to a fair trial and due process as guaranteed by the Fifth, Sixth, Ninth and Fourteenth Amendments to the United States Constitution.**

(Petition, ECF No. 11-5, at ¶¶ 99-106.)  According to Petitioner, "[t]he testimony of various police officers at the hearing on Petitioner's Motion to Suppress statements and evidence, held

on February 12, 1999, described a coercive, and deliberately deceptive pattern of contact with Petitioner, designed to take advantage of his low I.Q., and to elicit a confession before Petitioner could evaluate his need for counsel or marshal any resistance." (*Id*. at ¶ 100.) Petitioner offers as one example of the deception and coercion the fact that Agent Heinlein on June 26, 1998, viewed Petitioner as a suspect but never informed Petitioner as much. Petitioner also points out that under the guise of clearing up discrepancies in a statement Petitioner had made during the neighborhood canvass, officers requested that Petitioner go to the police station, questioned him for hours, and induced him to write a statement detailing his whereabouts on the day the victim disappeared. Petitioner notes that during that interview session, he received *Miranda* warnings only after officers learned that he had a prior arrest for indecent exposure and had been the subject of other similar complaints, after which officers kept him at the police station until 5:00 a.m., officers subjected him to repeated voice stress tests, and officers obtained from him a consent to search his vehicle and apartment. Petitioner proceeds to assert that a few days later, officers requested that he return to the police station for tire track testing at a time when they knew he would be finishing working a full night shift and that the tire track testing was a ruse. Officers questioned Petitioner "extensively," after which he eventually made statements inculpating himself, led officers to the victim's body, and gave a full confession that officers transcribed and that Petitioner reviewed and signed. Petitioner also executed a second consent to search his apartment. Asserting that neither his statements nor his consents to search were the product of a free and voluntary waiver of his constitutional rights, Petitioner argues that "[t]he merits decisions of the Ohio courts on Petitioner's claims were contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court." (*Id*. at ¶¶ 105-106.)

      Petitioner presented claims on direct appeal challenging the voluntariness of his *Miranda* waivers and consents to search. Before considering those claims, however, the Court turns its

attention to claims that Petitioner also attempted to raise in postconviction challenging the voluntariness of his *Miranda* waivers and consents to search.  Petitioner argued in his ninth ground for relief that his attorneys were ineffective during the hearing to suppress statements police obtained pursuant to Petitioner's *Miranda* waivers and evidence police obtained pursuant to Petitioner's consents to search.  Petitioner challenged the admission of his statements in his tenth ground for relief and the admission of the evidence in his eleventh ground for relief.  The trial court concluded that Petitioner's tenth and eleventh grounds were barred by the doctrine of *res judicata*, due to the fact that they could have been or were raised on direct appeal.  (App. Vol. 7, at 367-68.)  The appellate court affirmed, holding that the "claims were barred by *res judicata*, as they were or could have been raised on direct appeal without resort to the attached affidavit."  (App. Vol. 8, at 359-60.)  The Ohio Supreme Court declined to review Petitioner's discretionary appeal, leaving the appellate court's decision as the last reasoned opinion addressing the claims.  The foregoing circumstances compel this Court to confine its review of ground ten to only the facts and arguments that Petitioner raised on direct appeal.

The Court finds nothing inequitable or unfair about enforcing a procedural default under a scenario such as the instant one.  That Respondent did not raise a *res judicata* procedural default against Petitioner's tenth ground for relief is understandable.  The manner in which Petitioner pled ground ten in his petition, setting forth <u>only</u> the operative facts that he had presented on direct appeal and <u>not</u> including the new operative facts that he attempted to raise in postconviction, did not put Respondent on notice to raise a *res judicata* procedural default against Petitioner's tenth ground for relief.  Petitioner raised the latter arguments for the first time in his merit brief, prompting Respondent to raise the *res judicata* procedural default against the new facts at the first possible opportunity: Respondent's response in opposition.  Petitioner had an opportunity to respond in his reply; he did not avail himself of that opportunity.  *See, e.g., Lorraine v. Coyle*, 291 F.3d 416, 426 (6th Cir. 2002) (finding procedural default *sua sponte* where the petitioner had an opportunity to respond to the procedural default argument).  Also

138

militating in favor of finding procedural default in this instance is the fact that the procedural default is obvious from the face of the record.  *See, e.g., Elzy v. United States*, 205 F.3d 882, 887 (6th Cir. 2000) (finding procedural default *sua sponte* where the procedural default was "manifest in the record").

Petitioner challenged the voluntariness of his *Miranda* waivers and consents to search on direct appeal.  It is indisputable that Ohio's *res judicata* rule prohibited Petitioner from raising those challenges in postconviction in the absence of cogent evidence outside the record that supported Petitioner's claim in a manner that no record evidence could. It is also indisputable that Petitioner failed to produce such evidence, offering only two affidavits by clinical psychologist William W. Friday–one of which described the results of the Cognitive Assessment System test that Dr. Friday administered and the other of which opined that Petitioner should be administered the "Grisso" test to assess whether Petitioner was competent to execute voluntary, knowing, and intelligent waivers of his rights.  (App. Vol. 5, at 379, 386.)  The state courts rejected Petitioner's postconviction claims solely on the basis of Petitioner's violation of Ohio's *res judicata* rule.  The Court already determined in its February 25, 2009 Opinion and Order that Ohio's *res judicata* rule is an adequate and independent state procedural ground upon which to deny habeas corpus relief.  (ECF No. 25, at 27-29.)  For the foregoing reasons, the Court will consider Petitioner's tenth ground for relief only to the extent that he presented it on direct appeal.

In his fourth proposition of law on direct appeal, Petitioner challenged the admission into evidence of statements that were involuntary and unknowing.  Petitioner argued in his fifth proposition of law that the trial court erred in admitting evidence that officers seized from his home pursuant to consents to search that were involuntary and unknowing.  The Ohio Supreme Court rejected Petitioner's claims as follows:

> **Voluntariness.**  In proposition of law IV, Lynch argues that his statements and confessions to police were involuntary.  Lynch asserts that the police elicited two statements before advising him of his *Miranda* warnings, that his low IQ and

inexperience in dealing with the police contributed to the coercive nature of police questioning, that he was worn down by lengthy interrogations, and that the police used deception in getting him to the police station for questioning.

**Interviews on June 26 and June 27.** Lynch argues that the police improperly questioned him on June 26 and 27 by failing to advise him of his *Miranda* rights. We reject his claim.

On June 26, 1998, Special Agent Heinlein interviewed Lynch in the hallway outside his apartment as part of a neighborhood canvass. Lynch was not a suspect, he was not arrested, and he was not advised of his *Miranda* rights. Lynch was sweating profusely as he described to Heinlein his last encounter with Love, and Lynch provided information to police that conflicted with information obtained from another neighbor.

On June 27, Detective Corbett contacted Lynch at his apartment to discuss the discrepancies in his statement. Lynch was not arrested. Rather, Lynch was asked whether he "would mind" going to the police station to talk, and he said that "he would be happy to do so, and he drove his van up to [the] district."

Lynch was not advised of his *Miranda* rights when his interview began at the police station. Lynch was very talkative, provided detailed information about his activities on June 24, and prepared a written timeline of his whereabouts on that date. During a break in the interview, investigators learned that Lynch had a prior conviction for contributing to the delinquency of a minor for exposing himself to two young girls.

Police advised Lynch of his *Miranda* rights before resuming his interview. Lynch also reviewed a written copy of his *Miranda* rights after telling police that he could "read well." Lynch waived his rights at 6:44 p.m. and signed the waiver form.

While Lynch's interview was underway, police administered a computerized voice-stress test around 11:00 p.m. During this test, Lynch stated that he was not involved in Love's disappearance, did not know her whereabouts, did not hurt her, and did not sexually molest her. Test results showed deception. When the police confronted Lynch with those findings, Lynch admitted lying to the FBI. Lynch admitted that he had talked with Love on the steps inside his apartment building on June 23 and that he had lifted her up and had gotten an erection.

The police did not arrest Lynch, and he left the police station around 5:00 a.m. after spending approximately 15 hours there. As Lynch left the police station to return home, he shook hands with Sgt. Thomas Boeing and said he "wanted to thank [the police] very much, and if there was anything else that he could do for us in the future, to feel free to give him a call."

Police are not required to administer *Miranda* warnings to everyone they question. *Oregon v. Mathiason* (1977), 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714. "Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person

140

is one whom the plice suspect." *Id.*, 429 U.S. at 494, 97 S.Ct. 711, 50 L.Ed.2d 714.  The determination of whether a suspect was in custody at a particular time requires an inquiry into "how a reasonable man in the suspect's position would have understood his situation."  *Berkemer v. McCarty* (1984), 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317.  "[T]he ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."  *California v. Beheler* (1983), 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275, quoting *Mathiason*, 429 U.S. at 495, 97 S.Ct. 711, 50 L.Ed.2d 714.

Lynch's initial questioning on June 26 occurred at his apartment before he was suspected of any involvement in Love's disappearance.  Clearly, there was no custodial interrogation, and *Miranda* warnings were unnecessary.

On June 27, Lynch voluntarily drove his own vehicle to the police station to be interviewed.  He was not under arrest and was free to leave at any time.  Exercising caution, the police advised Lynch of his *Miranda* rights after learning of his earlier conviction.  However, the police were not required to advise Lynch of his *Miranda* rights because he was not undergoing custodial interrogation.  See *State v. Biros* (1997), 78 Ohio St.3d 426, 441, 678 N.E.2d 891 (no custodial interrogation where accused voluntarily went to the police station in his own vehicle, was not arrested, and was free to leave at any time).

**Interview on July 3.**  Lynch claims that his confession to police on July 3 was involuntary.  We also reject this claim.

Around 12:00 p.m. on July 3, police called Lynch at his place of employment and asked whether he "would mind bringing his van" to police headquarters so that they could take some tire impressions.  In fact, the police were not interested in checking the van's tires and admitted using deception to get Lynch to police headquarters.  Lynch drove his van to police headquarters as requested, and he agreed to talk to police upon arriving at the station.  Again, Lynch was not arrested and was free to leave.

Police advised Lynch of his *Miranda* rights before beginning the interview.  Lynch also read a copy of his *Miranda* rights and then signed a waiver form.  During the course of the interview, at around 7:15 p.m., Lynch told police, "She's on Breezy Acres."

Lynch took police to Love's body and then returned to the police station and gave a taped confession.  At the beginning of this confession, an officer said to Lynch, "[E]arlier today, prior to ahh, this tape being taken ahh, you were advised of your rights, is that correct?"  Lynch answered, "Yes I was."  The officer then asked, "Okay and you understood your rights at the time?"  Lynch said, "Yes I did."  The tape was transcribed, and Lynch read and signed the transcript at 12:16 a.m. on July 4, after spending 11 and one-half hours with the police.

"A court, in determining whether a pretrial statement is involuntary, 'should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency

141

of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.' " *State v. Mason* (1998), 82 Ohio St.3d 144, 154, 694 N.E.2d 932, quoting *State v. Edwards* (1976), 49 Ohio St.2d 31, 3 O.O.3d 18, 358 N.E.2d 1051, paragraph two of the syllabus.

First, Lynch argues that his statements were involuntary because of his low IQ and his inexperience in dealing with the police. Deficient intelligence is but one factor in the "totality of circumstances" to be considered in determining the voluntariness of a confession. While a defendant's mental condition is a significant factor in the voluntariness calculus, it "does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.' " *Colorado v. Connelly* (1986), 479 U.S. 157, 164, 107 S.Ct. 515, 93 L.Ed.2d 473. See, also, Annotation, Mental Subnormality of Accused as Affecting Voluntariness or Admissibility of Confession (1981), 8 A.L.R.4th 16.

Although Lynch's low IQ was not raised at the suppression hearing, the record shows that his IQ was 72. However, Lynch does not suffer from a major mental disorder such as schizophrenia or bipolar disorder. See *State v. Bays* (1999), 87 Ohio St.3d 15, 23, 716 N.E.2d 1126 (voluntary confession from accused with an IQ of 74); and *State v. Dailey* (1990), 53 Ohio St.3d 88, 91-92, 559 N.E.2d 459 (voluntary confession from an 18-year-old accused with an IQ of 71). Lynch was also able to maintain employment for 19 years prior to Love's murder. Moreover, there was no evidence that Lynch was under the influence of any substance during the interrogation.

Lynch's behavior during the investigation also belies his claim that his confession was involuntary. On both June 27 and July 3, Lynch voluntarily drove himself to the police station to answer questions. Lynch told police that he "read well," and he read a copy of the *Miranda* waiver form before waiving his rights. Finally, Lynch's written timeline and his taped confession demonstrate his ability to express his thoughts and recall his actions in a rational manner.

Lynch's claim that his confession was involuntary because he was worn down by lengthy interrogations can also be dismissed. Lynch's interrogation that began on June 27 lasted around 15 hours. However, police did not obtain a confession on June 27; Lynch drove home after the interrogation was over, and several days elapsed before he was questioned again. Thus, the length of Lynch's interrogation on June 27 had no impact on the voluntariness of his confession on July 3.

On July 3, Lynch's interrogation lasted about five hours before he confessed. Police stopped their interrogation while Lynch showed police the location of Love's body. After returning to the police station, Lynch gave a taped confession, and he signed the transcript of those tapes four hours later.

Lynch was not under arrest on July 3 until he confessed, and he was free to leave at any time before that. On July 3, Lynch never refused to answer questions, never asked for the questioning to stop, and never asked for medical attention or a lawyer. Lynch was also offered food, soft drinks, and the use of a restroom. Moreover, the police made no threats or promises to Lynch to gain his cooperation. Thus, the evidence supports the conclusion that Lynch's confession

was voluntary. See *State v. Green* (2000), 90 Ohio St.3d 352, 366, 738 N.E.2d 1208 (pretrial statement resulting from a 12-hour interview deemed voluntary); see, also, *State v. Brewer* (1990), 48 Ohio St.3d 50, 58, 549 N.E.2d 491.

Finally, Lynch claims that his confession was involuntary because the police used deception in getting him to the police station on July 3. Deception is a factor bearing on voluntariness. *Schmidt v. Hewitt* (C.A. 3, 1978), 573 F.2d 794, 801. "However, this factor, standing alone, is not dispositive of the issue." *State v. Wiles* (1991), 59 Ohio St.3d 71, 81, 571 N.E.2d 97. Here, police used deception to get Lynch to the police station, but deception was not used during the interview. Thus, police deception did not render Lynch's confession involuntary.

Under the totality of the circumstances, we find that Lynch's confession was voluntary. We reject proposition IV.

***Consent to search.*** In proposition of law V, Lynch argues that he did not voluntarily consent to the search of his apartment and van and that evidence seized during those searches was improperly admitted at trial.

On June 27, police obtained Lynch's consent to search his apartment and his van while questioning him at the police station. Lynch was not under arrest when this request was made. Police read the consent-to-search forms to Lynch and asked him to "please read [the forms] over." Lynch replied that "he had no problem with it, and he signed both of these documents at the bottom."

On July 3, police again obtained Lynch's consent to search his apartment while questioning him. Lynch agreed and signed a written consent form.

Police searched Lynch's apartment on July 4 and seized numerous items of evidence. At trial, an inventory sheet listing the property seized during the search and various photographs taken inside Lynch's apartment were admitted into evidence.

In order to validly waive his Fourth Amendment rights against unreasonable searches and seizures, Lynch must have voluntarily consented to the searches. Voluntariness of consent is determined under a totality-of-the-circumstances standard. *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 248-249, 93 S.Ct. 2041, 36 L.Ed.2d 854; *State v. Childress* (1983), 4 Ohio St.3d 217, 4 OBR 534, 448 N.E.2d 155, paragraph one of the syllabus; *State v. Barnes* (1986), 25 Ohio St.3d 203, 208-209, 25 OBR 266, 495 N.E.2d 922.

Lynch argues that the police coercion that led to his confession also tainted his consents to search. However, as discussed in proposition IV, the police did not use coercion to obtain his confession. Similarly, the police made no promises or threats to obtain Lynch's consent to search his van and apartment. Also, there is no evidence that Lynch was under the influence of drugs or alcohol when he gave his consent.

Moreover, Lynch's low intelligence and lack of education do not negate the voluntariness of his consent to search. Low intelligence is a factor in

determining whether consent was voluntary, but it is not necessarily the decisive factor. Cf. *United States v. Mendenhall* (1980), 446 U.S. 544, 558, 100 S.Ct. 1870, 64 L.Ed.2d 497. See, also, Annotation, When is Consent Voluntarily Given so as to Justify Search Conducted on Basis of that Consent-Supreme Court Cases (1998), 148 A.L.R.Fed. 271, 284.

> Lynch appeared to the police to "understand what [they] were asking him to do when [they] read over that consent to search." Lynch also told investigators that he "read well, he just didn't write very well," before reading over the consent-to-search forms himself and signing them. Despite evidence of Lynch's low intelligence, we find that Lynch voluntarily consented to the searches. We overrule proposition V.

*Lynch*, 98 Ohio St. 3d at 520-24, 787 N.E.2d at 1197-1201; (App. Vol. 3, at 266-69.)

Petitioner argues in his merit brief that the Ohio Supreme Court unreasonably applied *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973), in concluding that the totality of the circumstances demonstrated that Petitioner's *Miranda* waivers and consents to search were voluntary. (ECF No. 56, at 79.) According to Petitioner, "[t]he Court failed to accord the appropriate weight to the factors surrounding Petitioner's waivers, which resulted in his confession." (*Id*. at 79-80.) Petitioner points, as he did in his petition, to what in his view constituted deception and overreaching on the part of the investigators who questioned Petitioner. He targets the fact that officers viewed Petitioner as a suspect days before they advised him he was a suspect, the fact that officers questioned Petitioner for extremely long periods of time and once after he had finished a full night shift at work, and the fact that officers employed a ruse to get Petitioner to report to the police station on July 3. In addition, Petitioner argues, his own low intellectual functioning and history of desiring to please authority figures combined with the officers' deception and overreaching to further undermine the voluntariness of his *Miranda* waivers and consents to search.[17] (*Id*. at 78-79.)

---

[17] In so arguing, Petitioner relies in part on the evidence he attempted to present to the state courts in postconviction, as well as the findings that Dr. Gelbort reached during discovery in the instant proceedings. The Court will consider neither. As this Court explained more fully above, Petitioner procedurally defaulted the claims and evidence that he attempted to present to the state courts in postconviction; the Court's review of Petitioner's claim is confined to the trial record and the claim that Petitioner presented to the Ohio Supreme Court on direct appeal. Because the only claim before this Court is a claim that the Ohio Supreme Court adjudicated on the merits, *Cullen v. Pinholster* prohibits the Court from considering Dr.

Respondent argues that Petitioner's claim is "plainly meritless, as can be seen from reading [Petitioner]'s own statement of facts."  (ECF No. 57, at 89.)  Noting that *Miranda* warnings are not required unless the subject is both interrogated and in custody, Respondent asserts that because Petitioner indisputably was not under arrest when agents questioned him at his apartment on June 26 as part of a neighborhood canvass, there was nothing objectively unreasonable about the Ohio Supreme Court's decision rejecting Petitioner's claim that any statements he made that day were obtained in violation of his constitutional rights.  With respect to Petitioner's encounter with police on June 27, Respondent argues that because Petitioner was never under arrest or in custody–from the time police questioned him at his apartment to the time, to the time Petitioner voluntarily went to the police station, to the time that Petitioner waived his *Miranda* rights and answered questions well into the following morning–there was nothing objectively unreasonable about the Ohio Supreme Court's decision rejecting Petitioner's claim that any statements he made during that encounter were involuntary or otherwise obtained in violation of his constitutional rights.

"Finally," Respondent argues, "the state court reasonably held [that] Lynch's confession on July 3 was valid."  (*Id.* at 91.)  Specifically, Respondent argues, the Ohio Supreme Court's decision belies Petitioner's argument that the court failed, in determining that the totality of the circumstances demonstrated voluntariness, to accord appropriate weight to the factors surrounding Petitioner's waivers.  According to Respondent, the Ohio Supreme Court gave due consideration to the circumstances and conditions surrounding the confession.  Respondent points to the Ohio Supreme Court's consideration of  the fact that Petitioner was free to leave up until he confessed.  The Ohio Supreme Court noted that Petitioner never asked for questioning to stop or for medical attention.  Respondent further points to the Ohio Supreme Court's consideration of the fact that Petitioner was offered food, drinks, and the use of the restroom. The Ohio Supreme Court proceeded to consider  the absence of threats or inducements by police,

Gelbort's findings in assessing the reasonableness of the Ohio Supreme Court's decision.

Petitioner's behavior in voluntarily going to the police station and insisting that he could read well and understood his rights, and the manner in which Petitioner's confession demonstrated his ability to express his thoughts and recall his actions in a rational manner. Finally, according to Respondent, the Ohio Supreme Court also gave consideration to the length of the questioning, the deception that the police employed to persuade Petitioner to go to the police station on July 3, and Petitioner's level of intelligence and inexperience in dealing with law enforcement. With respect to Petitioner's emphasis on his low intellect, Respondent asserts that an accused's mental deficiencies, by themselves, are insufficient to render a confession involuntary. Respondent also argues that the record does not support Petitioner's assertion that police took advantage of Petitioner's low intellect with coercion or overreaching.

Petitioner offers no counter-arguments in his reply memorandum.

The issue this Court must decide is whether the Ohio Supreme Court's decision rejecting Petitioner's claim that neither his *Miranda* waivers nor his consents to search were knowing, intelligent, and voluntary contravened or unreasonably applied clearly established federal law or involved on an unreasonable determination of the facts. It is well settled pursuant to *Miranda v. Arizona* that a " 'defendant may waive effectuation' of the rights conveyed in the [*Miranda*] warnings 'provided the waiver is made voluntarily, knowingly and intelligently.' " *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quoting *Miranda*, 384 U.S. at 444, 475). Likewise, an accused's consent to search, which absolves officers' obligation to obtain a search warrant, must be "freely and voluntarily given." *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). The Court determines voluntariness by viewing the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226-27 (1973). In *Murphy v. Ohio*, the Sixth Circuit reaffirmed:

> The totality of the circumstances can include such factors as "age, education, and intelligence of the defendant; whether the defendant as been informed of his *Miranda* rights; the length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as deprivation of food or sleep."

551 F.3d 485, 511 (6th Cir. 2009) (quoting *McCalvin v. Yukins*, 444 F.3d 713, 719 (6th Cir.

2006)); *see, generally, Schneckloth*, 412 U.S. at 226; *Arizona v. Fulminante*, 499 U.S. 279, 286 (1991).

Petitioner falls short of demonstrating that the Ohio Supreme Court failed to consider, gave short shrift to, or unreasonably construed any of these factors. This Court's review of the transcript of the suppression hearing revealed no indication that the detectives' questioning of Petitioner occurred under harsh conditions or an oppressive atmosphere. Officer Diersing estimated that the dimensions of the interview room were ten feet by ten feet. (Tr. Vol. 2, at 279.) Officer Corbett testified that the interview room did not contain a telephone, may have had a tape-recording device, and intermittently had its door open so Petitioner could smoke. (Tr. Vol. 2, at 244.) The record does not reflect that the room was unduly hot or cold. That the interview rooms were located in the basement hardly constitutes a harsh condition or oppressive setting. (Tr. Vol. 2, at 239-40, 263-64.) The only sign of aggression on the part of officers is Officer Corbett recalling that he might have confronted Petitioner about what Officer Corbett perceived as a lack of truthfulness based on the results of several voice stress tests that police administered to Petitioner. (Tr. Vol. 2, at 246-47.) The record contains no indication that any officers made threats or promises to Petitioner, or called Petitioner a liar. (Tr. Vol. 2, at 230-31; 317; 323; 340.) Officers repeatedly offered Petitioner food, drinks, and breaks. (Tr. Vol. 2, at 219, 220, 226, 234, 328.) At no time did Petitioner complain of any discomfort. (Tr. Vol. 2, at 220.) Although Detective Dilbert testified that Petitioner may have once mentioned being tired during the June 27-28 questioning, Detective Dilbert testified that Petitioner never stopped answering questions or indicated that he wanted to stop. (Tr. Vol. 2, at 317.) It is telling that, at the conclusion of the questioning that began in the mid-afternoon hours of June 27 and ended around 5:00 a.m. on June 28, Petitioner voiced no complaints to police (Tr. Vol. 2, at 291) and actually expressed his gratitude to Sergeant Boeing and said the police could contact him if there was anything else they needed from him. (Tr. Vol. 2, at 288.)

Petitioner received *Miranda* warnings on the evening of June 26, when police learned

147

during a break from their questioning that Petitioner had a prior conviction for contributing to the delinquency of a minor, stemming from his exposing himself to two young girls. (Tr. Vol. 2, at 222.) Petitioner indicated that he understood his rights, proceeded to read a rights form, and then signed a waiver of his rights. (*Id*. at 223-24.) Petitioner received *Miranda* warnings again once he voluntarily returned to the police station in the early afternoon hours of July 3. (*Id*. at 269.) Again, Petitioner also read a rights form and signed a waiver of his rights. (*Id*. at 269-70.) After Petitioner stated in the early evening hours of July 3 that he knew where the victim was, led police to her body, and then returned to the police station, detectives reminded Petitioner of the rights that he had received and waived before detectives commenced obtaining a taped statement from Petitioner. (*Id*. at 336.) Petitioner received *Miranda* warnings when they were appropriate. Each time Petitioner received *Miranda* warnings, he also read and waived them. At no time prior to Petitioner receiving *Miranda* warnings on the evening of June 26 were *Miranda* warnings required because Petitioner had not been under arrest and in custody. The Ohio Supreme Court's decision finding as much was not incorrect, much less unreasonable.

It is true that police employed deception in getting Petitioner to agree to report to the police station, straight from working a full shift, shortly after Noon on July 3. Police asked Petitioner to come to the police station so that they could take a tire impression from his vehicle, although they had no need for one or intended to do so. Detective Boeing admitted to employing the ruse during the suppression hearing. (*Id*. at 305.) That said, the record fully supports the Ohio Supreme Court's conclusion that police may have used deception to get Petitioner to the police station, but not to obtain his confession. As this Court observed earlier, by all indications, Petitioner would have responded to the police station if just asked. Thus, the nexus between the police's use of deception and the police obtaining Petitioner's confession is far too tentative to be a significant factor in determining whether the totality of the circumstances demonstrated that overreaching by the police overcame Petitioner's will. That being so, the police's use of deception in this case does little to undermine the voluntariness of Petitioner's *Miranda* waivers

and consents to search.

The record reflects that police subjected Petitioner to two lengthy periods of questioning: approximately fifteen hours on June 27-June 28 and approximately eight hours total on July 3. (Tr. Vol. 2, at 242-43, 281, 283, 336-40.) The record also reflects that when Petitioner responded to the police station a little after Noon on July 3, he had just completed a work shift beginning at 2:00 a.m. and ending around Noon. (*Id*. at 249, 273, 304-05, 321, 360-62.) These factors, viewed in a vacuum, might give cause for concern. But viewed in the context of the totality of the circumstances, these factors do not weigh in favor of a conclusion that Petitioner's *Miranda* waivers and consents to search were involuntary.

The record demonstrates clearly and consistently that not once during either session of questioning did Petitioner ever ask to stop, ever ask for a break, or ever ask for medical attention. (*Id*. at 220, 229, 234.) Police repeatedly offered Petitioner food, drinks, cigarettes, and use of a restroom. (*Id*. at 219-20, 226, 234, 328.) Only once or twice did Petitioner remark that he was tired (*Id.* at 362); the Court reiterates, however, that he never asked to stop or gave any indication that he was over-tired to the point of being susceptible to having his will overborne. (*Id*. at 317.) Thus, the length of questioning that Petitioner endured was a factor to be considered, which the Ohio Supreme Court did, but the totality of the circumstances, which includes the length of questioning, demonstrates that Petitioner's *Miranda* waivers and consents to search were voluntary, knowing, and intelligent.

The record reflects that Petitioner was forty-eight years old at the time police questioned him. (Tr. Vol. 1, at 12.) The record also reflects that, although Petitioner was by no means a career criminal and did not appear to have spent any significant time in prison, Petitioner did have some experience with the criminal justice system. He had a prior conviction for contributing to the delinquency of a minor, stemming from an incident during which he had exposed himself to two young girls. (Tr. Vol. 2, at 221, 350.) He had also been the subject of other complaints and investigations involving improper sexual conduct with children. Although

149

little evidence was developed during the suppression hearing demonstrating Petitioner's low intellect, more evidence was developed during trial that Petitioner had a diminished intellectual capacity. (Tr. Vol. 6, at 1118, 1122, 1125; Tr. Vol. 7, at 1206, 1212, 1291.) Petitioner told police that he could read well, on June 26 wrote an expansive time-line rationally documenting his whereabouts and actions on the day the victim disappeared, and on July 3 provided to officers precise directions as to where they could find the victim's body. Petitioner answered questions and interacted with the detectives in a manner that indicated that he fully understood what was going on, the questions he was asked, and the rights that officers read and explained to him. During the June 26 interview, according to Officer Corbett, Petitioner was talkative about his childhood, his nephew, and other matters, such that officers often allowed Petitioner to direct where the conversation went. All of these occurrences demonstrated an ability on the part of Petitioner to recall events and communicate rationally. (Tr. Vol. 2, at 217, 224, 226-27, 231, 234, 270, 318, 321, 340, 381.) Petitioner's low intellect was a factor to be considered, and the Ohio Supreme Court did consider it; the totality of the circumstances, however, which includes Petitioner's low intellect, demonstrates that Petitioner's *Miranda* waivers and consents to search were voluntary, knowing, and intelligent.

For the foregoing reasons, the Court cannot agree with Petitioner's claims and finds that the state court decisions were not unreasonable. Accordingly, the Court **DENIES** Petitioner's tenth ground for relief.

The Court concludes that Petitioner's tenth ground for relief satisfies the requirements for a certificate of appealability. Because of the fact-intensive nature of the claim, the many factors to consider in determining voluntariness, and the fact that Petitioner's confession was the linchpin in the state's case against him, the Court is of the view that reasonable jurists could find its decision debatable or wrong. The Court accordingly certifies for appeal Petitioner's tenth ground for relief.

I.   <u>**Eleventh Ground for Relief**</u>: **Admission of evidence which had**

150

> **no bearing on Petitioner's guilt, and which was only offered to
> establish Petitioner's bad character denied Petitioner a fair
> trial and freedom from cruel and unusual punishment in
> violation of the Fifth, Eighth and Fourteenth Amendments to
> the United States Constitution.**

(Petition, ECF No. 11-5, at ¶¶ 107-112.)  Petitioner argues that the trial court erred, to the denial

of his right to fundamental fairness, in admitting evidence–a photograph of stuffed animals that

police found in Petitioner's apartment–that was not relevant to the charged crimes and that

served only to establish Petitioner's bad character.  (*Id*. at ¶¶ 107-109.)  In the second component

of his claim, Petitioner alleges prosecutorial misconduct for the prosecutor's reference to the toys

as "tools of the trade" of a pedophile in urging the jury to find that Petitioner's actions were

cold-blooded and planned.  (*Id*. at ¶¶ 110-111.)  In its February 25, 2009 Opinion and Order

addressing procedural default, this Court deferred ruling on Respondent's argument that

paragraphs 107 through 109 raised only a state law claim and were not cognizable in federal

habeas corpus.  (ECF No. 25, at 44-45.)  This Court also dismissed the prosecutorial misconduct

arguments that Petitioner set forth in paragraphs 110 through 111 on the ground that Petitioner

defaulted those claims when he failed to object at trial.  (*Id*. at 45-48.)

Petitioner presented this claim to the Ohio Supreme Court on direct appeal in his sixth

proposition of law.  The Ohio Supreme Court rejected it as follows:

> In proposition of law VI, Lynch complains that the trial court erred by
> admitting into evidence a photograph depicting the stuffed children's toys found
> in his apartment.  Lynch argues that the prosecution presented this picture as
> evidence of wrongdoing that should not have been admitted.

> The police searched Lynch's apartment and seized about a dozen stuffed
> animals from his bedroom closet.  A photograph of these stuffed animals was
> admitted into evidence at trial.

> However, Lynch's possession of stuffed animals could not reasonably be
> considered evidence of other crimes, wrongs or bad acts.  See *State v. Wickline*
> (1990), 50 Ohio St.3d 114, 120, 552 N.E.2d 913.  Moreover, Lynch's possession
> of the stuffed toys at the time of Love's murder was relevant to the facts of the
> crime.  See *State v. Hirsch* (1998), 129 Ohio App.3d 294, 308, 717 N.E.2d 789.
> Lynch admitted that Love was inside his apartment prior to the murder, and the
> toys helped explain how Lynch may have lured the six-year-old girl into his
> apartment on the day she was murdered.  We find that the trial court did not abuse
> its discretion in admitting this evidence.  See *State v. Hartman* (2001), 93 Ohio

St.3d 274, 281, 754 N.E.2d 1150 (the admission of relevant evidence is within the sound discretion of the trial court.)

Lynch also argues that the prosecutor improperly referred to Lynch's stuffed animals during the state's penalty-phase closing argument. Here, Lynch objects to the prosecutor's comments that "toys and popcorn, those are the tools of the trade for the child molester, and that's why he has those and that's why he chose to have those items with him. It was his free choice; no addiction and no compulsion made him do that. He chose." However, Lynch failed to object at trial to the argument he now complains about and thus waived all but plain error. *State v. Wade* (1978), 53 Ohio St.2d 182, 7 O.O.3d 362, 373 N.E.2d 1244, paragraph one of the syllabus.

The prosecutor's rebuttal comments responded to earlier defense arguments suggesting that Lynch's behavior as a pedophile was not a matter of choice. The defense counsel argued that Lynch "has had a lifetime of secrets, shameful urges and compulsions. Pedophiles are not generally killers. * * * What happened, his behavior was out of control. He was fulfilling a fantasy and things went out of control, and I think he's appalled by what he did also. He panicked." The defense also argued that "this is not something that anyone would wish for themselves. It's not so simple with this compulsion to simply turn on the faucet and turn it off. It does not work that way."

Here, the prosecutor simply pointed out that Lynch made choices (i.e., living at an apartment complex populated with children and possessing children's toys) that led to Love's murder. Thus, the prosecutor's rebuttal argument represented fair comment and was not plain error. See *State v. Murphy* (1992), 65 Ohio St.3d 554, 572, 605 N.E.2d 884. For these reasons, we reject proposition VI.

*Lynch*, 98 Ohio St. 3d at 525-26, 787 N.E.2d 1201-02; (App. Vol. 3, at 269-70.)

Petitioner argues that the Ohio Supreme Court's decision contravened or unreasonably applied clearly established federal law as determined by the United States Supreme Court, or involved an unreasonable determination of the facts. Petitioner reasons that the evidence was not relevant because there was no testimony suggesting that Petitioner used the toys in any way during the commission of the offenses. (ECF No. 56, at 80-81.) Petitioner also notes that when defense counsel objected to the prosecutors' introduction of a photograph of the stuffed animals and again when the prosecution offered the exhibit into evidence, the trial court denied the motions without any explanation. Finally, Petitioner argues that "[i]f the jury had been aware of Petitioner's organic brain dysfunction and mental retardation, as addressed in Ground Seven above, Lynch would have been better able to defend himself against such irrelevant and unfairly

152

prejudicial charges of bad character." (*Id*. at 81.)

   Respondent reiterates his argument that Petitioner's claim alleges only an erroneous state evidentiary ruling, rather than a federal constitutional violation, and is accordingly not cognizable in federal habeas corpus. (ECF No. 57, at 97.) To the extent that Petitioner now is arguing that the trial court's evidentiary ruling rose to the level of a denial of due process, Respondent asserts that Petitioner never presented that federal aspect of his claim to the state courts. Respondent also argues that this Court cannot consider Petitioner's reference to his organic brain impairment and mental retardation because Petitioner never presented those arguments to the state courts. (*Id*.) Finally, Respondent argues that Petitioner fails to demonstrate that the Ohio Supreme Court's decision rejecting Petitioner's claim contravened or unreasonably applied clearly established federal law as determined by the Supreme Court or involved an unreasonable determination of the facts. (*Id*. at 97-98.) Specifically, Respondent argues that Petitioner fails to provide any applicable United States Supreme Court precedent in support of his claim and that indeed, "there 'is no Supreme Court precedent establishing that a state violates due process by allowing the admission of other acts evidence.' " (*Id*. at 98 (quoting *McCall v. Palmer*, No. 2:08-CV-10489, 2010 WL 2287435, at *5 (E.D. Mich. June 4, 2010).) Respondent further asserts the reasonableness of the Ohio Supreme Court's finding that the evidence in question could not reasonably be regarded as evidence of other crimes or bad acts and that the evidence was relevant to establish how a 6-year-old girl came to be in the apartment of a 49-year-old self-admitted pedophile. (ECF No. 57, at 98.)

   In his reply memorandum, Petitioner in large part rests on his main merit brief. Petitioner does dispute Respondent's argument that Petitioner failed to federalize his claim when he presented it to the Ohio Supreme Court on direct appeal. Petitioner asserts that the last sentence of his sixth proposition of law on direct appeal included an allegation that admission of evidence deprived him of his rights to due process of law and to be free from cruel and unusual punishment under the state and federal constitutions. (*Id*. (citing App. Vol. 3, at 54).)

153

The only issue before the Court is whether the Ohio Supreme Court's decision rejecting the admission-of-evidence component of Petitioner's eleventh ground for relief contravened or unreasonably applied clearly established Supreme Court precedent or involved an unreasonable determination of the facts. To be clear, in asserting that Petitioner did not "federalize" his claim when he presented it on direct appeal, Respondent argues not that Petitioner waived the claim by failing to fairly present the claim as a federal constitutional claim, but only Petitioner failed to allege that the admission of the evidence in question was an error that rose to the level of denying Petitioner fundamental fairness. To resolve that issue, the Court turns to the law governing habeas corpus review of state court evidentiary rulings.

It is well settled that federal habeas corpus review of state court evidentiary rulings is extremely limited. *See, e.g., Waters v. Kassulke*, 916 F.2d 329, 335 (6th Cir. 1990). In order for a state court evidentiary ruling to rise to the level of a constitutional violation, the ruling must violate a bedrock principle of justice sufficient to deprive the defendant of a fundamentally fair trial. *Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007); *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000); *Serra v. Michigan Dep't of Corr.*, 4 F.3d 1348, 1354 (6th Cir. 1993). The Court emphasizes that "the Supreme Court has defined 'very narrowly' the category of infractions that violates 'fundamental fairness.' " *Bey*, 500 F.3d at 522 (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)). As another district court within the Sixth Circuit has explained, "[t]he admission of evidence violates due process '[o]nly if there are no permissible inferences the jury may draw from the evidence[.]' " *Sutton v. Bell*, 683 F. Supp. 2d 640, 692 (E.D. Tenn. 2010) (quoting *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991)).

In the instant case, the Ohio Supreme Court rejected Petitioner's claim challenging the trial court's admission of a photograph depicting stuffed animals and other children's toys, reasoning both that the evidence "could not reasonably be considered evidence of other crimes, wrongs or bad acts" and that the evidence was relevant insofar as it "helped explain how Lynch may have lured the six-year-old girl into his apartment on the day she was murdered." *Lynch*, 98

154

Ohio St. 3d at 525, 787 N.E.2d at 1202; (App. Vol. 3, at 269.)  This Court might conclude

otherwise if it were reviewing the issue as a matter of first impression.  In this Court's view, the

probative value of evidence of Petitioner's possession of children's toys was minimal because

there was no testimony or evidence suggesting that Petitioner used those stuffed animals to lure

Mary Jennifer Love into his apartment.  In fact, the Ohio Supreme Court had found "highly

relevant" testimony from Love's mother about the trusting nature of the little girl as an

explanation for how Petitioner may have lured her into his apartment.  Petitioner in his

confession never suggested that he had used the toys to entice Love into his apartment.  The

evidence was prejudicial for arguably changing the face of the case from one, according to

Petitioner, in which Petitioner acted impulsively in the instant case and gave into urges that he

had largely managed to resist, to one, according to the prosecution, in which Petitioner

knowingly and deliberately possessed items for the purpose of luring children into his apartment.

Even if this Court were to disagree with the Ohio Supreme and take a different view of the

relevancy of the challenged evidence, that is not the standard for granting habeas corpus relief.

*See, e.g., Schoenberger v. Russell*, 290 F.3d 831, 836 (6th Cir. 2002) (expressing the court's

"general reluctance to second-guess state court evidentiary rulings in a habeas proceeding.").

*See also Hairston v. Blades*, No. 1:00-CV-303-BLW, 2011 WL 121 9267, at *6 (D. Idaho Mar.

30, 2011) ("it is not this Court's place on habeas review in a post-AEDPA case to quibble about

the finer points of Idaho's evidentiary rules, or to second-guess the weighing of the probative

value of the evidence against its prejudicial effect."); *Noling v. Bradshaw*, No. 5:04 CV 1232,

2008 WL 320531, at *26-27 (N.D. Ohio Jan. 31, 2008) (finding, even where state's highest court

found that admission of "other acts" evidence was abuse of discretion, that evidence was not

prejudicial sufficient to warrant habeas relief).

     As noted above, the admission of evidence violates due process only if the admission

rises to the level of denying the accused fundamental fairness and so tainting the trial that its

result cannot be trusted.  The Court cannot so find in the instant case.  In view of the "very

narrow[]" category of evidence whose admission rises to the level of fundamental fairness, the Court concludes that any unfair prejudice that the evidence was posed was more than outweighed by the strength of the evidence against Petitioner in the culpability phase, including and especially Petitioner's own confession.  Even if it were within the province of this Court to find that the trial court abused its discretion in admitting the evidence–a finding this Court is not making–the Court is not persuaded that evidence of Petitioner's possession of stuffed animals was a critical factor in the jury finding Petitioner guilty sufficient to support habeas corpus relief. *See Neal v. Cain*, 141 F.3d 207, 214 (5th Cir. 1998) (even "erroneous admission of prejudicial evidence will justify habeas relief only if the admission was a crucial, highly significant factor in the defendant's conviction").  Of equal weight in foreclosing relief on Petitioner's claim is, as Respondent correctly observes, the apparent absence of any United States Supreme Court decisions directly addressing the constitutionality of a trial court's admission of evidence of the accused's other crimes or bad acts.  *See Bey v. Bagley*, 500 F.3d at 520 (recognizing that "the state court's admission of 'other acts' evidence was not contrary to clearly established Supreme Court precedent, inasmuch as '[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence.' " (quoting *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003))); *Sutton*, 683 F. Supp. 2d at 693 ("Sutton does not cite to, nor does research reveal, any Supreme Court cases directly addressing the constitutionality of a trial court admitting evidence of a defendant's other crimes or bad acts.").

For the foregoing reasons, the Court does not conclude that the Ohio Supreme Court's decision rejecting Petitioner's claim challenging the trial court's admission of evidence of Petitioner's possession of stuffed animals and other children's toys contravened or unreasonably applied clearly established federal law as determined by the United States Supreme Court. Accordingly, the Court **DENIES** Petitioner's eleventh ground for relief.

The Court is satisfied that Petitioner's eleventh ground for relief meets the conditions for

156

a certificate of appealability.  Because this Court finds questionable whether the trial court

abused its discretion in admitting the evidence and in view of the risk that the evidence painted

Petitioner as a predator–a scenario that was marginally relevant and highly prejudicial–the Court

is satisfied that reasonable jurists could find its decision debatable and that the issue deserves

further consideration on appeal.  The Court accordingly certifies for appeal Petitioner's eleventh

ground for relief.

> **J.**    **Twelfth Ground for Relief: The trial court erred by refusing to allow Petitioner's proffered evidence in mitigation demonstrating that he would be incarcerated for life. Petitioner's rights to a fair trial and due process as guaranteed by the Fifth, Sixth, Ninth and Fourteenth Amendments to the United States Constitution were violated.**

(Petition, ECF No. 11-5, at ¶¶ 113-118.)  Petitioner argues that the trial court erred to his

prejudice when it refused to allow him to present certain evidence explaining to the jury the

possible sentences that Petitioner would receive for the other offenses the jury found him guilty

of committing.  Petitioner sought to demonstrate to the jury that because of the other sentences

he would receive for his noncapital offenses, "imposition of the death penalty was not necessary

to insure that Petitioner would never be free to commit other offenses."  (*Id*. at ¶ 115.)  Petitioner

asserts that in view of all the evidence demonstrating his pedophilia and other involvements in

sexual activity with children, the prosecution made Petitioner's future dangerousness an issue

before the jury and the court.  For that reason, Petitioner asserts, "[a]ny information bearing on

his ability to attain release was, therefore, relevant to the jury's decision process."  (*Id*. at ¶ 117.)

The record demonstrates that prior to the commencement of the mitigation phase and

following a discussion in chambers of the mitigation-phase jury charge, defense counsel made

the following suggestion:

> MR. KELLER:    In other death penalty cases, we have blackboarded all the offenses and have said, for example, in a rape case, you can get from three to ten years, and that's something that Your Honor will consider, and you go on down the line in addition to the imposition of either a life sentence or a death penalty, but to give them a full disclosure of what the individual is facing.

(Tr. Vol. 8, at 1560.)  The prosecution offered a "strenuous objection."  (*Id*. at 1560-61.)

157

Ultimately, the trial court held that defense counsel would not be permitted to discuss any

possible sentences on any other charges beyond the aggravated murder charges.  (*Id*. at 1562.)

When defense counsel asked whether the trial court would permit them to make reference to the

fact that the trial court alone would handle other sentences for the other convictions, the trial

court answered, "[a]s long as you don't mention what the possible sentence would be."  (*Id*. at

1562-63.)  During the mitigation-phase closing arguments, defense counsel stated:

> What are we talking about?  We're talking about protecting society.  Do
> you want Mr. Lynch on the street again or where there could be a victim of sexual
> abuse?  No.  This man will be 50 years old next month.  What I would suggest is
> that – and I want you to think about it – if you gave him, for example, 25 years,
> full sentence, he would be 75 years old.  And that doesn't take into consideration
> the issue of punishment as it relates to the others, the aggravated circumstances.
> The rape, the kidnapping, the gross abuse of a corpse, I can't talk about those, and
> that's for His Honor to do at a different time.

(Tr. Vol. 9, at 1782-83.)  Defense counsel proceeded to remark that at the very least, the jury

could recommend a sentence of life imprisonment with parole eligibility in twenty-five years,

which would be in addition to anything the trial court would impose for the other convictions.

Beyond that, defense counsel argued, the jury could guarantee that Petitioner would spend the

rest of his life in prison by recommending a life sentence without the possibility of parole.

Petitioner presented a claim on direct appeal challenging the trial court's refusal to allow

him to present more extensive evidence about the possible sentences that he would receive.  The

Ohio Supreme Court rejected Petitioner's claim as follows:

> In proposition of law XIII, Lynch argues that the trial court violated his
> due process rights by refusing to provide the jury with information about potential
> sentences for his noncapital offenses.

> The trial court refused the defense request to present the jury with
> information about Lynch's possible sentence for rape, kidnapping, and gross
> sexual imposition.  However, the trial court permitted the defense to note in
> closing argument that Lynch faced additional jail time "[a]s long as you don't
> mention what the possible sentence would be."

> First, Lynch argues that information about sentencing for Lynch's
> noncapital offenses was relevant mitigation that he was entitled to present to the
> jury.  "In Eighth Amendment jurisprudence, mitigating factors are facts about the
> defendant's character, background, or record, or the circumstances of the offense,
> that may call for a penalty less than death."  *State v. White* (1999), 85 Ohio St.3d

158

433, 448, 709 N.E.2d 140; see, also, *Franklin v. Lynaugh* (1988), 487 U.S. 164, 174, 108 S.Ct. 2320, 101 L.Ed.2d 155 (plurality opinion).  However, "the length of incarceration to be served by the defendant before parole eligibility is not a fact about the defendant's character or background, or about the circumstances of the offense."  *State v. White*, 85 Ohio St.3d at 448, 709 N.E.2d 140; *O'Dell v. Netherland* (1997), 521 U.S. 151, 162-168, 117 S.Ct. 1969, 138 L.Ed.2d 351.  Thus, information about sentencing for noncapital offenses is not a mitigating factor.

Second, Lynch argues that *Simmons v. South Carolina* (1994), 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133, permitted the defense to provide the jury with complete information about his sentencing for noncapital offenses, since it showed that he would never be released from jail.  *Simmons* holds that in a capital case, "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, *due process* requires that the sentencing jury be informed that the defendant is parole ineligible."  (Emphasis added.)  Id. at 156, 114 S.Ct. 2187, 129 L.Ed.2d 133 (plurality opinion).  In *Simmons*, life imprisonment without parole was the sole alternative to death–a point stressed by the concurring judges who cast the deciding votes in that case.  Id. at 176-177, 114 S.Ct. 2187, 129 L.Ed.2d 133 (O'Connor, J., concurring); *State v. White*, 85 Ohio St.3d at 449, 709 N.E.2d 140.

In the case sub judice, the jury had the choice of sentencing Lynch to death, life without parole, life with parole eligibility after 30 years, or life with parole eligibility after 25 years.  Thus, unlike in *Simmons*, the jury in this case was not faced with the notion that the only way to keep Lynch from getting out of prison was to sentence him to death.

During the penalty-phase closing argument, the defense pointed out that Lynch was assured of spending the rest of his life in jail because he faced additional jail time for his noncapital offenses.  The defense argued:

"Do you want Mr. Lynch on the street again or where there could be a victim of sexual abuse?  No.  This man will be 50 years old next month.  What I would suggest is that * * * if you gave him, for example, 25 years, full sentence, he would be 75 years old.  And that doesn't take into consideration the issue of punishment as it relates to the others, the aggravating circumstances.  The rape, the kidnapping, the gross abuse of a corpse, I can't talk about those, and that's for His Honor to do at a different time.  So, at the very least, you would be talking about 25 full years, plus in addition to whatever His Honor would give.  And if you go beyond that, you can guarantee that there is life without parole, and that's punishment.  And let nobody suggest to you that being in prison for the balance of your life is not punishment."

Thus, the defense assured the jury that "future dangerousness" was not an issue because Lynch would spend the rest of his life in jail after he was sentenced for both the capital and noncapital offenses.  In view of the defense argument and the trial court's instructions on sentencing options, we do not believe that the jury recommended the death penalty based on the false belief that Lynch might otherwise be released on parole some day.  Thus, we find that the record does not support Lynch's due process claim.  Accordingly, we rejected proposition XIII.

*Lynch*, 98 Ohio St. 3d at 532-33, 787 N.E.2d at 1207-08; (App. Vol. 3, at 273-74.)

Petitioner argues that the Ohio Supreme Court's decision involved an unreasonable application of *Simmons v. South Carolina*, 512 U.S. 154 (1994). (ECF No. 56, at 87-90.) Petitioner argues that *Simmons*, *Shafer v. South Carolina*, 532 U.S. 36 (2001), and *Kelly v. South Carolina*, 534 U.S. 246 (2002), support his argument that because the state during the mitigation phase made Petitioner's future dangerousness an issue, "[d]ue process required informing the jury that a life sentence meant no chance of parole, ever." (ECF No. 56, at 87.) "Lynch's counsel," Petitioner insists, "should have been allowed to argue this point so the jury would not think that one day Lynch could get released on parole." (*Id*.)

Petitioner takes issue with several aspects of the Ohio Supreme Court's decision. First, Petitioner points to the Ohio Supreme Court's holding that Petitioner's case was distinguishable from *Simmons* because " 'unlike in Simmons, the jury in this case was not faced with the notion that the only way to keep Lynch from getting out of prison was to sentence him to death.' " (ECF No. 56, at 88 (quoting *Lynch*, 98 Ohio St. 3d at 533, 787 N.E.2d at 1208).) That holding, Petitioner argues, "ignores the reasoning of Simmons." (ECF No. 56, at 88.) Petitioner explains that the United States Supreme Court specifically held that " '[t]he Due Process Clause does not allow the execution of a person 'on the basis of information which he had no opportunity to deny or explain.' " (*Id*. (quoting *Simmons*, 512 U.S. at 161).) Petitioner also emphasizes the United States Supreme Court's remark in *Simmons* that where the risk that the jury will not or cannot follow the jury instructions is so great, the practical and human limitations on the jury system cannot be ignored.

Petitioner next challenges the Ohio Supreme Court's finding that Petitioner's defense counsel had assured the jury that Petitioner's future dangerousness was not an issue by asserting that Petitioner would spend the rest of his life in prison after he was sentenced on both the capital and non-capital convictions. Petitioner argues that the Ohio Supreme Court's finding ignored the testimony that the state elicited and the closing arguments that the state advanced

160

emphasizing Petitioner's future dangerousness. Petitioner also argues that the finding ignored the fact that defense counsel, in Petitioner's view, failed to argue clearly that Petitioner would never be released. Even assuming defense counsel had argued more succinctly that Petitioner would never be released, Petitioner argues, that would not have fulfilled *Simmons*' requirement that the jury be fully informed.

Respondent asserts that "[d]espite the trial court's ruling on the future sentencing for the noncapital offenses, the defense still made the point in closing argument that Lynch would spend the rest of his life in jail for his noncapital offenses[.]" (ECF No. 57, at 100.) Respondent proceeds to argue that the Ohio Supreme Court's decision did not turn on any factual determination, much less an unreasonable one as described in § 2254(d)(2). Respondent also argues that the Ohio Supreme Court's decision did not contravene or unreasonably apply *Simmons*. Specifically, according to Respondent, the clearly established federal law that *Simmons* created was: "[W]here the State puts the defendant's future dangerousness in issue, and the only available alternative sentence to death is life imprisonment without possibility of parole, due process entitles the defendant to inform the capital sentencing jury that he is parole ineligible." (ECF No. 57, at 103.) Respondent insists that Petitioner's case, by virtue of the fact that Petitioner's jury was not faced with only a death sentence and a life-without-parole sentence, was "not at all like *Simmons*[.]" (*Id.*) Also unlike in *Simmons*, according to Respondent, the jury instructions in Petitioner's case expressly informed the jury that one of the life sentence options was "*without the possibility of parole*." (ECF No. 57, at 104 (quoting Tr. Vol. 10, at 1810).) The jury in *Simmons*, Respondent argues, was not so informed.

Respondent also argues both that the trial court did not "tie the defendant's hands while forcing him to sustain hit after hit from the prosecution's advantageous free reign on the topic of future dangerousness" and that it was Petitioner, rather than the state, that put before the jury the issue of Petitioner's future dangerousness. (ECF No. 57, at 103.) Respondent argues that Petitioner's argument actually invited the Ohio Supreme Court to expand *Simmons*' holding,

161

which not only would have violated the proscription against application of a new rule of constitutional criminal law that *Teague v. Lane*, 489 U.S. 288 (1989), established, but also belies any suggestion that the Ohio Supreme Court's refusal amounted to an unreasonable application of *Simmons*. Finally, Respondent argues that no clearly established federal law exists to support Petitioner's proposition that the sentences that a defendant will receive on noncapital offenses amount to constitutionally relevant mitigating evidence.

Petitioner's reply memorandum does not include any arguments in response to Respondent's contentions. (ECF No. 58, at 11-12.)

For the reasons that follow, this Court concludes that Petitioner has not demonstrated that the Ohio Supreme Court's decision rejecting his claim contravened or unreasonably applied clearly established federal law because no clearly established federal law supports the position that Petitioner advances: namely, that once the prosecution made Petitioner's future dangerousness an issue before the jury, due process required informing the jury that a life sentence meant that Petitioner would have no chance of parole. Petitioner's reliance on *Simmons v. South Carolina* is misplaced in two respects. First, *Simmons* stands only for the principle that "where the defendant's future dangerousness is at issue, and State law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." *Simmons*, 512 U.S. at 156. To the extent that Petitioner is arguing that he was entitled to a "parole-ineligible" instruction, his argument fails because he received such an instruction, repeatedly. The trial court's mitigation-phase jury instructions included the following statements:

> You will decide whether Ralph L. Lynch shall be sentenced to life in prison without parole eligibility for 25 full years, to life imprisonment without parole eligibility for 30 full years, *or to life imprisonment without the possibility of parole*, or to death. (Tr. Vol. 10, at 1799 (emphasis added).)

> \*   \*   \*

> (Describing the life sentenced alternatives): The sentence of life imprisonment without parole eligibility until 25 full years of imprisonment have been served, the sentence of life imprisonment without parole eligibility until 30

162

full years of imprisonment have been served, *or life imprisonment without the possibility of parole*.  (*Id*. at 1810 (emphasis added).)

\*     \*     \*

Third form verdict with Count 2.  "We, the jury, being duly impaneled and sworn, find that the State of Ohio failed to prove that the aggravating circumstances Ralph L. Lynch was found guilty of committing were sufficient to outweigh the mitigating factors present in this case and, therefore, that *the sentence of life imprisonment without parole eligibility* shall be imposed upon Ralph L. Lynch," and 12 signature lines provided there.  (*Id*. at 1815 (emphasis added).)

To the extent that one of the life sentence alternatives available to the jury was a life sentence *without the possibility of parole*, the trial court unambiguously and repeatedly informed the jury as much.  By way of contrast, the cases upon which Petitioner relies–*Simmons*, *Kelly*, and *Shafer*–addressed South Carolina's long-standing policy of both having as the sole alternative to a death sentence a life sentence without parole <u>and</u> refusing to instruct juries about the parole ineligibility.  *See Shafer*, 532 U.S. at 48-49.  That was not the case at Petitioner's trial.  Petitioner's jury received a parole-ineligibility instruction as to the life sentence alternative where such an instruction applied.  Petitioner therefore cannot establish a contravention of *Simmons*.

Petitioner misplaces reliance on *Simmons* in a second respect.  Neither *Simmons* nor any of the other cases that Petitioner cites stand for the broad principle that the Constitution entitles a death-eligible defendant, whose future dangerousness is at issue, to present evidence or receive an instruction informing the jury about other sentence terms for which the defendant is eligible for accompanying non-capital convictions.  *Cf. Sutton v. Bell*, 683 F. Supp. 2d 640, 719 (E.D. Tenn. 2010) ("*Simmons* does not address the order in which a sentence is served, but instead, addresses parole eligibility.").  Petitioner thus cannot establish that the Ohio Supreme Court's decision approving of the trial court's refusal to allow such evidence or give such an instruction contravened or unreasonably applied *Simmons* or any other clearly established federal law as determined by the United States Supreme Court.

Finally, the Court notes, in spite of the foregoing, that the trial court did not absolutely

163

hamstring defense counsel from informing the jury of the likelihood that, even in the absence of a death sentence, Petitioner would remain in prison for the rest of his life. The trial court permitted, and defense counsel in fact made, reference to the fact that Petitioner would receive other sentences for his non-capital convictions, sentences that the trial court would solely impose. (Tr. Vol. 8, at 1562-63; Tr. Vol. 10, at 1782-83.) In addition to making that point, defense counsel also emphasized that Petitioner was already 50 years old, that even the least of the life sentence alternatives providing for parole eligibility after 25 full years would find Petitioner at the age of 75 years old before he would be eligible for parole, and that the jury could guarantee that Petitioner would spend the rest of his life in prison simply by recommending the life sentence alternative that provided for no parole eligibility. If defense counsel failed to make those points more clearly or forcefully, that failure simply is not of constitutional magnitude. Thus, to the extent that Petitioner's future dangerousness was an issue, due to testimony about his proclivity to engage in sexual acts with children, the Court concludes that there was little risk in the instant case that Petitioner's jury was misled into believing that recommending a death sentence was the only way to ensure that Petitioner would never be released and pose a risk to children.

For the foregoing reasons, the Court does not conclude that the Ohio Supreme Court's decision rejecting Petitioner's claim challenging the trial court's refusal to allow evidence or give an instruction about the other sentences that Petitioner would receive contravened or unreasonably applied clearly established federal law as determined by the United States Supreme Court. Accordingly, the Court **DENIES** Petitioner's twelfth ground for relief.

The Court is of the view that Petitioner's twelfth ground for relief does not meet the requirements for a certificate of appealability. Controlling case law appears to foreclose relief definitively on Petitioner's claim and this Court can conceive of no scenario under which Petitioner would be entitled to present the evidence he sought to present–evidence about the other sentences that he would receive. The Court accordingly denies a certificate of

164

appealability on Petitioner's twelfth ground for relief.

>        **K.**        **Thirteenth Ground for Relief:** **The trial court's refusal to allow Petitioner's unsworn statement to be given in a question and answer format where Petitioner's mental deficiencies and difficulty in expressing himself made it impossible for him to make an effective presentation to the jury violated his rights to due process and a fair trial in violation of the Fifth, Sixth, Ninth and Fourteenth Amendments to the United States Constitution.**

(Petition, ECF No. 11-5, at ¶¶ 119-125.)  Petitioner asserts that the trial court's refusal to allow

him to give his unsworn statement in a question-and-answer format ran afoul of the wide latitude

and flexibility in the presentation of mitigation evidence that the Ohio legislature intended and

thwarted the full exercise of Petitioner's right to allocution.  Petitioner explains that prior to the

commencement of the mitigation phase, his defense counsel requested permission to present

Petitioner's unsworn statement in a question-and-answer format.  Defense counsel supported

their request with findings by mental health experts regarding Petitioner's low IQ and relating

their own observations of his difficulty in expressing himself.  The trial court denied Petitioner's

request.  "As a result," Petitioner explains, "Petitioner made an unsworn statement which covers

less than a page of transcript and succeeds in expressing only a generalized remorse and

confusion."  (*Id.* at ¶ 121.)  Petitioner argues that the trial court's failure to allow defense counsel

to present Petitioner's unsworn statement via question-and-answer format violated Petitioner's

rights to due process and freedom from cruel and unusual punishment.

>        Petitioner challenged the trial court's ruling in his fourteenth proposition of law on direct

appeal, both as a claimed violation of his federal constitutional rights and as a claimed abuse of

discretion.  The Ohio Supreme Court rejected the constitutional component of Petitioner's claim

as follows:

>        In proposition of law XIV, Lynch argues that the trial court erred by refusing his counsel's request to use a question-and-answer format in presenting Lynch's unsworn statement.

>        The defense requested a question-and-answer format because of Lynch's "difficulty focusing on an issue for even a brief period of time."  In support of this motion, Dr. Robert Tureen, a clinical psychologist, stated that Lynch has an IQ of

72.  According to Tureen, Lynch has "considerable difficulty * * * [attending] to auditory information in a consistent and efficient manner" and has "difficulty with attentional focusing."  Further, an increase in Lynch's anxiety level at trial could be expected to "intensify [his] attentional problems."  The trial court, however, denied the defense's request.

R.C. 2929.03(D)(1) permits a capital defendant to make an unsworn statement during the penalty phase of the trial.  R.C. 2929.03(D)1) provides, "If the offender chooses to make a *statement*, the offender is subject to cross-examination only if the offender consents to make the statement under oath or affirmation."  (Emphasis added.)

First, Lynch claims that the trial court violated his constitutional rights by refusing his request to make an unsworn statement using a question-and-answer format.  However, the underlying premise of Lynch's constitutional claim is faulty.  The Supreme Court of the United States has never squarely held that a court's refusal to allow a defendant to allocute is a constitutional violation.  However, two federal circuit courts recently concluded that a capital defendant does not have a constitutional right to make an unsworn statement to a jury during the penalty phase of the trial.  See *United States v. Hall* (C.A. 5, 1998), 152 F.3d 381,396, abrogated in part on other grounds; *United States v. Barnette* (C.A. 4, 2000), 211 F.3d 803, 820.  Several state courts have reached the same conclusion.  See *State v. Stephenson* (Tenn. 1994), 878 S.W.2d 530, 551; *People v. Robbins* (1988), 45 Cal.3d 867, 889, 248 Cal.Rptr. 172, 755 P.2d 355; *People v. Brown* (1996), 172 Ill.2d 1, 61, 216 Ill.Dec. 733, 665 N.E.2d 1290; *State v. Green* (1994), 336 N.C. 142, 191, 443 S.E.2d 14; and *Duckett v. State* (Okla.Crim.App. 1995), 919 P.2d 7, 22.

Other jurisdictions have concluded that the common-law right of allocution permits a capital defendant to make an unsworn statement before a jury.  *Harris v. State* (1986), 306 Md. 344, 359, 509 A.2d 120; *Homick v. State* (1992), 108 Nev. 127, 133, 825 P.2d 600.  In some states, a capital defendant's right to make an unsworn statement before the jury is explicitly permitted by statute or rule.  *People v. Borrego* (Colo. 1989), 774 P.2d 854, 856; *Shelton v. State* (Del. 1999), 744 A.2d 465, 495.

Several jurisdictions limit the scope and content of a capital defendant's right to present an unsworn statement before the jury.  See *State v. Zola* (1988), 112 N.J. 384, 430, 548 A.2d 1022 (defendant "would not be permitted to rebut any facts in evidence, to deny his guilt, or indeed, to voice an expression of remorse that contradicts evidentiary facts"); *State v. Rogers* (2000), 330 Ore. 282, 304, 4 P.3d 1261 (requiring defendant "to read from a prepared statement and to submit that statement in advance for the court's review"does not violate the defendant's rights).  See, also, *State v. Lord* (1991), 117 Wash.2d 829, 898, 822 P.2d 177.

In sum, Ohio and several other states permit defendants to present an unsworn statement to the jury during the penalty phase of a capital trial.  However, the majority view does not support a holding that a defendant has a constitutional right even to make an unsworn statement, let alone an unsworn statement in a question-and-answer format.  We find that the trial court did not violate Lynch's constitutional rights by denying his re[]quest.

166

*Lynch*, 98 Ohio St. 3d at 529-30, 787 N.E.2d at 1205-06; (App. Vol. 3, at 272-73.)

In his merit brief, Petitioner begins by highlighting the statutory authority in Ohio granting a capital defendant the right to present an unsworn statement to the jury and the court at the mitigation phase. (ECF No. 56, at 91 (discussing Ohio Rev. Code § 2929.03(D)(1)).) According to Petitioner, "[t]he state does not mandate whether the statement must be given in an unsworn narrative or as answers to questions posed by counsel." (*Id.*) Noting that the statute requires that "great latitude" be given to a defendant in the presentation of evidence of factors in mitigation, Petitioner asserts that "[t]he defendant's unsworn statement constitutes one of these factors to be considered." (*Id.*) Petitioner proceeds to argue that *Ferguson v. Georgia*, 365 U.S. 570 (1961), constitutes clearly established federal law supporting his claim. There, according to Petitioner, the United States Supreme Court held that the Fourteenth Amendment required the State of Georgia to allow defense counsel to question the defendant in order to elicit his unsworn statement. *Id.* at 595. Pointing to deficiencies in his mental functioning, his inexperience with public speaking, and unfamiliarity with the legal system, Petitioner argues that the reasoning in *Ferguson* "applies with full force to the unsworn statement [he] gave during the mitigation phase of his capital trial." (ECF No. 56, at 93.)

Petitioner asserts that the Ohio Supreme Court's decision rejecting his claim was unreasonable, in large part because "[t]he Ohio Supreme Court did not address the applicable case on this issue." (*Id.* at 94 (citing *Ferguson v. Georgia*).) Petitioner argues that the Ohio Supreme Court also erred, unreasonably and to Petitioner's prejudice, in concluding that the trial court had not abused its discretion in denying defense counsel's request to present Petitioner's unsworn statement via a question-and-answer format.

In response, Respondent begins by noting that the Ohio Supreme Court specifically addressed Petitioner's failure to support his claim with proffered material demonstrating what additional information a question-and-answer format would have enabled him to present. Respondent proceeds to suggest that because Petitioner is challenging the state trial court's

application of the right of allocution that Ohio Revised Code § 2929.03(D)(1) establishes, Petitioner is raising a claim that, by virtue of alleging an error of state law, is not cognizable in federal habeas corpus. Respondent ultimately argues that the Ohio Supreme Court's adjudication did not contravene or unreasonably apply clearly established federal law. (ECF No. 57, at 111-12.) Respondent notes that Petitioner failed to cite any United States Supreme Court precedent supporting his claim and asserts that Petitioner could not because "there is no constitutional right to allocution." (*Id*.) Respondent dismisses Petitioner's reliance on *Ferguson v. Georgia*, characterizing that case as "obscure" and "inapplicable," and defending the Ohio Supreme Court's failure to address a "case which Lynch wholly failed to mention." (*Id*. at 112.)

"In *Ferguson*," according to Respondent, "the Supreme Court found Fourteenth Amendment error where a state barred a criminal defendant from testifying under oath, provided him a state right to give an unsworn statement, and denied the defense the ability to have his counsel elicit testimony through questioning during the unsworn statement." (*Id*.) Respondent proceeds to argue that *Ferguson* is inapposite because it concerned a state, unlike Ohio or any other state, "that was 'the only jurisdiction in the common-law world[] to retain the common-law rule that a person charged with a criminal offense is incompetent to testify under oath in his own behalf at his trial.' " (*Id*. (quoting *Ferguson*, 365 U.S. at 570).) Respondent reasons that Ohio <u>does</u> provide a criminal defendant the ability to testify in a question-and-answer format, under oath, and asserts that, by foregoing that option and electing to make an unsworn statement, "Lynch just chose not to avail himself of this opportunity." (ECF No. 57, at 112-13.) Respondent also argues, albeit summarily, that the Ohio Supreme Court's adjudication did not involve an unreasonable determination of the facts in light of the evidence presented to the state court. (*Id*. at 113.) Finally, Respondent argues that Petitioner could not prevail in state court and cannot prevail herein on his claim for the reason that "[t]he record did not contain a proffer of what he would have presented[.]" (*Id*.)

In his reply memorandum, Petitioner disputes Respondent's assertion that Petitioner

somehow chose not to avail himself of the opportunity to present his unsworn statement in a question-and-answer format. (ECF No. 58, at 12.) Petitioner's argument misconstrues Respondent's assertion. Respondent's precise argument was that Petitioner chose not to avail himself of the only procedure by which he had a right to utilize a question-and-answer format to present information to the jury: namely, by testifying under oath.

Although the Ohio Supreme Court appears to have blurred the lines, this Court is of the view that it is incorrect to conflate Petitioner's statutory right to make an unsworn statement with his less-defined right to allocution. The Sixth Circuit in *Goff v. Bagley* made unmistakably clear that the two are not one and the same. 601 F.3d 445, 467 (6th Cir. 2010) ("[T]he right to make an unsworn statement to the jury at the penalty phase is not the equivalent to the right of allocution before the judge imposes sentence.").

Having parsed out from the inquiry before the Court Petitioner's right to allocution and any parameters that govern that right, the Court is left with Petitioner's statutory right to make an unsworn statement and the parameters that govern that right. The inquiry before the Court is whether the Ohio Supreme Court's decision rejecting Petitioner's claim challenging the trial court's refusal to allow him to make his unsworn statement via a question-and-answer format contravened or unreasonably applied clearly established Supreme Court precedent or involved an unreasonable determination of the facts. Framed as such, the answer is "No." First, the language of the statutory section state trial courts must follow "[w]hen death may be imposed as a penalty for aggravated murder" does not, strictly speaking, entitle a defendant to present his unsworn statement via a question-and-answer format. Ohio Revised Code § 2929.03(D)(1).

Further, no clearly established federal law supports such a right. The case upon which Petitioner relies, *Ferguson v. Georgia*, is readily distinguishable and does not stand for the proposition that Petitioner had a right to present his unsworn statement via a question-and-answer format. As the Ohio Supreme Court has explained:

> *Ferguson* arose in the entirely different context of "the common-law rule
> [codified in Georgia] that a person charged with a criminal offense is incompetent

169

> to testify under oath in his behalf at his trial." *Id.*, 365 U.S. at 570, 81 S.Ct. 756,
> 5 L.Ed.2d 783.  The defendant in *Ferguson* had a constitutional right to the
> assistance of counsel to present his view of the events in an unsworn statement
> because, pursuant to Georgia law, he could not testify at all under oath.  *Id.* at
> 596, 81 S.Ct. 756, 5 L.Ed.2d 783.

*State v. Barton*, 108 Ohio St. 3d 402, 412-13, 844 N.E.2d 307, 317 (2006).  Petitioner was not so

situated in the instant case, as he certainly had the right to testify at his mitigation hearing if he

so chose.  He did not. Neither *Ferguson* nor any other case to this Court's knowledge supports

Petitioner's argument that he had a right to use a question-and-answer format to give his

unsworn statement.

To the extent that Petitioner's claim asserts that the trial court unreasonably and to

Petitioner's prejudice limited his right to present mitigation evidence, Petitioner's claim fails.

Petitioner asserts that Ohio's capital statutory framework explicitly provides capital defendants

"great latitude" in the presentation of mitigation evidence.  Petitioner is correct; Ohio Revised

Code § 2929.03(D)(1) includes a provision stating that "[t]he defendant shall be given great

latitude in the presentation of evidence of the mitigating factors set forth in division (B) of

section 2929.04 of the Revised Code and of any other factors in mitigation of the imposition of

the sentence of death."  Petitioner has not cited, however, and this Court is not otherwise aware

of, any clearly established federal law supporting the proposition that "great latitude" translates

to "free reign."  *Cf. Buell v. Mitchell*, 274 F.3d 337, 358-59 (6th Cir. 2001) (finding no error in

trial court's exclusion of expert testimony at penalty phase despite "great latitude" that Ohio

Revised Code § 2929.03(D)(1) provides a defendant in presenting mitigation evidence).

Petitioner has not demonstrated that the Ohio Supreme Court's decision rejecting his

claim ran afoul of § 2254(d).  Although arguably blurring the lines between Petitioner's statutory

right to give an unsworn statement at the penalty phase and his right of allocution before the

judge imposes sentence, the Ohio Supreme Court nonetheless gave exhaustive consideration to

the issue sufficient to diminish any argument that its decision rejecting Petitioner's claim was

unreasonable.  In view of the fact that neither the language of the statutory section nor any

170

clearly established federal law allows for the giving of an unsworn statement in a question-and-answer format, the Ohio Supreme Court's decision did not contravene or unreasonably apply clearly established federal law.

For the foregoing reasons, the Court does not conclude that the Ohio Supreme Court's decision rejecting Petitioner's claim challenging the trial court's refusal to allow use of a question-and-answer format for Petitioner's unsworn statement was contrary to or involved an unreasonable determination of clearly established federal law as determined by the United States Supreme Court.  The Court also does not conclude that the Ohio Supreme Court's decision involved an unreasonable determination of the facts.  Accordingly, the Court **DENIES** Petitioner's thirteenth ground for relief.

The Court is satisfied, however, that Petitioner's thirteenth ground for relief meets the requirements for a certificate of appealability.  Although controlling authority appears to definitively foreclose relief on Petitioner's claim, the emphasis that the Supreme Court has placed on guarding against laws, rules, or jury instructions that prevent capital juries from giving effect to mitigation evidence persuades this Court that Petitioner's thirteenth ground for relief is deserving of further consideration on appeal.  *See, e.g., Buchanan v. Angelone*, 522 U.S. 269, 276 (1998) ("the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence").  The Court accordingly certifies for appeal Petitioner's thirteenth ground for relief.

      **L.**    <u>**Fourteenth Ground for Relief**</u>**: The trial court erred by denying Petitioner's motions on instructional issues in the trial phase, violating Petitioner's rights to due process and a fair trial as guaranteed by the Fifth, Sixth, Ninth and Fourteenth Amendments to the United States Constitution.**

(Petition, ECF No. 11-5, at ¶¶ 126-133.)  In its February 25, 2009 Opinion and Order, the Court dismissed sub-part (B) of Petitioner's claim (¶¶ 130-133) as procedurally defaulted.  (ECF No. 25, at 53-55.)  In his merit brief, Petitioner expressly withdraws his claim that the trial court erred by not instructing the jury on the lesser included offense of gross sexual imposition.  (ECF

No. 56, at 95 n.16.) All that remains before this Court is Petitioner's argument that the trial court erred to Petitioner's prejudice by refusing to instruct the jury on the lesser included offense of involuntary manslaughter as to the charge of aggravated murder. Petitioner asserts that the evidence supported acquittal on the aggravated murder count and conviction for the lesser included involuntary manslaughter.

Petitioner raised this claim on direct appeal as his nineteenth proposition of law. The Ohio Supreme Court rejected it as follows:

> In proposition of law XIX, Lynch claims that the trial court erred by refusing Lynch's request to instruct the jury on the lesser included offenses of involuntary manslaughter on Count 5 and gross sexual imposition on Count 1.
>
> The trial court instructed the jury on involuntary manslaughter as a lesser included offense of the two felony murder charges in Counts 2 and 4. However, the trial court refused to instruct on involuntary manslaughter as a lesser included offense of aggravated murder by purposely causing the death of a child under 13 years of age, R.C. 2903.01(C), in Count 5.
>
> Involuntary manslaughter, R.C. 2903.04, is a lesser included offense of aggravated murder with prior calculation and design, R.C. 2903.01(A), aggravated felony murder, R.C. 2903.01(B), and murder, R.C. 2903.02. *State v. Thomas* (1988), 40 Ohio St.3d 213, 533 N.E.2d 286, paragraph one of the syllabus; *State v. Rhodes* (1986), 23 Ohio St.3d 225, 227, 23 OBR 382, 492 N.E.2d 430. Thus, involuntary manslaughter is a lesser included offense of other forms of murder besides felony murder. Involuntary manslaughter is a lesser offense of these forms of murder because the only distinguishing factor is the mental state involved in the act. See *State v. Thomas*, 40 Ohio St.3d at 216, 533 N.E.2d 286. The same rationale applies in finding that involuntary manslaughter is a lesser included offense of aggravated murder of a child under 13.
>
> However, even though involuntary manslaughter is a lesser included offense in Count 5, the trial court did not err by refusing to instruct on involuntary manslaughter. A charge on a "lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." *State v. Thomas*, 40 Ohio St.3d 213, 533 N.E.2d 286, paragraph two of the syllabus; *State v. Kidder* (1987), 32 Ohio St.3d 279, 513 N.E.2d 311.
>
> During trial, the defense argued for an involuntary manslaughter instruction on Count 5 because of evidence that Lynch wanted to make Love stop crying but did not purposely kill her. However, under any reasonable view of the evidence, the killing was done with purpose. According to Lynch's confession, his hands were around Love's neck for approximately "three minutes" when he strangled her. Lynch's actions would lead any reasonable trier of fact to conclude that Lynch intended to kill Love when his hands remained around her neck for that length of time. See *State v. Goodwin* (1999), 84 Ohio St.3d 331, 347, 703

> N.E.2d 1251 (shooting in the head at point-blank range showed that the victim was killed purposely despite defendant's claim that the "gun just went off"); *State v. Williams* (1996), 74 Ohio St.3d 569, 574, 660 N.E.2d 724 (nature of the victim's injuries did not support a reasonable finding that the victim was not killed purposely).
>
> Even if the trial court erred by not instructing on the lesser included offense in Count 5, it made no difference. The jury found that Lynch purposely killed Love when it found him guilty of aggravated murder rather than involuntary manslaughter in Counts 2 and 4. Clearly, the jury would have reached a similar finding on Count 5.

*Lynch*, 98 Ohio St. 3d at 526-27, 787 N.E.2d at 1202-03; (App. Vol. 3, at 270.)

Petitioner argues in his merit brief that the Ohio Supreme Court's decision contravened and/or unreasonably applied clearly established federal law or involved an unreasonable determination of the facts. (ECF No. 56, at 96-97.) According to Petitioner, a criminal defendant is entitled to a jury instruction on the lesser included offense when both the trial court determines that the offense for which the accused requests an instruction is lesser than an included within the charged offense and the evidence would reasonably support a conviction for the lesser offense rather than the greater offense. (*Id.* at 95 (citing *State v. Johnson*, 36 Ohio St. 3d 224, 225, 522 N.E.2d 1082, 1084 (1988)).) Petitioner proceeds to note the four requirements in federal cases establishing that a lesser included offense instruction is warranted:

> (1) a proper request; (2) the elements of the lesser offense are identical to part of the elements of the greater offense; (3) there is evidence that would support conviction of the lesser offense; and (4) the proof of the element or elements differentiating the two crimes is sufficiently disputed so that the jury could consistently acquit on the greater offense and convict on the lesser.

(*Id.* at 95-96 (citing *United States v. Mays*, 69 F.3d 116, 119 (6th Cir. 1995)).) According to Petitioner, Ohio essentially applies the same standard as federal courts. In arguing that the Ohio Supreme Court's decision was not just erroneous but unreasonable, Petitioner explains:

> The Ohio Supreme Court recognized that involuntary manslaughter was a lesser included offense of O.R.C. §2903,01(C), the purposeful killing of a person under 13 years of age. Yet, that court said the trial court did not err in refusing the instruction, because the evidence presented at trial proved Lynch purposefully killed the victim. State v. Lynch, 787 N.E.2d 1185, 1203 (Ohio 2003). This is a contradiction in logic that cannot stand. If the trial court found that there was sufficient credible evidence that the jury could rely on to find Lynch guilty of involuntary manslaughter (the defense argued that the killing was an accident, and

173

that Lynch was only trying to stop the victim from crying) on counts 2 and 4, then the same would be true for count 5. Therefore, it was a violation of Petitioner's due process right to a fair trial for the trial court not to include the involuntary manslaughter instruction.

(ECF No. 56, at 96-97.)

Asserting that the clearly established federal law governing Petitioner's claim is *Beck v. Alabama*, 447 U.S. 625, 627 (1980), Respondent argues that the Ohio Supreme Court's decision was not contrary to or an unreasonable application of *Beck*. Respondent reasons first that because the Ohio Supreme Court based its decision on state court decisions that employed the same standard as *Beck*, "the state court adjudication is not contrary to *Beck*." (ECF No. 57, at 116.) Respondent next asserts that the Ohio Supreme Court's decision did not unreasonably apply *Beck* because evidence establishing that Petitioner had his hands around the victim's neck for approximately three minutes "simply did not permit a rational jury to find Lynch guilty of involuntary manslaughter under [Ohio Revised Code]. §2903.04 and not guilty of aggravated murder under [Ohio Revised Code] §2903.01(C)." (*Id.*) "In fact," according to Respondent, "Lynch's admission to pouring water into Mary's lungs after strangling her and then continuing his pedophilia by inserting his finger into her vagina supports the conclusion that this was no accident." (*Id.*) Respondent proceeds to characterize as reasonable the Ohio Supreme Court's conclusion that the trial court's denial of the involuntary manslaughter instruction on Count 5 made no difference, noting that "[d]espite the trial court instructing the jury on involuntary manslaughter with respect to aggravated murder in Counts 2 and 4, the jury still concluded Lynch purposely killed Mary." (*Id.* at 117.) Finally, Respondent dismisses Petitioner's argument that the trial court's inconsistency establishes that the Ohio Supreme Court's decision was objectively unreasonable. Respondent reasons that "the State did not oppose the instruction for [Counts 2 and 4], and whether the instruction was necessary for Counts 2 and 4 was not the claim presented or addressed by the state court adjudication." (*Id.*)

Petitioner's reply memorandum does not include any arguments in response to Respondent's arguments. (ECF No. 58, at 12.)

The issue before the Court is whether the Ohio Supreme Court's decision rejecting Petitioner's claim contravened or unreasonably applied clearly established federal law or involved an unreasonable determination of the facts. In *Beck*, 447 U.S. 625, the Supreme Court held that it was unconstitutional to impose a death sentence for a capital conviction where the jury was not permitted to consider a lesser included offense and the evidence would have supported a verdict of guilt on the lesser offense. *See also Hopper v. Evans*, 456 U.S. 605, 610 (1982) (holding that instruction on lesser-included offense was not required under *Beck* where evidence could not reasonably have supported a verdict of guilt on the lesser-included offense). At issue in *Beck* was the fact that Alabama law at the time prohibited the trial court from instructing on the lesser-included offense of felony murder, thereby requiring the jury to either convict on capital murder or acquit the defendant altogether. *See Raglin v. Mitchell*, No. 1:00-cv-767, 2011 WL 2183287, at *17 (S.D. Ohio Feb. 2, 2011). "*Beck* explained," as the Sixth Circuit has noted, "that 'when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense–but leaves some doubt with respect to an element that would justify conviction of a capital offense–the failure to give the jury the "third option" of convicting of a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction.' " *Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010) (quoting *Beck*, 447 U.S. at 637). Earlier, the Sixth Circuit explained that, "[i]n holding that the denial of an instruction on the lesser-included offense violated Beck's constitutional rights, the Court focused on the accuracy of the factfinding process." *Campbell v. Coyle*, 260 F.3d 531, 540 (6th Cir. 2001). To be clear, "[a] court need not give an instruction every time 'some evidence' is presented on a lesser included or inferior degree offense." *Madrigal v. Bagley*, 276 F. Supp. 2d 744, 757 (N.D. Ohio 2003) (quoting *State v. Shane*, 63 Ohio St. 3d 630, 632-33, 590 N.E.2d 272, 274-75 (1992)). Rather, "*Beck v. Alabama* requires that the jury be instructed on a non-capital lesser-included offense if, and only if, 'the evidence would permit a jury rationally to find [the defendant] guilty of the lesser offense and acquit him of the greater.' " *Smith*, 591 F.3d at 523

(quoting *Beck*, 447 U.S. at 635).

It is undisputed that "[u]nder Ohio law, involuntary manslaughter is a lesser included offense of aggravated murder, distinguished by the lack of intent to kill." *Smith*, 591 F.3d at 523 (citation omitted). In the instant case, the Ohio Supreme Court concluded that the trial court did not err in refusing to instruct Petitioner's jury on the lesser-included offense of involuntary manslaughter. Relying on two of its own decisions, the Ohio Supreme Court explained that, "[a] charge on a 'lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense.' " *Lynch*, 98 Ohio St. 3d at 526, 787 N.E.2d at 1202; (App. Vol. 3, at 270 (quoting *State v. Thomas*, 40 Ohio St. 3d 213, 533 N.E.2d 286, paragraph two of the syllabus (1988)), & *State v. Kidder*, 32 Ohio St. 3d 279, 513 N.E.2d 311 (1987)).). In *Goodwin*, the Sixth Circuit stated that *State v. Thomas*'s standard "is substantially the same as the Supreme Court's language in *Beck* and *Hopper*." That being so, the Ohio Supreme correctly identified the clearly established federal law, leaving only the questions whether the Ohio Supreme Court unreasonably applied that law and/or unreasonably determined the facts.[18]

In determining whether the Ohio Supreme Court's decision rejecting Petitioner's claim unreasonably applied *Beck* and its progeny, this Court finds guidance from within the Sixth Circuit. In *Campbell*, the Sixth Circuit found reasonable the Ohio Supreme Court's decision rejecting Petitioner's lesser-included-offense-instruction claim, explaining that, "[a] decision as to whether a *Beck* instruction is required is a fact-specific inquiry in which a court must determine whether there were sufficient facts for a reasonable jury to conclude that such an intent did not exist[]" and finding that "[t]hat was precisely the inquiry made by the Ohio Court." *Campbell*, 260 F.3d at 545. The evidence established that Campbell had broken into the

---

[18] The latter question must be answered in the negative. In the Sixth Circuit, "[w]here 'the highest court of the state has reviewed a defendant's request for a lesser included offense instruction and concluded that it is not warranted by the evidence elicited at trial, that conclusion is axiomatically correct, as a matter of state law.' " *Rodgers v. Stine*, 73 F. Supp. 2d 778, 784 (E.D. Mich. 1999) (quoting *Bagby v. Sowder*, 894 F.2d 792, 795 (6th Cir. 1990)).

apartment of 78-year-old Henry Turner to commit a robbery while Turner was asleep and, in the process, stabbed Turner five times with a knife from Turner's own kitchen after Turner awoke during the robbery.  Campbell offered two arguments in support of his claim that the evidence warranted an instruction on the lesser-included offense of involuntary manslaughter: (1) evidence that Campbell struggled with the victim and (2) evidence that Campbell was unarmed when he entered the victim's apartment.  "Key to the Ohio court's conclusion that no lesser-included offense instruction was constitutionally required," the Sixth Circuit explained, "was the lack of evidence to explain away all five wounds to Turner's body."  *Id*. at 543.  As the Sixth Circuit elaborated:

> The [Ohio Supreme Court] never disputed the evidence of one "defensive wound," that a struggle ensued, or that Turner tried to ward off Campbell. Rather, the fact that there were four deadly wounds, the court, reasoned, precluded a rational juror from finding the lack of a purposeful killing.  *See Campbell*, 630 N.E.2d at 350 ("the number and location of his victim's wounds would compel any reasonable trier of fact to find intent to kill").  This "compelled" conclusion was not sufficiently negated by the evidence of a struggle.  The Ohio Supreme Court's holding was thus not an unreasonable one.  Campbell as yet to explain how the four deadly wounds could have been inflicted consistent with his theory that Turner's death was not intentional but, rather, solely the result of a struggle.

260 F.3d at 543.

The Sixth Circuit has reasoned that "the question under *Beck* is whether the evidence would have permitted a reasonable jury to find that [the defendant] caused the death of the victim as a proximate result of committing a felony but without specifically intending to cause the victim's death."  *Goodwin v. Johnson*, 632 F.3d at 316.  There, evidence that the shooting was unintentional was "paltry," consisting only of the accused's "self-serving statements," while evidence that the shooting was intentional was overwhelming.  *Id*. at 317-18.  As the Sixth Circuit explained:

> There was conflicting evidence concerning whether Goodwin intended to fire the revolver, but not enough to justify an instruction on the lesser-included offense.  On the one hand, Goodwin directs attention to remarks that indicate the shooting was unintentional.  He did not testify at trial, but a statement he gave to police was admitted.  Goodwin told Detective Kovasic that he pulled out his gun and pointed it at the clerk and told him to take him to the safe, "and the next thing

I knew, the gun just went off."  When the detective asked Goodwin why he shot the clerk, Goodwin responded: "I don't know.  I didn't mean to."  Goodwin also said that he drank some gin the morning of the robbery and "felt it a little."  In addition, Johnson testified that when he and Padgett confronted Goodwin after the robbery, Goodwin said he did not mean to shoot him.

On the other hand, this evidence of Goodwin's self-serving statements is at odds with the overwhelming weight of the evidence, which strongly suggests the shooting was intentional.  The witnesses agreed that Goodwin held the weapon that was used to kill the victim.  Padgett testified that when he asked Goodwin why he shot the clerk, Goodwin said that the clerk reached for his mask and Goodwin thought the clerk saw his face.  Padgett and Johnson testified that the victim put his hands in the air and did not struggle or resist as Goodwin put the revolver to his head, and that Goodwin grabbed the surviving clerk after shooting the victim.  The surviving clerk heard the shot that killed the victim before Goodwin grabbed him and took him to the office to open the safe.  A firearms expert for the prosecution testified that there are two ways of firing a revolver: single action and double action.  In the single action method, the hammer is pulled back first and then the trigger is pulled to fire the weapon.  In the double action method, the trigger is pulled which first draws the hammer back and then drops the hammer on the ammunition.  The expert was not asked whether or how a revolver could discharge accidentally, nor did Goodwin's counsel put on any proof on this question.  In either the single action or the double action method, however, the trigger must be pulled.  Further, the location of the fatal wound works against a finding that the shooting was accidental.  There was thus no evidence from which a jury could reasonably conclude that Goodwin proximately, but no intentionally, caused the revolver to fire.  *See Hopper*, 456 U.S. at 610, 102 S.Ct. 2049; *Campbell*, 260 F.3d at 541; *Thomas*, 533 N.E.2d at 289-91.

*Id*. at 317-18.

A sister court within the Sixth Circuit has found no error in the absence of an instruction on the lesser-included offense of involuntary manslaughter.  *Raglin v. Mitchell*, No. 1:00-cv-767, 2011 WL 2183287, at *16-18 (S.D. Ohio Feb. 2, 2011).  Relying on *Beck v. Alabama*, the court explained that "[t]he hypothesis in *Beck* as it is in general in lesser included offenses cases is that, on the evidence presented, a jury could rationally find the defendant guilty of the lesser included offense but not guilty on the element which elevates the crime to the greater offense." (*Id*. at * 18.)  The court found that the accused's claims of panic and fright, rather than intention to kill, found no reasonable support in the evidence.  The accused had brandishing a loaded semiautomatic pistol while robbing at gunpoint a defenseless victim who offered no resistance and then shot the victim in the neck

178

In *Beck*, the crucial element of intent was very much in dispute at trial. *See Campbell*, 260 F.3d at 540. That is not the case here. The only evidence that Petitioner offers in support of his claim that he did not mean to kill Mary Jennifer Love are his own self-serving statements–statements that were at odds with the evidence in the record. In *Beck*, where Beck and an accomplice tied up an elderly man during robbery and the accomplice struck the man once and killed him, the claimed lack of intent was not so inconsistent with the record as to be incredulous. That is not the case here. Petitioner's claimed lack of intent is impossible to reconcile with evidence that he had his hands around the neck of his considerably weaker victim for three minutes and subsequently placed her unresponsive body in the bathtub and poured water into her lungs.

As in *Goodwin*, the only evidence that Petitioner offered in support of his claim that he did not intend to kill the victim were his self-serving statements suggesting as much. And as in *Goodwin*, the overwhelming weight of the evidence strongly suggested that the killing of Mary Jennifer Love was intentional. She was defenseless and almost surely did not offer (and could not have offered) resistance. Petitioner put his hands around her neck for three minutes and, as in *Goodwin*, no evidence suggests that this act was accidental. The facts in Petitioner's case fall squarely within the lesson of *Goodwin*–namely, the nature of Petitioner's actions works against any finding that the killing of Mary Jennifer Love was accidental. As in *Raglin*, where the accused's claims of panic found no reasonable support in the evidence, Petitioner's claim herein that he never meant to kill the victim is belied by the record. All evidence and inferences to be drawn therefrom lead to one inescapable conclusion: Petitioner purposefully killed Mary Jennifer Love when he squeezed his hands around her neck for approximately three minutes, and subsequently placed her unresponsive body into the bath tub and poured water into her lungs. *See also Palmer v. Bagley*, 330 F. App'x 92, 98-100 (6th Cir. 2009) (agreeing that lesser-included-offense instruction not warranted where evidence belied any argument that shootings were accidental or unintentional, despite numerous arguments offered by the petitioner

supporting claim that he fired shots in a "panic" or "mass confusion"); *Madrigal v. Bagley*, 276 F. Supp. 2d 744, 757 (N.D. Ohio 2003) (no error in refusing involuntary manslaughter instruction where evidence demonstrated that assailant shot the victim point-blank in the head after she could not open the safe and then said, "Now you're playing, bitch.").

*Smith v. Bradshaw* succinctly describes the importance of examining the nature of the accused's actions to determine his or her intent. "It is well established," *Smith* states, "that a lesser-included-offense instruction is not required where the facts of a murder so strongly indicate intent to kill that the jury could not rationally have a reasonable doubt as to the defendant's intent." 591 F.3d at 524 (citations omitted). As the Sixth Circuit in *Smith* cautioned:

> Smith's fundamental claim is that a jury could reasonably make the leap from his obvious intoxication to the conclusion that he did not intend to kill Autumn Frye. And, it is certainly not physically or logically impossible that he did not harbor such an intent because the ultimate fact of intent can only be inferred, rather than ever known.
>
> However, what Smith seeks from a jury would be a leap of faith, not an inferential leap based on evidence. * * *.

*Id*. at 524. Petitioner herein seeks to make the same leap. His claim that he never meant to kill Mary Jennifer Love does not match the evidence. *Smith* teaches that a lesser included offense instruction is not warranted when the record contains no sufficient evidence that a "theoretically possible situation occurred." *Id*. at 525.

Beyond the foregoing, the Court additionally incorporates by reference its discussion in Section V.D. above rejecting Petitioner's sixth ground for relief, where Petitioner argued ineffective assistance for counsel's failure to present a mental health expert in support of defense counsel's request for a lesser-included offense instruction.

For the foregoing reasons, the Court does not conclude that the Ohio Supreme Court's decision rejecting Petitioner's claim challenging the trial court's refusal to instruct the jury on the lesser-included offense of involuntary manslaughter as to the aggravated murder offense charged in Count Five contravened or unreasonably applied clearly established federal law as

determined by the United States Supreme Court.  The Court also does not conclude that the Ohio

Supreme Court's decision involved an unreasonable determination of the facts.  Accordingly, the

Court **DENIES** Petitioner's fourteenth ground for relief.

The Court is not persuaded that Petitioner's fourteenth ground for relief meets the

requirements for a certificate of appealability.  Although Petitioner has maintained since his

confession to police that he did not intend to kill the victim, and that fact has met the

requirements for a certificate of appealability as to other legal claims with that factual predicate,

controlling case law definitively forecloses relief on this particular claim.  The Court accordingly

does not find that reasonable jurists would find its decision debatable or wrong.  The Court

denies a certificate of appealability on Petitioner's fourteenth ground for relief.

> **M.** **Eighteenth Ground for Relief**: **Petitioner's sentence is
> disproportionately severe in relation to the crime committed,
> and to sentences imposed upon others for the same crime in the
> same and other jurisdictions in violation of his rights to due
> process and equal protection as guaranteed by the Fifth,
> Eighth and Fourteenth Amendments to the United States
> Constitution.[19]**

(Petition, ECF No. 11-5, at ¶¶ 180-183.)  Petitioner argues in his eighteenth ground for relief

that, "[a] review of capital and non-capital cases can only lead to the conclusion that the death

penalty is arbitrarily applied in general, and is specifically disproportionate in Petitioner's case."

(*Id*. at ¶ 182.)  He asserts that there exists no principled way to distinguish his case, in which he

received the death penalty, and the many other similar cases in which the accused did not.

Petitioner's precise argument is best presented in his own words:

> The cruel and unusual punishment prohibition of the Eighth Amendment
> bars sentences which are disproportionately severe when compared to other
> sentences meted out for the same offense.  "(A) court's proportionality analysis
> under the Eighth Amendment should be guided by objective criteria, including (i)
> the gravity of the offense and the harshness of the penalty; (ii) the sentences
> imposed on other criminals in the same jurisdiction; and (iii) the sentences

---

[19]    The Court in its February 25, 2009 Opinion and Order dismissed grounds fifteen
and sixteen as procedurally defaulted (ECF No. 25, at 55-63), and Petitioner in his merit brief
expressly withdrew ground seventeen (ECF No. 56, at 98, n.17).

imposed for commission of the same crime in other jurisdictions." Solem v. Helm, 463 U.S. 277, 292 (1983). According to the Supreme Court, courts are able to perform such comparisons and "[t]he easiest comparison, of course, is between capital punishment and non-capital punishments, for the death penalty is different from other punishments in kind rather than degree." Id. at 294. The Supreme Court has cited with approval the practice of the Georgia Supreme Court, which "uses for comparison not only similar cases in which death was imposed, but similar cases in which death was not imposed." Zant, 462 U.S. at 880.

(ECF No. 56, at 98.)

In his merit brief, Petitioner explains that he "is presently in jeopardy of his life and others are not, yet all have been convicted of acts rendering them ineligible for the death penalty." (*Id.* at 99.) Petitioner asserts:

As there is no hierarchy of capital-generating felonies – that is, aggravated robbery or burglary are not considered more capitally-serious than is kidnapping or rape, as the presence of either, combined with purposeful killing, renders the offender capitally eligible – it cannot be said that Petitioner's crime was worse, or more deserving of death under Ohio statutes, than the crimes committed by others who were not exposed to the ultimate punishment.

(*Id.*) Petitioner proceeds to point to a 1984 case in which the accused was convicted of aggravated murder, but was spared by the jury of the death penalty. (*Id.* (citing *State v. Mughni*, Nos. C-850288 & C850320, 1986 WL 11243, at *3, (Ohio App. 1 Dist. Oct. 1, 1986)).) For these reasons and because it dismissed his argument summarily, Petitioner argues that the Ohio Supreme Court's decision contravened or unreasonably applied clearly established federal law or involved an unreasonable determination of the facts.

Petitioner presented this precise argument to the Ohio Supreme Court on direct appeal in his eighth proposition of law. The Ohio Supreme Court rejected his claim summarily, relying on a string cite of its previous decisions purporting to have rejected the same or similar arguments. *Lynch*, 98 Ohio St. 3d at 539; 787 N.E.2d at 1213; (App. Vol. 3, at 278.)

Respondent argues that the Ohio Supreme Court's decision "was not contrary to, or an unreasonable application of, any clearly established federal law as determined by the U.S. Supreme Court at the time of the 2003 state court adjudication." (ECF No. 57, at 122.) Respondent asserts that "[Petitioner] committed a deliberate murder, and thus, his capital

182

sentence is appropriate pursuant to *Gregg v. Georgia*, 428 U.S. 153 (1976)." (*Id.* at 122.)

Petitioner's reply memorandum does not include any arguments in response to Respondent's arguments. (ECF No. 58, at 12.)

The Court does not disagree with, much less find unreasonable or contrary, the Ohio Supreme Court's decision finding that Petitioner's death sentence is neither inappropriate, nor disproportionate, nor excessive. The Court reaches this conclusion because the Constitution does not require proportionality review and Sixth Circuit case law forecloses relief on Petitioner's claim. This Court recognizes that Petitioner has endeavored to distinguish the instant claim from one challenging Ohio's application of the proportionality review that Ohio Revised Code § 2929.05 requires (App. Vol. 3, at 71) and in fact has advanced a separate claim herein arguing that the statutorily required proportionality review that Ohio employs does not comport with the Constitution (ECF No. 11-5, at ¶¶ 184-199). That said, the case law foreclosing relief on proportionality review challenges is no less dispositive of Petitioner's instant claim. *See Smith v. Mitchell*, 567 F.3d 246, 261 (6th Cir. 2009) (relying on prior decisions in rejecting claim that Ohio's system of proportionality and appropriateness review is inadequate because limiting review to only cases where the death penalty was imposed prevents fair proportionality review); *Wickline v. Mitchell*, 319 F.3d 813, 824-25 (6th Cir. 2003) (rejecting claim asserting that Ohio Supreme Court did not conduct meaningful proportionality review on grounds that proportionality review is not Constitutionally required, states have latitude in defining pool of cases for comparison, and Ohio acted within that wide latitude); *Cooey v. Coyle*, 289 F.3d 882, 928 (6th Cir. 2002) ("The Constitution simply has not been held to require proportionality review of the sort that Mr. Cooey desires."); *Buell v. Mitchell*, 274 F.3d 337, 368 (6th Cir. 2001) ("Buell's contentions regarding inadequate appellate review of the proportionality of death sentences under the Ohio statute fail because no proportionality review is constitutionally required." (citing *Pulley v. Harris*, 465 U.S. 37, 44-51 (1984)); *Jamison v. Collins*, 100 F. Supp. 2d 647, 765 (S.D. Ohio 2000) (holding that there is no federal

constitutional requirement that a state appellate court conduct a comparative proportionality review); *Treesh v. Bagley*, No. 1:02 CV 462, 2007 WL 1039081, at *62 (N.D. Ohio Mar. 31, 2007) ("The Sixth Circuit has held that by limiting proportionality review to previous cases wherein the death penalty has been imposed, the Ohio Supreme Court has complied with the latitude allowed.").

For the foregoing reasons, this Court does not disagree with, much less find unreasonable or contrary, the Ohio Supreme Court's decision finding that Petitioner's death sentence neither inappropriate, nor disproportionate, nor excessive. The Court **DENIES** Petitioner's eighteenth ground for relief.

The Court likewise concludes that Petitioner's eighteenth ground for relief does not meet the standards for a certificate of appealability. Because controlling case law definitively forecloses relief on *any* claim whose legal predicate asserts a constitutional entitlement to proportionality review, reasonable jurists could not find this Court's decision debatable or wrong and this claim is not in need of further consideration on appeal. The Court denies a certificate of appealability on Petitioner's eighteenth ground for relief.

     **N.**     **Nineteenth Ground for Relief: The statutorily mandated proportionality review currently being employed in Ohio does not comport with the requirements of the Fifth, Eighth and Fourteenth Amendments to the United States Constitution.**

(Petition, ECF No. 11-5, at ¶¶ 184-199.) The gravamen of Petitioner's nineteenth ground for relief is that Ohio courts, by confining their proportionality review only to cases in which death was imposed, fail to provide the meaningful proportionality review necessary to prevent arbitrary, capricious, or excessive imposition of the death penalty. "Basing a proportionality decision on a data bank containing only death verdicts," Petitioner explains, "can result in one conclusion, that all death verdicts are proportional." (*Id.* at ¶ 186.) Petitioner insists that "[i]n Ohio, reviewing courts must consider the facts, circumstances and penalty imposed in all cases in which death was a possible penalty when the case progressed through each stage of the

process." (*Id*. at ¶ 194.)

In his ninth proposition of law on direct appeal, Petitioner argued "that the death penalty is disproportionate when his case is compared to similar death-penalty cases." *Lynch*, 98 Ohio St. 3d at 537, 787 N.E.2d at 1211; (App. Vol. 3, at 277.) The Ohio Supreme Court considered Petitioner's argument during its independent sentencing determination, concluding as follows:

> Finally, we find that the death penalty is proportionate to death sentences approved in similar cases. For rape-murders, see *State v. Phillips* (1995), 74 Ohio St.3d 72, 656 N.E.2d 643 (three-year-old victim); for kidnapping-murders, see *State v. Hartman*, 93 Ohio St.3d 274, 754 N.E.2d 1150; *State v. Buell* (1986), 22 Ohio St.3d 124, 22 OBR 203, 489 N.E.2d 795 (11-year-old victim); for murders to escape detection, see *State v. Lawson*, 64 Ohio St.3d 336, 595 N.E.2d 902; and for the murder of a child under 13, see *State v. Smith*, 97 Ohio St.3d 367, 2002-Ohio-6659, 780 N.E.2d 221 (six-month-old victim).

(*Id*. at 544; Ohio App. 3, at 281.)

Petitioner reiterates essentially the same arguments and points in his merit brief (ECF No. 56, at 100-105), to which Respondent replies in response, "Lynch cannot obtain relief because he does not have a constitutional right to proportionality review." (ECF No. 57, at 123.) Respondent further asserts that, "the Supreme Court of Ohio conducted a proportionality review in Lynch's case pursuant to state law and confirmed Lynch's capital sentence is appropriate." (*Id*.)

This Court is not unsympathetic to Petitioner's arguments and, if addressing them in the first instance, might find them persuasive. The issue before the Court, however, is whether the Ohio Supreme Court's decision contravened or unreasonably applied clearly established law. The answer is decidedly no. As the Court discussed above, the Constitution does not require proportionality review and Sixth Circuit case law forecloses relief on Petitioner's claim. Accordingly, for the reasons and upon the authority that the Court set forth above dismissing Petitioner's eighteenth ground for relief, the Court likewise **DISMISSES** Petitioner's nineteenth ground for relief.

For the reasons and upon the authority that the Court set forth above declining to certify

for appeal Petitioner's eighteenth ground for relief, the Court denies a certificate of appealability

on Petitioner's nineteenth ground for relief.

> **O.**     <u>**Twentieth Ground for Relief**</u>**: The death penalty as administered by lethal injection in the State of Ohio violates Petitioner's rights to be free from cruel and unusual punishment and to due process of law under the Fifth, Eighth, Ninth and Fourteenth Amendments to the U.S. Constitution.**

(Petition, ECF No. 11-5, at ¶¶ 200-206.)  Petitioner argues in his petition that "[d]eath by state-

sanctioned lethal injection violates the due process protections of life and constitutes cruel and

unusual punishment in violation of Petitioner's constitutional rights because it inflicts torturous,

gratuitous and inhumane pain, suffering and anguish upon the person executed by this means."

(*Id*. at ¶ 201.)  In his petition, Petitioner assails Ohio's procedure of "tying a human being to a

table then forcing a needle into him through which flows a combination of drugs designed in

theory to stop the heart, paralyze the breathing muscles, and sedate the person."  (*Id*. at ¶ 202.)

Petitioner proceeds in his petition to offer examples since 1977, when the first lethal injection

occurred, of what Petitioner characterizes as "botched" executions.

> In his merit brief, Petitioner offers several new arguments, reflecting the ever-changing

landscape of method-of-execution litigation.  Specifically, since the time that Petitioner filed his

petition, substantial developments have emerged in the manner in which courts address method-

of-execution challenges and substantial changes have occurred in the manner in which Ohio

conducts its executions.  Thus, although Petitioner in his petition assailed generally execution by

lethal injection and specifically Ohio's three-drug lethal injection protocol (a protocol Ohio has

since replaced with a single-drug protocol), Petitioner in his merit brief additionally introduces

entirely new challenges.  He argues that Ohio's execution protocol denies him access to counsel

in violation of his Sixth Amendment rights.  (ECF No. 56, at 106.)  He also argues that Ohio's

frequent deviations from its written protocol constitute a Fourteenth Amendment equal

protection violation.  (*Id*. at 107.)  In so arguing, Petitioner references and indeed quasi-

incorporates certain pleadings from the "*Cooey/Biros*" litigation before this Court, to wit: *Cooey*

*v. Kasich*, S.D. Ohio Case No. 2:04-cv-1156.  Petitioner argues that the Ohio Supreme Court's decision rejecting his claim, by consisting of a summary dismissal relying on prior decisions, contravened or unreasonably applied clearly established federal law or involved an unreasonable determination of the facts.[20]

Respondent offers several arguments urging this Court not to even address Petitioner's claim.  First, Respondent argues that Petitioner did not raise in his petition claims alleging a denial of access to counsel in violation of his Sixth Amendment rights, and instead, raises them for the first time, improperly, in his merit brief.  Second, Respondent asserts that Petitioner's newly raised allegations are barred by the statute of limitations.  Third, according to Respondent, this Court lacks jurisdiction to consider Petitioner's claim because the claim sounds not in habeas corpus but in a civil rights action pursuant to 42 U.S.C. § 1983.  (ECF No. 57, at 125 (citing *Hill v. McDonough*, 547 U.S. 573, 583 (2006)).)  Respondent also asserts that even assuming Petitioner's method-of-execution claim sounds in habeas corpus, the claim is barred by procedural default because "[h]e did not present the claim in state court."  (ECF No. 57, at 126.) Finally, Respondent asserts that no court has ever ruled lethal injection *per se* unconstitutional and that to the extent that Petitioner relies on decisions rendered *after* the state court adjudication in his case, *Teague v. Lane*, 489 U.S. 288 (1989), forecloses habeas corpus relief.

In his reply brief, Petitioner insists that his citations to pleadings in the *Cooey/Biros* litigation were specific rather than general; that the development of additional factual support for an underlying constitutional claim does not transform the issue into a new claim; and that if method-of-execution challenges truly were not cognizable in habeas corpus, then the *Cooey/Biros* litigation would not exist.  (ECF No. 58, at 12-13.)

The Court will begin its analysis by addressing those of Respondent's arguments that fall

---

[20]     Curiously, the parties fail to mention either that Petitioner raised in postconviction a claim challenging execution by lethal injection and Ohio's lethal injection protocol (App. Vol. 4, at 82-84) or that the state courts addressed and rejected that claim on the merits (App. Vol. 7, at 371; App. Vol. 8, at 362).  That claim essentially mirrors the claim that Petitioner pleaded in his petition.

short.  Ultimately, however, as the Court explains below, Petitioner's claim does not warrant

habeas corpus relief.

Turning to the myriad arguments urging the Court not to address Petitioner's claim, the

Court rejects Respondent's argument that it is without jurisdiction to address Petitioner's claim.

Relying primarily on *Hill v. McDonough*, 547 U.S. 573 (2006), and *Nelson v. Campbell*, 541

U.S. 637 (2004), Respondent asserts that method-of-execution challenges are cognizable only in

a 42 U.S.C. § 1983 action and that this Court is accordingly without jurisdiction to address such

a challenge in a habeas corpus action.  The Supreme Court has held that Hill's lawsuit

challenging Florida's lethal injection procedure could proceed under 42 U.S.C. § 1983.  *Hill*, 547

U.S. at 576, 580.  Nowhere, in this Court's understanding, did the Supreme Court hold that such

method-of-execution challenges could proceed *only* under 42 U.S.C. § 1983.  In *Adams v.*

*Bradshaw*, No. 10-4281, 2011 WL 2803408 (6th Cir. Jul. 19, 2011), the Sixth Circuit reached

the same conclusion.  There, the Sixth Circuit had earlier remanded the petitioner's habeas

corpus action to the district court below in order for the district court to develop additional facts

on the petitioner's claim challenging Ohio's lethal injection process.  When, on remand, the

State filed a motion to dismiss the claim, arguing that it was not cognizable in habeas corpus, the

district court denied the State's motion.  On appeal from the State, the Sixth Circuit affirmed,

reasoning as follows:

> Nowhere in *Hill* or *Nelson* does the Supreme Court state that a method-of-
> execution challenge is not cognizable in habeas corpus or that a federal court
> "lacks jurisdiction" to adjudicate such a claim in a habeas action.  Whereas it is
> true that certain claims that can be raised in a federal habeas petition cannot be
> raised in a § 1983 action, *see Preiser*, 411 U.S. at 500, 93 S.Ct. 1827, it does not
> necessarily follow that any claim that can be raised in a § 1983 action cannot be
> raised in a habeas petition, *see Terrell v. United States*, 564 F.3d 442, 446, n. 8
> (6th Cir. 2009).  Moreover, *Hill* can be distinguished from this case on the basis
> that Adams has not conceded the existence of an acceptable alternative procedure.
> *See* 547 U.S. at 580, 126 S.Ct. 2096.  Thus, Adams's lethal-injection claim, if
> successful, could render his death sentence effectively invalid.  Further, *Nelson*'s
> statement that "method-of-execution challenges [] fall at the margins of habeas,"
> 541 U.S. at 646, 124 S.Ct. 2117, strongly suggests that claims such as Adams's
> can be brought in habeas.

*Adams*, 2011 WL 2803408, at *2.  As in *Adams*, Petitioner appears to challenge Ohio's

execution protocol as a general matter and rather than seeking to enjoin Ohio from executing him in the manner that Ohio currently intends. As in *Adams*, Petitioner nowhere concedes that Ohio ever could execute him in a constitutional manner. Accordingly, this Court declines Respondent's invitation to extend *Hill v. McDonough* or *Nelson v. Campbell*, to hold that method-of-execution challenges cannot sound in habeas corpus.

Respondent's assertion of a statute of limitations defense to Petitioner's claim misses the mark. To the extent that Petitioner's claim was presented to and addressed by the state courts, and set forth in the petition, Petitioner's claim is not time-barred. To the extent that Petitioner's new allegations have not been presented to the state courts and now arguably no longer can for purposes of federal habeas corpus, Respondent's assertion of a statute of limitations defense is unnecessary because Petitioner waived the new allegations.

In large part, the Court concludes that Petitioner's claim is not properly before this Court. The evolving nature of method-of-execution challenges does <u>not</u> relieve an inmate who chooses to litigate that claim via federal habeas corpus of the obligations to present the essence of the claim to the state courts and to plead the essential facts and legal arguments in his petition. A petitioner "fairly presents" the "substance of his federal habeas corpus claim" when the state courts are afforded sufficient notice and a fair opportunity to apply controlling legal principles to the facts bearing upon the constitutional claim. *Anderson v. Harless*, 459 U.S. 4, 6 (1982). With respect to the question of whether, or to what extent, new facts or evidence not presented to the state courts can affect a petitioner's ability to present that claim to the federal courts, the Sixth Circuit has held that the new facts or evidence presented in conjunction with the claim must not place that claim in a "significantly different posture" than that presented to the state courts. *Sampson v. Love*, 782 F.2d 53, 55 (6th Cir. 1986).[21] The United States Supreme Court reached a

---

[21] The Sixth Circuit in *Sampson* addressed this issue in the context of exhaustion, concluding that a petitioner had presented new evidence sufficient to place his claim in a significantly different posture and that there were available state remedies for the petitioner to present his new evidence.

similar result in *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986), when it approved the district court's decision to direct the parties to supplement the record with updated, more expansive statistics regarding racial composition of the jury venire than the statistics that had been presented to the state courts.

In the instant case, the claim that Petitioner presented to the state courts in postconviction, that the state courts rejected on the merits, and that Petitioner pleaded in his petition is largely moot. It challenges, generally, an execution protocol that Ohio has since several times modified or replaced. The new allegations that Petitioner raises in his merit brief are not properly before the Court because Petitioner never presented them to the state courts and because Petitioner never sought leave to amend his petition to add them.

Even assuming that Petitioner's claim–as set forth in his petition or as modified in his merit brief–were properly before this Court,[22] the Court would be compelled to deny it on the merits. In short, Petitioner has not (and cannot) cite to any clearly established federal law as determined by the United States Supreme Court holding that lethal injection constitutes cruel and unusual punishment, or violates the rights to due process or equal protection. In *Fitzpatrick v. Bradshaw*, where the petitioner asserted a claim asserting that lethal injection violated the petitioner's rights to protection from cruel and unusual punishment and to due process of law, a sister court within the Sixth Circuit rejected it as follows:

> Fitzpatrick does not provide this Court with any citation to case law in which lethal injection was found to be cruel and unusual punishment. No court has found this method of execution to be constitutionally impermissible. The Sixth Circuit has even commented that at this time, lethal injection "is the law of the republic." *Alley v. Little*, 2006 WL 1313365 * 2 (6th Cir. 2006); *Adams v. Bradshaw*, 484 F.Supp2d 753, 796 (2007). This Court also notes, that recently the U.S. Supreme Court upheld the constitutionality of a lethal injection protocol similar to that used in Ohio. *Baze v. Rees*, 553 U.S. 35, 128 S.Ct. 1520, 170

---

[22] The claim that Petitioner presented to the state courts in postconviction, that the state courts rejected on the merits, and that Petitioner pleaded in his petition is properly before the Court. Although the essence of the claim is moot, as it references features of an execution protocol that Ohio has several times since modified or replaced, to the extent that it raises a general constitutional challenge to execution by lethal injection, it is properly before the Court for a decision on the merits.

L.Ed.2d 420 (2008). This claim is without merit.

No. 1:06-cv-356, 2008 WL 7055605, at *62 (S.D. Ohio Oct. 14, 2008); *see also Hand v. Houk*, No. 2:07-cv-846, 2011 WL 2446383 , at *113 (S.D. Ohio Apr. 25, 2011); *Hanna v. Ishee*, No. C-1:03-cv-801, 2009 WL 485487, at *52-53 (S.D. Ohio Feb. 26, 2009). Not even this Court's recent decision in *Cooey v. Kasich* granting Smith's motion for a temporary restraining order and preliminary injunction staying his execution bolsters Petitioner's claim. Nos. 2:04-cv-1156, 2:09-cv-242, 2:09-cv-823, & 2:10-cv-27, 2011 WL 2681193 (S.D. Ohio Jul. 8, 2011). The decision does not constitute clearly established federal law as determined by the Supreme Court. And in granting the Plaintiff-Intervener's motion for a temporary restraining order and preliminary injunction staying his execution, this Court did not hold that Ohio's execution procedure was unconstitutional. 2011 WL 2681193, at *34. Rather, the Court concluded only that the Plaintiff-Intervener had a substantial likelihood of succeeding on the merits of his claim that Ohio's execution procedure violates the Equal Protection Clause. *Id.*

Of course, nothing in this Court's Opinion and Order prevents Petitioner from attempting to challenge Ohio's execution procedure in a 42 U.S.C. § 1983 action, either by initiating his own action or seeking leave to intervene in the *Cooey/Biros* litigation.

For the foregoing reasons, the Court **DENIES** Petitioner's twentieth ground for relief.

The Court likewise concludes that Petitioner's twentieth ground for relief does not meet the requirements for a certificate of appealability. Because much of Petitioner's claim is not properly before the Court and because even a properly raised claim has no clearly established federal law supporting it, reasonable jurists could not find this Court's decision debatable or wrong. The Court denies a certificate of appealability on Petitioner's twentieth ground for relief.

## VI. Conclusion

For the reasons that the Court discussed in Section II above, the Court **DENIES** Petitioner's motion for an evidentiary hearing (ECF No. 59) and **GRANTS** Respondent's motion for reconsideration of the Court's order granting Rule 7 expansion of the record (ECF No. 65).

The Court also **DENIES** Petitioner's habeas corpus claims, **DISMISSES** this action, and **DIRECTS** the Clerk to enter judgment accordingly.

The Court further **CERTIFIES FOR APPEAL** grounds one, two, five, seven, eight, ten, eleven, and thirteen.

**IT IS SO ORDERED.**

    /s/   Gregory L. Frost
GREGORY L. FROST
UNITED STATES DISTRICT JUDGE

192